## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **MOBILE MED WORK HEALTH SOLUTIONS, INC.; JLL VENTURES, INC.; and M-M WHS LLC** | § § § § § § § § § | Case No.  1:24-CV-1219 <br><br> Judge: |
| *Plaintiffs,* | § § § § § § | **COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE SECURITIES LAWS AND APPLICATION FOR PRELIMINARY INJUNCTION** |
| **v.-** | § § § | **JURY TRIAL DEMANDED** |
| **JOSHUA MOORE; CORY RODRIGUEZ; NFN8 GROUP, INC.; NFN8 HOLDINGS, LLC; NFN8 CAPITAL, LLC; NFN8 MEDIA, LLC; NFN8 FOUNDATION; and CRYPTOTECH HOLDINGS, LLC;** | § § § § § § § § § § § | |
| *Defendants.* | § § § § § | |

Plaintiffs Mobile Med Work Health Solutions, Inc. ("Mobile Med"),  JLL Ventures, Inc. ("JLL"), and M-M WHS LLC ("M-M WHS") (collectively, "Plaintiffs"), by their undersigned attorneys file Plaintiffs' Complaint against NFN8 Group, Inc. ("NFN8 Group"), NFN8 Holdings, LLC ("NFN8 Holdings"), NFN8 Capital, LLC ("NFN8 Capital"), NFN8 Media, LLC ("NFN8 Media"), NFN8 Foundation, Cryptotech Holdings, LLC ("Cryptotech" and, collectively, with NFN8 Holdings, NFN8 Group, NFN8 Media, and NFN8 Foundation, "NFN8 Defendants"), Joshua Moore ("Moore"), and Cory Rodriguez ("Rodriguez") (all collectively, "Defendants"). Plaintiffs allege the following based upon personal knowledge as to Plaintiffs' own acts and statements, and information and belief as to all other matters, based upon, without limitation, documents relating to Plaintiffs' interactions with Defendants, a review of NFN8's public documents and disclosures, publicly available information, including information on the Internet, and statements by Defendants.

Plaintiffs' claims include claims for statutory equitable relief arising from Defendants' unauthorized and unlawful fraudulent transfers under the Texas Uniform Fraudulent Transfers Act ("TUFTA") and, under TUFTA, warrant statutory  provisional remedies, including an order of attachment freezing Defendants' assets, including all bank and brokerage accounts for all Defendants (including the accounts of all NFN8 entities and the personal accounts of Moore and Rodriguez), and preliminary and permanent injunctive relief to prevent the unlawful movement or waste of assets, and further harm to Plaintiffs.  Plaintiffs also seek actual and exemplary damages in connection with Defendants' intentional fraudulent misconduct.

**<u>OVERVIEW</u>**

I. **SUMMARY OF THE ACTION**

1.      Combining a classic sale-leaseback scheme with the high-tech allure of the cryptocurrency mining industry, Defendants have perpetrated a massive, multi-year securities fraud on Plaintiffs and Defendants' other investors.

2.      Specifically, Moore, Rodriguez, and each NFN8 Defendant induced Plaintiffs to enter into a series of fraudulent cryptocurrency mining sale-leaseback investments (the "Sale Leaseback Securities"), marketing these securities through a litany of intentional misrepresentations and calculated fraudulent omissions.

3.      Then, when the time came for Defendants to make good on their first obligation to repurchase Plaintiffs' machines, they defaulted.

4.      Because of Defendants' default and their claimed inability to pay, Plaintiffs suggest an enterprise at or past the brink of collapse, Plaintiffs seek an expedited preliminary injunction freezing all Defendants' and any other related entities' assets to ensure that no further wasting of assets from which Defendants will pay a judgment in this case.

5.      From June 2021 to May 2024, Plaintiffs invested over $10 million in Defendants' fraudulent scheme. Under Defendants' Sale Leaseback Securities fraud scheme, Defendants claimed that the money Plaintiffs and others invested would be used to purchase specific, identifiable cryptocurrency mining machines with individual serial numbers. Plaintiffs then would lease these crypto miners to Defendants for a fixed term, usually five years.

6.      Supposedly, the Sale Leaseback Securities Plaintiffs purchased would provide Plaintiffs with a guaranteed return of between 22% and 36% annually, depending on the

investment.[1] Defendants were to provide Plaintiffs with this guaranteed return first by making periodic lease payments equivalent to the guaranteed return, and then by buying back (i.e., "repurchasing") the underlying cryptocurrency mining machines from Plaintiffs at the original purchase price at the end of the lease term.

      7.      But the Sale Leaseback program was a complete fraud, built on lie stacked upon lie.  Among other deceptions, Defendants lied to Plaintiffs over the three-year period in which Plaintiffs invested in the following ways:

    a.   **Lie:** Defendants told Plaintiffs that the crypto miners they supposedly purchased cost between $20,000 and $30,000 apiece.  **Truth:** the miners Defendants claim to have bought—assuming that they bought any—cost $5,000 or less, a fraction of what Defendants represented.

    b.   **Lie:**  Defendants told Plaintiffs that Plaintiffs' funds would be used exclusively to purchase miners.  **Truth:** A substantial portion of Plaintiffs' funds were used for other purposes, including—by Defendants' own post-investment admission—paying for new facilities.

    c.   **Lie:** Defendants told Plaintiffs that they had obtained "significant investments from corporations, institutional entities, or financially sophisticated investors."  **Truth:** There were no such "significant investments;" Defendants provided Plaintiffs with information over time from which Plaintiffs were ultimately able to determine that

---

[1] As described further below, Plaintiffs made a series of nine investments in Defendants' securities. The first was to pay Plaintiffs an annualized return of 22%, and the last (solicited by Defendants when they were desperate for cash) was to pay Plaintiffs 36%.  All other investments were to pay Plaintiffs 24% annually.

their investments accounted for roughly 2/3 of Defendants' total sale/leaseback investments.

d. **Lie:** Defendants repeatedly claimed, including in 2023 and 2024, that they had never missed a monthly payment to investors.  **Truth:** Defendants suspended payments to other investors in 2023 and did not inform Plaintiffs of this fact. Moreover, at all times Defendants had reason to expect that they would miss payments, but they never disclosed this to Plaintiffs.

e. **Lie:** Defendants claimed that they had reserved sufficient cash to make the balloon repurchase payments at the end of the lease term.  **Truth:** Plaintiffs did not reserve such funds, a truth that became shockingly apparent when Defendants stopped making all lease payments just two months after they represented this to Plaintiffs.

f. **Lie:** Defendants claimed that they ordered, built, and frequently upgraded customized mining machines for their investors that gave them a competitive advantage over standard commercially available miners.  **Truth:** To the extent Defendants purchased and deployed mining equipment at all, they purchased standard off-the-shelf miners that were not—and in fact could not be—upgraded.

g. **Lie:** Defendants claimed that NFN8 derived additional competitive advantages from being able to switch their cryptocurrency mining activities from one currency to another in real time.  **Truth:** Defendants' mining activity was limited to only one

cryptocurrency—Bitcoin—because the off-the-shelf miners Defendants purchased and deployed were only capable of mining that currency.[2]

h. **Lie:** Defendants helped to "invent" the crypto mining industry and "led" that industry. **Truth:** These claims were false. Defendants never invented nor led the crypto mining industry. If Defendants participated in the industry at all, they were minor players on its fringes. Indeed, if Defendants' representations to Plaintiffs regarding the number of miners they actually own are accurate, Defendants *at most* have a Bitcoin-mining market share of around one tenth of one percent (0.1%).

8. Defendants' public representations are calculated to reinforce the lie that investing in NFN8 Defendants' Sale Leaseback Securities was risk-free. For example, NFN8 Defendants claim that:

- NFN8 Defendants' "system has thrived in all market conditions;"

- NFN8 Group "has prospered in the worst worldwide pandemic in a century;"

- NFN8 Group "has consistently lived up to its mission of delivering winning opportunities in the form of *predictable and reliable* cash flow to all of their clients." (emphasis added).

None of these claims are true.

9. Defendants also lied repeatedly about the success of their business model. For example, when attempting to justify a potential reduction in the guaranteed rate of return they were offering to Plaintiffs, Rodriguez informed Plaintiffs' principal on a telephone call in or about

---

[2] More accurately, the machines Defendants purchased were capable of mining cryptocurrencies using only the SHA-256 hashing algorithm. Although there are a few highly obscure (and thus commercially insignificant) currencies other than Bitcoin using this algorithm, Bitcoin and Bitcoin Cash are the only commercially viable SHA-256 cryptocurrencies.

February 2022 that NFN8 had attracted significant interest in the Sale Leaseback Securities from large, institutional investors.  Rodriguez told Plaintiffs that the presence of these larger players in Defendants' sale/leaseback business would require Defendants to lower their rate of return.

10.     But Defendants had attracted no institutional investors.  Indeed, several months later, Plaintiffs' principal learned from one of NFN8 Defendants' employees that Plaintiffs' purchases of Sale Leaseback Securities accounted for approximately two-thirds of *all* of NFN8 Defendants' lease payment obligations.

11.     In July 2024, Defendants' house of cards came crashing down when Defendants defaulted on all of their monthly lease payment obligations to Plaintiffs.  Not only that, Defendants failed to make good on their promise to pay back $1,020,000 in principal due to Plaintiffs at the end of their first lease term. Only then did Plaintiffs and their counsel discover that Defendants were perpetrating a massive fraud.

12.     Defendants' recent conduct, which has become even more egregious, constitutes a violation of the Texas Uniform Fraudulent Transfer Act ("TUFTA"). In May 2024, Plaintiff M-M WHS LLC executed a purchase agreement with NFN8 Capital, LLC ("NFN8 Capital Purchase Agreement") and simultaneously entered into a lease agreement with NFN8 Holdings, LLC ("Holdings").

13.     Under the NFN8 Capital Purchase Agreement, M-M WHS paid NFN8 Capital $1 million in exchange for what NFN8 Capital described as "50 Infinite Miner(s)."  Under the M-M WHS/NFN8 Holdings lease agreement ("NFN8 Holdings Lease"), NFN8 Holdings (1) was to lease the 50 "Infinite Miners" back from M-M WHS for forty months, paying M-M WHS fixed monthly amounts in exchange for the right to mine cryptocurrency with M-M WHS's miners, and

Case 1:24-cv-01219-RP   Document 1   Filed 10/10/24   Page 8 of 61

(2) had an obligation to purchase all 50 miners back from M-M WHS at the end of the 40-month lease term for their full original purchase price.

14.     In sum, Plaintiff M-M WHS's May 2024 Sale Leaseback Securities purchase gave Defendant NFN8 Capital $1 million with which it was to purchase miners it would then allow NFN8 Holdings to use for cryptocurrency mining.  The Lease Agreement also obligated NFN8 Holdings to make lease payments to M-M WHS and ultimately to buy back the equipment using some of the revenue it generated from its mining activity to fund those obligations.

15.     Plaintiffs' May 2024 investment took place just two months before Defendants' first lease, executed in June 2021, was to expire (and thus their first approximately $1 million end-of-lease principal payment to Plaintiffs was coming due) in July 2024.  Defendants approached Plaintiffs seeking that investment in mid-May 2024, but Plaintiffs were wary about investing because they were concerned that Defendants might simply use the proposed $1 million investment made in May of 2024 to make the end-of-lease buyback payment two months later instead of using the funds to buy additional new miners.  Defendants reassured Plaintiffs that the new $1 million investment would not be used to make the end-of-lease payment because "that would be a Ponzi scheme" and that Defendants kept funds in reserve to make the end-of-lease payments.  After receiving these reassurances and a more favorable rate of return from Defendants, M-M WHS completed its investment on May 24, 2024.

16.     Two short months later, Defendants defaulted on *all* of their lease obligations to Plaintiffs.  That is, they failed to return to Plaintiffs their initial approximately $1 million principal

investment and failed to pay Plaintiffs further monthly lease payments on any of the leases. As of this filing, Defendants still have not made any of their required payments since June 2024.

17.     Defendants' principals refused to provide plausible—much less verifiable—explanations for their defaults in response to Plaintiffs' repeated requests. Despite Defendants' attempt to hide the ball, Plaintiffs' initial negotiations with Defendants were revealing in one respect. These negotiations revealed that Defendants likely had not used Plaintiffs' $1 million on new miners, but instead used the money in part (at least according to Defendants) to pay for new facilities.

18.     It is clear, therefore that Defendants violated TUFTA in at least two ways. First, NFN8 Holdings accepted from NFN8 Capital an obligation for approximately $2.2 million in lease payments and equipment buyback responsibilities *without receiving the mining assets that would support that obligations by generating revenue from which NFN8 Holdings could pay M-M WHS.* Second, NFN8 Capital diverted Plaintiffs' $1 million investment to purposes for which it was not intended; NFN8 Capital's transfer of those funds thus leaves it with an obligation to purchase miners but without the cash to do so.

19.     Remedying these violations of TUFTA necessitates provisional remedies, including an order of attachment freezing Defendants' assets, including all bank and brokerage accounts for all Defendants (including each of the NFN8 entities and the personal accounts of Moore and Rodriguez), and preliminary and permanent injunctive relief to prevent the unlawful movement or waste of assets, and further harm to Plaintiffs. These remedies are also warranted because Plaintiffs have sought the equitable remedy of rescission, and a freeze of Defendants' assets will best serve rescission's goal of restoring Plaintiffs to their original position prior to Defendants' fraud.

20.     Defendants' entire business is fraudulent.   Defendants claim that they have discovered the "secret sauce" to making money in the cryptocurrency market.   In reality, they are nothing more than typical sale-leaseback fraudsters, massively overcharging Plaintiffs and other investors for equipment that may or may not exist, then using the funds they raise both to enrich themselves and to make Plaintiffs' and other investors' monthly lease payments until the money runs out.

## II.     PLAINTIFFS' INVESTMENTS IN NFN8

21.     Beginning in 2021, Defendants approached Dr. Justin Lo, M.D. ("Dr. Lo") about an investment in the Sale Leaseback Securities.   Dr. Lo is a senior control person for each of Plaintiffs.   Dr. Lo is not a lawyer or an investment professional.

22.     Plaintiffs began investing with Defendants in the spring of 2021.   The chart below sets out the date of purchase, purchase price, Sale Leaseback Securities purchased, and contractual end of payment (i.e., end-of-the-lease term) for each of Plaintiffs' investments.

| SALE LEASEBACK SECURITIES PURCHASE DATE | PURCHASE PRICE (TO NFN8 MEDIA OR NFN8 CAPITAL) | NUMBER OF MINER UNITS | MONTHLY "LEASE" PAYMENT (FROM CRYPTOTECH OR NFN8 HOLDINGS) | TERM OF "LEASE" (MONTHS) | CONTRACTUAL PAYMENT END (PURCHASE PRICE DUE FROM CRYPTOTECH OR NFN8 HOLDINGS) |
|---|---|---|---|---|---|
| 6/28/2021 | $1,020,000 | 34 | $18,700[3] | 36 | 7/26/2024 |
| 3/18/2022 | $1,020,000 | 34 | $20,400 | 60 | 3/26/2027 |
| 5/20/2022 | $1,020,000 | 34 | $20,400 | 60 | 5/28/2027 |
| 5/20/2022 | $1,020,000 | 34 | $20,400 | 60 | 5/28/2027 |
| 8/19/2022 | $2,040,000 | 68 | $40,800 | 60 | 8/27/2027 |
| 12/22/2022 | $1,020,000 | 34 | $20,400 | 60 | 2/23/2028 |
| 3/23/2023 | $1,020,000 | 34 | $20,400 | 60 | 6/30/2028 |
| 3/23/2023 | $1,020,000 | 34 | $20,400 | 60 | 6/30/2028 |
| 5/24/2024 | $1,000,000 | 50 | $30,000 | 40 | 10/29/2027 |

23.    From June 28, 2021 to May 24, 2024, Plaintiffs made nine investments in the Sale Leaseback Securities, totaling $10,180,000.  One investment was in the amount of $2,040,000, seven investments were in the amount of $1,020,000, and the final investment was in the amount of $1,000,000.  Mobile Med and JLL each currently hold Sale Leaseback Securities with an original purchase price of $1,020,000.  M-M WHS currently holds the other Sale Leaseback

---

[3] For this security, NFN8 was to pay $56,100 quarterly, which equates to $18,700 monthly.

Securities at issue, with an aggregate original purchase price of $8,140,000.    Following Defendants' requests to do so, Plaintiffs transmitted funds to purchase each of the Sale Leaseback Securities across state lines via ACH and/or wire transfers.[4]

## III.    DEFENDANTS' FRAUDULENT SECURITIES INVESTMENT SCHEME

24.    Through these investments, Plaintiffs collectively became the largest investor in NFN8 by a wide margin.  Plaintiffs understand that they currently own approximately two-thirds of the total outstanding Sale Leaseback Securities issued by NFN8.

25.    Defendants never let on that they were so reliant upon Plaintiffs. To the contrary, Defendants bragged repeatedly about the breadth and depth of their roster of investors.   As described in detail below, in written promotional materials called a "Company Overview," Defendants falsely touted substantial investments from sophisticated institutional investors in order to portray NFN8 as a highly vetted company that appealed even to the most knowledgeable financial experts.   These claims were materially false.

26.       As a result, Defendants failed to inform Plaintiffs of their complete dependence on

---

[4] Although there is language in the fraudulently obtained contracts committing certain related matters to JAMS arbitration, Plaintiffs contend that its claims are not subject to these clauses. More important for present purposes, even if Plaintiffs are ultimately incorrect regarding the arbitrability of certain of their claims, the arbitration clauses in question call for arbitration under JAMS rules.  Even in contexts involving requests for emergency relief, the JAMS rules do not permit ex parte action of the sort Plaintiffs need and seek here to ensure that fraudster Defendants do not dissipate or waste assets in the time between provision of notice and the Emergency Arbitrator's decision.   Compare JAMS Comprehensive Arbitrations Rules and Procedures §2(c) (authorizing emergency relief but requiring notice to opposing parties and requiring only that Emergency Arbitrator set a schedule for consideration of emergency relief request "[w]ithin two business days, or as soon as practicable thereafter" with FED. R. CIV. P. 65(b) (authorizing district courts to issue TROs without notice on showing of immediate and irreparable injury and for good cause.)  Moreover, the last three leases that Plaintiffs executed specifically permit the parties to seek "provisional remedies in aid of arbitration from a court of appropriate jurisdiction."  And the Fifth Circuit has held that a district court has jurisdiction to order temporary equitable relief pending ruling on a motion to compel arbitration. *Janvey v. Alguire*, 647 F.3d 585, 593 (5th Cir. 2011).

Plaintiffs, all the while soliciting Plaintiffs repeatedly to invest additional funds in NFN8 Sale Leaseback Securities—funds that Plaintiffs now know NFN8 needed not to buy more mining machines, but to sustain its charade.

27.     Defendants solicited and sold the Sale Leaseback Securities based on materially false statements regarding NFN8 Defendants' business operations and materially false statements regarding the risks inherent to the investments, simultaneously hiding from Plaintiffs the fact that the Sale Leaseback Securities were a fraud *at inception*.

28.     According to the Sale Leaseback agreements, Plaintiffs purchased 356 crypto miners—miners that were supposed to be "the same specified computer equipment that the Company owns and uses." Even if all 356 miners Plaintiffs purportedly purchased from Defendants actually existed, NFN8 secretly marked up the purchase price of each miner so that Plaintiffs and other investors paid NFN8 Defendants many times the retail price of the devices. Defendants never told Plaintiffs this was the case, and in fact took extensive affirmative steps to ensure that neither Plaintiffs nor other investors would be able to uncover this material lie of omission.

29.     For example, instead of providing Plaintiffs with Bills of Sale identifying the specific off-the-shelf mining machines Defendants purportedly purchased on Plaintiffs' behalf, Defendants provided Plaintiffs with Bills of Sale and other documents identifying the machines as "Infinite Blockchain Miners" or "Infinite Miners," along with impressive-looking but ultimately nonsensical lists of hardware they claim went into each purportedly custom miner.  Defendants' obfuscation and undisclosed markup of commercially available miners dramatically reduced the potential economic value available to Plaintiffs under the Sale Leaseback Securities.

30.     NFN8 claimed that its miners were so expensive because they were highly

advanced cutting-edge devices, not widely available in the marketplace, and that NFN8 had a unique ability to procure miners at *below*-market prices from manufacturers because of the vast scale of its operations and its ability to purchase miners in bulk.

31.     These statements were all untrue.

32.     NFN8 purchased miners widely available in the marketplace that were not unusual in any respect and, in fact, cost $5,000 or less per machine.  NFN8 Defendants sold most of the miners to Plaintiffs for $30,000 apiece, only reducing the price to $20,000 per miner for the last 50 miners, when Defendants were desperate for Plaintiffs' cash in May 2024.

33.     Far from the $30,000 per miner that Defendants charged Plaintiff, numerous investor relations press releases from publicly-traded cryptocurrency mining companies demonstrate that the volume-discounted prices for new miners have typically ranged from $1,700 to $4,500 during the relevant time period.   *See, e.g.,*   https://ir.mara.com/investors/news-events/press-releases/detail/1251/marathon-digital-holdings-purchases-30000-s19j-pro-bitcoin-miners-from-bitmain (2021: 30,000 miners for $120.7 million, or $4,023 per miner); https://theminermag.com/news/2023-12-04/riot-bitcoin-miner-whatsminer-microbt/ (2023: 66,560 miners for $290.5 million, or $4,364 per miner); https://ir.strongholddigitalmining.com/news-releases/news-release-details/stronghold-announces-addition-1-ehs-through-bitcoin-miner (2023: 5,000 miners for $8.5 million, or $1,700 per miner).

34.     NFN8's claim to have a large market presence such that it could procure special miners unavailable to others was also a complete fabrication.  In fact, NFN8 has always been a relatively small cryptocurrency mining operation, dwarfed by other businesses in the space.

35.     Indeed, no NFN8 Defendant appears on any list of the top Bitcoin miners, and the top ten publicly-traded Bitcoin miners each have market capitalizations in excess of $1 billion.

According to publicly available sources, the largest publicly-traded Bitcoin miner—Marathon Digital Holdings—operates almost 240,000 individual Bitcoin miners.  The second-largest—Core Scientific—operates approximately 214,000 miners, and the third-largest miner operates 163,000 individual machines.

36.    By contrast, NFN8 has represented to Plaintiffs that it currently owns approximately 6,000 miners on its own account, and that it claims to have spent approximately $31 million to buy miners from 2021 through 2024.  This confirms, once again, that Defendants grossly overcharged Plaintiffs, as the average price per miner would have been around $5,000, *one-sixth of what NFN8 charged Plaintiffs* for the vast majority of the miners that Plaintiffs supposedly purchased.

37.    But even the $5,000 per-miner figure likely overstates the actual purchase price of the miners NFN8 claims to have bought for their investors.  In mid-2022, NFN8 Defendants began operating "BlockOverstock.com," a website offering NFN8's "new and seasoned" miners for sale. *See*  https://blockoverstock.com/machine-line-up/.  Accordingly, because Defendants have purportedly supplied Plaintiffs with both their *current* number of miners and the total amount they have spent on miners since 2021, any miners that have already been sold through Block Overstock would further reduce the average per-miner price paid by Defendants for the relevant machines.

38.    Defendants' Block Overstock website also offers further confirmation that Defendants purchase and deploy only standard off-the-shelf miners. The site currently solicits potential customers by saying, "Just let us know how many you'd like, and which type(s), and the site's "Show Me the Miner's" [sic] tab identifies only three standard, commercially available Bitmain Antminer machines (the S19, the S19j Pro, and the S19 Pro) as being on offer.

39.    NFN8's fraud only became apparent recently.  On or about May 24, 2024, NFN8

solicited a further $1,000,000 investment from M-M WHS in the Sale Leaseback Securities. Before making this investment, Dr. Lo made a pointed inquiry, and with good reason: Dr. Lo knew that, under the terms of his very first 36-month Sale Leaseback Securities purchase from NFN8 Defendants, Plaintiff Mobile Med was due a $1,020,000 balloon payment to "repurchase" the miners it purchased under its first Sale Leaseback agreement, just a few weeks later, on July 26, 2024.  Accordingly, Dr. Lo wanted to make sure that the proceeds from M-M WHS's $1,000,000 investment, would not simply be "round-tripped" to Mobile Med, such that Plaintiffs would effectively be paying themselves instead of NFN8 Defendants' making the payment as required. In response to Dr. Lo's inquiry, Defendant Rodriguez assured Dr. Lo that nothing of the sort would happen because "that would be a Ponzi scheme."

40.    Rodriguez also assured Dr. Lo that, because the expiration of the Mobile Med contract and the repurchase obligation were known far in advance, NFN8 had funds set aside and readily available to complete the repurchase. While soliciting the May 2024 investment during a 27-minute telephone call on May 7, 2024 that started at 2:10 p.m. Pacific Time, Rodriguez repeatedly told Dr. Lo the purportedly perpetual profitability of the NFN8 business enabled NFN8 to set aside ample cash to meet all of NFN8's obligations.

41.    Throughout the fraudulent scheme, statements of this sort have been integral to Defendants' efforts to deceive Plaintiffs and other investors. Defendants not only made such statements to Dr. Lo, but have made them to numerous other investors and potential investors in phone/video conversations. They even make similar statements in NFN8's written marketing materials. The clams were false – it has now become clear that NFN8 did not have funds set aside to pay the repurchase amounts or lease amounts. Indeed, Defendant Moore recently admitted NFN8 did not set aside money to pay its obligations.

42.     A "round trip" payment of Plaintiffs' May 2024 $1,000,000 investment to satisfy NFN8 Defendants' July 2024 "buyback" obligations would have been bad enough. But what actually happened was even worse.

43.     On July 19, 2024, Defendants announced that not only would they not make satisfy their repurchase payment obligation by July 26, 2024, but that NFN8 Defendants would stop all lease payments to Plaintiffs entirely.  This announcement came without any advance warning.  In fact, NFN8 Defendants took Plaintiffs' last $1,000,000 investment in May 2024 and after that made no subsequent lease payments.

44.     Following the defaults, Plaintiffs asked Defendants to provide an explanation. Defendants have been evasive and withheld material information from Plaintiffs. It appears that M-M WHS's investments in Sale Leaseback Securities were not used to purchase crypto miners as required under the Offering Documents but have been routinely diverted for other purposes. At no time has NFN8 provided any information that would suggest, support, or in any way imply that the probability of the July 2024 default was not known to Rodriguez and NFN8 well before M-M WHS's May 24, 2024 investment.

45.     This is an unambiguous case of securities fraud that calls for the strongest of legal consequences for Moore, Rodriguez, and NFN8.  The fraud is pervasive—almost every material promise, assurance, and expectation made by Defendants has been materially untrue and intended to deceive Plaintiffs.  Defendants lied to secure Plaintiffs' money, kept lying to cover up what they were doing and to secure yet more money from Plaintiffs, and even lied after the defaults about the reasons that they occurred.  Defendants did not use Plaintiffs' money as they promised and diverted it for other purposes, including, for example, purportedly building out new mining facilities and, on information and belief, paying other investors and personally enriching Moore

and Rodriguez.  Defendants had none of the special capabilities that they advertised.  It is not an overstatement to conclude that the primary purpose of the NFN8 business enterprise was to swindle investors and to enrich Moore and Rodriguez.

46.     Given Defendants' pervasive wrongdoing, the opacity of its business structure and operations, and its ongoing attempts to conceal its operations from Plaintiffs, there is palpable risk that Defendants will commit further wrongdoing to prevent recovery by Plaintiffs and to further enrich Moore and Rodriguez. As such, this is a case that, in addition to damages, calls out provisional remedies to prevent further unlawful conduct that irreparably harms Plaintiffs. Such remedies should include a freeze of Defendants' assets, including without limitation a freeze of all bank and brokerage accounts for all Defendants (including the personal accounts of Moore and Rodriguez), and preliminary and permanent injunctive relief to prevent the unlawful movement or waste of assets, and further harm to Plaintiffs.

## IV.    NATURE OF THE ACTION

47.     This is a civil lawsuit by Plaintiffs, each of whom were investors in the Sale Leaseback Securities, against Defendants, each of whom offered or participated in the offering of the Sale Leasebacks Securities to Plaintiffs.

48.     Plaintiffs seek provisional remedies as described above.

49.     The Sale Leaseback Securities offered by Defendants or any other salespersons acting on Defendants' behalf are securities within the meaning of the Securities Exchange Act of 1934 ("Exchange Act").  Under the Exchange Act §3(a)(10), and 15 U.S.C. §78c(a)(10) the term "security" includes, but is not limited to, any note, evidence of indebtedness, or investment contract. Sale Leaseback Securities are considered securities under the law, because they are investment contracts that include evidence of indebtedness. *See United States v. Jones*, 450 F.2d 523, 525 (5th Cir. 1971) (finding "[t]he term "evidence of indebtedness" embraces [documents

that] on their face establish a primary obligation to pay the holders thereof a sum of money").  An investment contract is a security if "the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *See S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946). Plaintiffs invested substantial up-front amounts into Defendants' investment vehicles, with the express assurance and expectation they would receive regular payments from NFN8 and a return of their principal at the end of the investment. In sales and marketing materials, including written materials, Defendants portrayed the investments as providing very high, practically assured net annual returns in excess of 20%. Defendants' representatives have admitted that the Sale Leaseback Securities are, in fact, securities under both federal and Texas law.

50.    Plaintiffs seek to recover compensatory damages caused by the Defendants' violations of the federal securities laws and to pursue remedies under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

51.    Plaintiffs also seek to recover compensable damages caused by Defendants' violations of Texas state securities laws and to pursue remedies under Tex. Gov't Code Ann. § 4008.052 and § 4008.055.

52.    Plaintiffs also seek to recover compensative and treble damages caused by Defendants violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962, et seq.

53.    Plaintiffs also seek recovery under common law for fraud, conversion, conspiracy, and unjust enrichment, including punitive damages to the extent applicable.

54.    Plaintiffs also seek rescission and restitution to the extent applicable.

V.    **JURISDICTION AND VENUE**

55.    The claims asserted herein arise under and are pursuant to Section 10(b) of the

18

Exchange Act and Rule 10b-5 thereunder, as well as the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See* 28 U.S.C. § 1331; 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5 (2014); 18 U.S.C. §§ 1961-68. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

56.     Specifically, this Court has original jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, because the action arises under §27 of the Exchange Act (15 U.S.C. § 78aa(a) and under RICO, 18 U.S.C. § 1962(c) *et seq*.

57.     This Court has supplemental jurisdiction over all other non-federal question claims pursuant to 28 U.S.C. § 1367 because the other claims are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

58.     Venue is proper in the Western District of Texas pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs claims occurred in this Judicial District.

59.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and use of the Internet across state lines.

## VI.    PARTIES

60.     Plaintiff Mobile Med Work Health Solutions, Inc. is a California corporation with its principal place of business in Santa Clara County, California.

61.     Plaintiff JLL Ventures, Inc. is a California Corporation with its principal place of business in Santa Clara County, California.

62.     Plaintiff M-M WHS LLC is a California limited liability company with its principal

place of business in Santa Clara County, California.

63.     Defendant NFN8 Group, Inc. is a Nevada Corporation with its principal place of business in Austin, Texas.

64.     Defendant NFN8 Holdings, LLC is a Nevada limited liability company with its principal place of business in Austin, Texas.

65.     Defendant NFN8 Capital, LLC is a Nevada limited liability company with its principal place of business in Austin, Texas.

66.     Defendant NFN8 Media, LLC is or was a Texas limited liability company with its principal place of business in Austin, Texas.

67.     Defendant NFN8 Foundation is an entity formed under Texas law with its principal place of business in Austin, Texas.

68.     Defendant Cryptotech Holdings, LLC is or was a Texas limited liability company with its principal place of business in Austin, Texas.

69.     On information and belief, Moore is the Chief Executive Officer and a control person of the NFN8 business enterprise, and ultimately controls each of the entities named as defendants in this action.  On information and belief, Moore is domiciled within the Western District of Texas.

70.     On information and belief, Rodriguez is the Chief Operating Officer, Partner, and a control person of the NFN8 business enterprise; Rodriguez is also the principal salesperson for the NFN8 business enterprise. On information and belief, Rodriguez is domiciled within the Central District of California.

71.     Each Defendant was and is the agent, co-conspirator, employee, employer, or aider and abettor of one or more of the other Defendants. At all times herein mentioned, there has existed

20

and exists a unity of equitable and/or legal interest, ownership, and effective control among the Defendants, such that any individuality and separateness between or among them has ceased. Moreover, each such Defendant was and is the alter ego of each of the other Defendants and each of the Defendants was and is acting within the course and scope of such agency, and/or acting in furtherance of such conspiracy, and/or aiding and assisting one or more of the other Defendants in committing the wrongful acts alleged herein, and is liable to Plaintiffs as alleged herein.

72.     Individual Defendants Moore and Rodriguez have employed each of the Defendant Entities as a sham to perpetrate a fraud. As discussed below, Defendants formed and used these entities as a means to perpetrate a fraudulent scheme on Plaintiffs and others. Accordingly, the corporate fiction should be set aside.

## FACTUAL BACKGROUND

### I.     NFN8'S SECURITIES OFFERINGS

73.     The Sale Leaseback Securities are securities under the law and were described as securities in the contracts governing the investments (collectively, the "Offering Documents"). The investments were supposed to function as "sale-leaseback" transactions; each deal consisted of two contracts: (i) a Services and Purchase Agreement ("Purchase Agreement"); and (ii) a "Lease Agreement." The Purchase Agreements were similar in relevant part across all nine of Plaintiffs' investments, as were the Lease Agreements. The Lease Agreements and Purchase Agreements are collectively hereinafter, the "Offering Documents."

74.     In each Purchase Agreement, Plaintiffs purportedly purchased new, state-of-the-art computers specially procured by NFN8. These so-called "miners" were supposed to be able to

mine different cryptocurrencies at NFN8's command.[5]  Defendants said that they would "procure" (i.e., purchase) such miners, load the miners with software, and promptly set up the miners in NFN8 facilities to mine Bitcoin – a process by which computers can generate revenue by making complicated transactions.

75.    The contractual purpose of each Purchase Agreement was clear – the money received by NFN8 was to be used *only* for the purchase of miners and not for other purposes, such as to subsidize general overhead, pay management fees, or for any use by any affiliated entities with whom Plaintiffs did not contract.

76.    In all but one of Plaintiffs' investments, NFN8 charged Plaintiffs $30,000 per miner; accordingly, each $1,020,000 investment would involve the purchase of 34 miners.  For the final investment of $1,000,000 by M-M WHS in May 2024, Defendants agreed to lower the price to $20,000; so that final investment involved 50 miners.

77.    Defendants represented that this was a fair price for the miners and Defendants never suggested that they were overcharging Plaintiffs for the devices.  But, on information and belief, Defendants' representations were false; there was nothing particularly special about the miners, rather they were ordinary, commercially available devices that cost approximately $5,000.

78.    In their promotional materials, NFN8 Defendants expressly represent that each Sale Leaseback Securities purchaser "buys and owns the same specified computer equipment that the Company owns and uses."

79.    Plaintiffs learned of the true value of the miners they purportedly purchased only after Defendants defaulted. Following the defaults, Plaintiffs inquired about the value of NFN8's

---

[5] In reality, Defendants purchased only "Application-Specific Integrated Circuit" or "ASIC" machines, each of which could mine only Bitcoin variants.

assets to determine whether the defaults had been caused by a temporary cash flow issue (as Moore has recently claimed) or a more fundamental problem with the NFN8 business.  NFN8 refused to provide information regarding the *value* of its assets, and instead in trying to present itself as solvent and viable, stated that NFN8 owned miners that it initially *purchased* for $31,350,990.56. Of course, computers depreciate rapidly, and that is particularly true for miners, so the purchase price—even if accurate—provided little assurance.  In a separate email, again trying to claim it had valuable assets, NFN8 said it owned "over 6000 miners."  Accordingly, Defendants purchased miners for at most approximately $5,225 (*i.e.*, $31,350,991 divided by 6,000), or approximately one-sixth the amount ($30,000) for which they sold similar or identical devices to Plaintiffs.[6] This approximate 600% markup was never directly or indirectly disclosed by Defendants to Plaintiffs prior to Plaintiffs investing in the Sale Leaseback Securities. Plaintiffs' failure to disclose this vast markup made each transaction materially misleading. This failure to disclose also undermines Moore's claim that NFN8's cash flow issues are temporary and Defendants' claims that NFN8 continues to be creditworthy.

80.     In each Lease Agreement, NFN8 purportedly leased the miners that Plaintiffs had just purchased back to NFN8 for a fixed monthly fee. The term of most of Plaintiffs' NFN8 leases was 60 months, though Mobile Med's lease (i.e., the first of Plaintiffs' leases) was for only 36 months and M-M WHS's final lease (i.e., the last of Plaintiffs' leases) was for only 40 months.

81.     At the end of the lease, NFN8 is obligated to repurchase each miner from Plaintiffs at the original purchase price. These "repurchases" naturally create a significant financial

---

[6] As noted above, to the extent Defendants have sold machines through their BlockOverstock.com website, those sales would increase the total number of machines purchased for the $31 million and thus decrease the original average per-unit purchase price of the machines.  For example, if Defendants have already sold 500 total machines on BlockOverstock.com, their total average per-machine purchase price declines to $31,350,991/6500 = $4,823.23.

obligation for the NFN8 Defendants—they commit NFN8 Defendants to repurchase the miners for vastly more than they are actually worth—not only had NFN8 secretly marked-up the miners about 600% from the outset, but the value of those miners would decrease over the course of the leases and they would be used computer equipment, with relatively little value even relative to the amount NFN8 had paid for them. NFN8 never disclosed this financial risk to its business.

## II.  DEFENDANTS FRAUDULENTLY INDUCE PLAINTIFFS' INVESTMENTS IN NFN8 SECURITIES

82.    As described below, in written and oral promotional and sales communications over several years, NFN8 never accurately described the key attributes of the Sale Leaseback Securities it offered and sold, so Plaintiffs could make reasonable informed decisions about whether to invest with NFN8.

83.    Defendants failed to accurately describe without limitation NFN8's:

- actual use of money NFN8 generated from Purchase Agreements;

- the significant risk of default in the investments purchased by Plaintiff;

- cash flows and cash management issues (*i.e.*, NFN8 said it had more than ample cash flow, but in reality NFN8 was likely to have significant cash shortfalls relative to its lease obligations and other obligations);

- internal fees and expenses;

- inherent weaknesses of its business operation and competitive position (i.e., NFN8 claimed it had commercial advantages that it did not have and was, in fact, a "bit player" in a highly competitive industry in which NFN8 struggled);

- technical capabilities, including purportedly proprietary software that supposedly allowed NFN8 to both mine and trade cryptocurrency more profitably than other businesses;

- lack of ownership and/or control of state-of-the-art data centers;

- access to specially advantaged electrical service, including the lowest electricity rates in the nation for its mining machines;

24

- development of customized mining hardware that offered still further technological advantages over standard "off the shelf" miners;

- susceptibility to disruptions to NFN8's business operations caused by market forces;

- vulnerabilities to NFN8's business caused by the failure of business partners, including those housing NFN8's miners;

- salaries and bonuses paid directly or indirectly to Moore, Rodriguez, and other NFN8 personnel; and

- the routine transfers of money among NFN8 entities, without regard to the obligations owed to Plaintiffs.

**A.   Fraudulent Communications from Moore and Rodriguez**

84.     NFN8 failed to disclose default risk in the Offering Documents or in the sales process.  Rather than honestly and transparently describing NFN8's finances and the actual risks in play, NFN8 repeatedly lied to Plaintiffs and omitted important information in a materially misleading manner.

85.     For instance, in both written materials and sales conversations between Dr. Lo and Moore and/or Rodriguez, NFN8 repeatedly boasted that NFN8 had never missed payments to investors.  NFN8 made such claims to Dr. Lo repeatedly in an attempt to portray the Sale Leaseback Securities as safe, secure investments, to induce Dr. Lo to trust NFN8, and to secure Plaintiffs' ongoing stream of investments in the Sale Leaseback Securities.  These claims were misleading at all times and untrue for at least some of Plaintiffs' investments, because NFN8 had cash flow problems and defaults as early as 2023.

86.     Based on information acquired by Plaintiffs, it appears that although Defendants continued to make lease payments to Plaintiffs in 2023 and early 2024, they were not making lease payments to other investors, because Plaintiffs had been NFN8's largest source of funding and they wanted to present a false picture of financial stability to Plaintiffs before asking for more

money.

87.     The claimed ability of NFN8 Defendants to make lease payments in the past was not because Defendants had any special business strategy, technological capability, or trading acumen, as NFN8 consistently boasted.  Rather, Defendants were able to make lease payments because Plaintiffs had effectively injected massive amounts of excess cash into the NFN8 Defendants when those Defendants grossly overcharged Plaintiffs for the miners. That overpayment provided NFN8 Defendants liquidity to make lease payments for a significant period of time.

88.     NFN8 Defendants' sales process was also fraudulent. From the outset, NFN8 presented itself as considerably larger and more successful than it was. NFN8 claimed that it had special capabilities, strategies, and technologies that helped it generate cash flows and ensure the safety of investments. These statements were not true when made.

89.     NFN8 Defendants also serially overstated the breadth and depth of their investor base; for example, they continue to claim falsely in written promotional materials that their investors include "*institutional entities of all kinds*" while Plaintiffs now know that their own investments represent the majority of the Sale Leaseback Securities sales Defendants have secured.

90.     Moore and Rodriguez made false statements throughout Plaintiffs' dealings with Defendants.  In connection with the first deal, Moore (through his executive assistant, Christina Cantu) told Dr. Lo that, instead of acquiring new machines in connection with the deal, NFN8 would "allocate units out of NFN8's own" inventory:

> From: Christina Cantu <christina@nfn8.com>
> Sent: Tuesday, June 22, 2021 12:12 PM
> To: Justin Lo <justin@justinlomd.com>
> Cc: Josh Moore <josh@nfn8.com>

Subject: Serial Numbers for 34 Mining Farms - Justin Lo

Hi Justin,

We normally assign serial numbers out of the next batch of units that are shipped which we expect to land around July 15th. In your case *we are making an exception* and allocating units out of our own inventory. Below you will find the list of serial numbers that will also be on your Bill of Sale.

Of course these units are already up and running and are temporarily assigned to you until good funds are received.

(Emphasis added.)

91.     NFN8's statements were fraudulent and materially misleading because NFN8 was not making an exception in making this allocation.  NFN8 made similar "allocations" of miners (i.e., "units") in relation to other Purchase Agreements by Plaintiffs.

92.     While NFN8 claimed that it would "procure" state-of-the-art new machines, in fact —largely unbeknownst to Plaintiffs—it regularly moved old computers it already owned to investors, including Plaintiffs.  So, not only were the machines not remotely worth $30,000, since they likely could be purchased new for about $5,000, but in many instances NFN8 allocated computers worth far less than $5,000 because they were not new and were actually depreciated assets worth significantly less than $5,000.  Nevertheless, without disclosing to Plaintiffs the vast differential in price and value related to the miners or that this "allocation" was even more unfair to Plaintiffs and enriching to NFN8, NFN8 required Plaintiffs to pay $30,000 for each miner and only reduced this price to $20,000 for Plaintiffs' last purchase of Sale Leaseback Securities—at a time when Defendants were desperate for additional cash.

93.     In early 2022, as cryptocurrency prices fluctuated, NFN8 sent Dr. Lo an email

providing express assurances of the safety of NFN8's strategies:

> From: NFN8 Group <info@nfn8.com>
>
> Sent: Monday, January 24, 2022 1:12 PM
>
> To: Justin Lo <justin@justinlomd.com>
>
> Subject: Volatile Markets
>
> Hi Justin,
>
> When Financial Markets get roiled, we get worried calls, even though absolutely nothing has changed in our commitments to our clients, partners, and vendors.
>
> We understand and take your concerns seriously. You don't get to see our operations from the inside. You only hear talking heads on the news filling the hours with "attention grabbing" discussions.
>
> As we have often reported in our collateral materials and messages, Digital Assets and Cryptocurrency are volatile. Spikes and dips occur as this new marketplace matures and self regulates. We have experienced this before. ***We have anticipated and planned for these up and down cycles. We have never missed a payment to anyone for any reason in any market condition. We do not see any change in making consistent on time payments.***
>
> ***Please be assured, we will always communicate and update you as needed to keep you well informed***.

(Emphasis added.)

94.     On information and belief, these statements were fraudulent and materially misleading because (i) NFN8 had wholly inadequate internal controls, cash management, and risk management; (ii) NFN8 had reason to anticipate, at the time this statement was made, that it would

miss lease payments; and (iii) NFN8 failed to communicate in timely and commercially reasonable ways about problems with its business that would prevent NFN8 from making lease payments to Plaintiffs.  Moreover, lest NFN8 claim that these statements were true in January 2022 and only became inaccurate later, that is not the case.  NFN8 continues to make similar baseless assurances even after it NFN8 has missed payments to investors.

95.     Rodriguez emphasized the safety of the Sale Leaseback Securities offered by NFN8 in numerous telephone conversations and emails.  For instance, Rodriguez offered a "hard sell" to Plaintiffs for additional investments that was materially false:

> From: cory@nfn8media.com <cory@nfn8media.com>
> Sent: Wednesday, February 2, 2022 11:10 AM
> To: Justin Lo <justin@justinlomd.com>
> Subject: NFN8 Group
>
> Afternoon Justin,
>
> To Clarify your questions:
>
> The lease payments can be made from the combined resources of all our Companies. ***Our Companies earn between 8 and 9 times our lease expenses resulting in a net income of approximately 52%. While our lease holders do not participate directly in the profit. They currently earn between 17% and 22%. Our financial health speaks to the credit worthiness of NFN8 Group and its ability to pay lease holders which we have done consistently for almost five years, <u>never missing any payments, to anyone, for any reason in all market conditions</u>.***
>
> ***The 22% 5yr program will be terminated within the next couple of weeks.  This program is offering an internal rate return of 22% paid quarterly for 5yrs.  No***

*re-leasing, or early buyouts.  At the end of the term of the lease we buy back*
*100% for what you originally purchased. . . .*

(Emphasis added.)

96.     These statements were fraudulent and materially misleading because NFN8

Defendants:

- did not regularly earn between 8 and 9 times their lease expenses resulting in a net income of approximately 52%;

- had no basis in fact to expect that they could pay an internal rate of return of 22% on the investments and repurchase them for 100%;

- failed to disclose risks to the business and Plaintiffs in this and other communications;

- failed to describe the essential role in soliciting new investments to sustain lease payments and repurchases; and

- failed to disclose that the miners were being purchased at vastly inflated prices which affects both the economics of the deal (i.e., the return on investment) and the safety of the investments (i.e., since the miners provided security in the event of default and did not have value anywhere near the $30,000 purchase price of the miners).

97.     Rodriguez presented NFN8 as offering extraordinarily safe, very high-returning

securities with almost no downside risk. But Rodriguez had no reason to believe these statements

were true when he made the statements, because the existing cash flows of NFN8, the cash flows

likely to be produced from number and type of miners NFN8 operated, and the associated costs of

electricity that NFN8 paid (and other costs) made the statements manifestly unachievable.  The

defaults on NFN8's obligations to Plaintiffs and the prior defaults to other investors were thus

entirely predictable.

98.     In a phone conversation around the same time as Rodriguez's February 2022 email,

Rodriguez told Dr. Lo that NFN8 was terminating the 5-year program because of the extremely

high level of purported interest in the Sale Leaseback Securities from institutional investors. Rodriguez said that these supposed institutional investors were investing far larger amounts of capital investment than the private investors such as Plaintiffs.  The institutional investors were to be given an annualized return on investment of 13-18%, depending on the duration of each contract. Such statements were false and were intended to deceive Dr. Lo into believing that NFN8 had been vetted and approved by institutional investors with far greater market knowledge and financial sophistication than Plaintiffs and to create the false impression that the Sale Leaseback Securities were in very high demand.

**B.  Fraudulent NFN8 Company Overview**

99.    From at least 2021 onwards, NFN8 Defendants made a number of similar statements in promotional materials that they disseminated to prospective investors.  In a 2021 "Company Overview" document provided to Plaintiffs (attached hereto as Exhibit B), Moore and Rodriguez described themselves as "pioneers in what would become part of the backbone of a trillion-dollar global monetary system."  They said that "NFN8 founders had a comprehensive long-term vision, they were prepared and able to take uncertainty and create opportunity."  The document continued:

> Imagine a fund that uses dedicated computer systems, Math, science, and specialized knowledge to create Crypto-Assets for less than the spot market price and then leverages those assets by high-frequency trading; you would begin to understand the wise approach the Company uses to operate effectively. One thing that makes NFN8 Group so different is, they don't start with "money," they start with specialized computer mining machines!
>
> . . .
>
> If you are interested in Blockchain, Crypto-Assets, Revenues, and Profit
>
> **NFN8 GROUP is a company that helped invent a new industry.**
>
> **NFN8 GROUP is a company that continues to lead that industry.**

31

> **NFN8 GROUP is a company that continues to blaze a trail to consistent success.**
>
> **NFN8 GROUP is a company you have to know more about.**
>
> Because they have consistently lived up to their mission of delivering winning opportunities in the form of predictable and reliable cash flow for all of their client

(Emphasis in Original.)  On information and belief, none of these statements were true; NFN8 had no particular advantage or capability in the cryptocurrency mining industry space; instead, the core business objective of NFN8 was to have investors grossly overpay for miners.   Similarly, NFN8 did not help "invent a new industry," nor has it ever led that industry.

100.    The Company Overview went on to describe the Sale Leaseback Securities in several ways that matter to this case.  First, the document stated that the investor "buys and owns the same specified computer equipment that the Company owns and uses."  So, there can be no suggestion that the miners Plaintiffs purchased for $30,000 from NFN8 differed materially from those NFN8 purchased for about $5,000.   As in other promotional materials, NFN8 presented its securities as essentially a "can't lose" proposition: "The unique sales lease/back concept allows NFN8 to grow without dilution or debt while giving individuals a chance to get involved in the Blockchain and Crypto-Asset space with a five-year transaction that manages the risk while delivering a significant upside in the form of consistent cash flow."  This was misleading because, while the Sale Leaseback Securities were called a "Purchase" and "Lease," they had the attributes of corporate debt obligations—NFN8 owes money to Lessors just as it would to lenders.  So, the statement that NFN8 was unencumbered with debt relies on semantics rather than economic substance.

101.    NFN8 said that "The Company's proprietary trading system is designed to hold short term and thrive in bear markets with intense volatility, as well as profit in an upward trending

market. This is accomplished by trading spikes irrespective of market trends.  Therefore, NFN8 has survived in all market cycles.  While other companies were failing and selling off equipment for pennies on the dollar, NFN8 was buying at reduced costs because they were strong and cash-heavy.  The Company has proven its ability to excel in all market conditions." These statements were untrue because NFN8 did not have any capability to thrive in all market conductions and, in fact, has shown itself not only unable to do so, but incapable of managing basic business responsibilities and obligations or even telling investors the truth about the Sale Leaseback Securities or the reasons for NFN8's wholesale defaults.

102.    The Company Overview also made statements repeated elsewhere by NFN8 employees about the high demand for investments in NFN8 and the safety of the securities:

> NFN8 has demonstrated stability with a consistent flow of revenue and profits in an industry that has exhibited some degree of volatility. Most importantly, since the first sale/leaseback transaction was consummated, NFN8 Group has never been late or missed a payment to any of its hundreds of clients. These clients include individuals, Corporations, Family Trusts, and institutional entities of all kinds. Most of these clients are financially sophisticated investors. Many are repeat customers who own multiple sale/leaseback units with investments in the millions of dollars with NFN8.

103.    These statements were all highly misleading.  First, Plaintiffs were the only investors with such a large position with NFN8 and it is not true that NFN8 had significant investments from corporations, institutional entities, or financially sophisticated investors. Second, NFN8 had reason to know that there were considerable risks of default that had not been related to Plaintiffs and NFN8 never corrected or modified the statements in the Company Overview.

**C.  Fraudulent NFN8 "Questions About Volatile Markets"**

104.    A May 23, 2021 NFN8 promotional document entitled "Questions About Volatile Markets" made similar fraudulent statements:

It is important to remember we are **NOT IN THE CRYPTOCURRENCY STORAGE BUSINESS.** We do not manufacture and hold Bitcoins or other Crypto Assets. We create those assets and high-frequency trade them, turning them into cash to purchase more manufacturing equipment *while maintaining more than adequate reserves to meet all expenses*. The downturns have worked for us. We have purchased equipment at deep discounts because others did not have a solid plan for volatility and were forced to sell. Our trading platform is another hedge against down markets. We trade spikes not trends. Spikes occur in both up and down trends. We take advantage of them.

The facts are:

       **NFN8 GROUP** has been cash flowing, revenue producing and profitable when Bitcoin was $ 6,700.00 --- $14,000.00 --- $30,000.00 --- $55,000.00. In other words*, our system has* thrived *in all market conditions*.
       **NFN8 GROUP** has prospered in the worst worldwide pandemic in a century.
       **NFN8 GROUP** has grown during every period of volatility.
       **NFN8 GROUP** is vibrant, moving forward, and growing today.
       **NFN8 GROUP** has never missed a payment to anyone for any reason in any market condition.

The founder of NFN8 GROUP recently made this statement in a video presentation about the Company *everyone should ask to see.*

*"WE DEVELOPED OUR PROPRIETARY TRADING SYSTEM, TO NOT ONLY SURVIVE MASSIVE BEAR MARKETS AND INTENSE VOLATILITY, BUT TO REALLY THRIVE IN THESE ENVIRONMENTS,*

*AS WELL AS DURING UPWARD SURGES. AND WHILE MINING COMPANIES WERE SELLING OFF EQUIPMENT FOR PENNIES ON THE DOLLAR, WE WERE BUYING BECAUSE WE WERE CASH-HEAVY, PROFITABLE, AND IN A STRONG PURCHASING POSITION. OF COURSE, WE EXCEL DURING A GOOD BULL RUN BUT PROBABLY MADE SOME OF OUR BEST MOVES IN THE CRYPTO WINTER OF 2018."*

We feel it is important that anyone looking at transacting with NFN8 GROUP understands the above information. If you want to learn more, contact us!

(Emphasis in Original.)

105.    Again, these statements were false and misleading.  As with Moore's and Rodriguez's personal representations to Plaintiffs, this promotional document again presented NFN8 as hugely successful and innovative, an entity awash in cash "with more than adequate reserves to meet all expenses."  These claims were never true; NFN8 generated limited cash from operations (other than by overcharging investors for miners), had inadequate reserves, and would prove itself unable to meet its lease obligations.  While NFN8 claimed that it could meet its obligations even if Bitcoin was very low in price, it has now defaulted when Bitcoin is near historic highs—as of this writing Bitcoin is priced at more than $60,000.

**D.    <u>NFN8 Continues to Make Fraudulent Statements on its Website</u>**

106.    Again, lest the NFN8 Defendants argue that these statements were once true, but circumstances changed resulting in NFN8's defaults, many of the same misleading statements *still* appeared on NFN8's website in late-September 2024.  For instance, the substance of the "volatile markets" promotional documents appears in a full section of NFN8's website called "Volatile Markets"—https://nfn8.com/volatile-markets/  ("NFN8 GROUP has been cash flowing, revenue producing and profitable when Bitcoin was $ 6,700.00 — $14,000.00 — $30,000.00 —

$62,000.00")

107.   Similar misleading statements appear in a document here:  https://nfn8.com/wp-content/uploads/NFN8Group_Brochure-2023-web.pdf

108.   The Company Overview, described above, is also still used and prominent on the webpage:  https://nfn8.com/company-statement/  ("Today, NFN8 GROUP is a multimillion-dollar, multistate, Digital-Asset creation organization… that operates a cutting-edge business… mining digital-assets at an institutional scale. The Company has evolved into a multifaceted corporation with several profit center components. To date, NFN8 has demonstrated stability with a consistent flow of revenue and profits in an industry that has exhibited a degree of volatility. Most importantly, Since the first equipment purchase transaction was consummated, NFN8 Group has consistently provided cash flow to all of its purchasers. These purchasers include individuals, Corporations, Family Trusts, and institutional entities of all kinds.")

109.   And,   NFN8's   company   statements   have   remained   misleading: https://nfn8.com/company-statement/ ("Today, NFN8 GROUP is a multimillion-dollar, multistate, Digital-Asset creation organization… that operates a cutting-edge business… mining digital-assets at an institutional scale. The Company has evolved into a multifaceted corporation with several profit center components. ***To date, NFN8 has demonstrated stability with a consistent flow of revenue and profits in an industry that has exhibited a degree of volatility.*** Most importantly, Since the first equipment purchase transaction was consummated, NFN8 Group has consistently provided cash flow to all of its purchasers. These purchasers include individuals, Corporations, Family Trusts, and institutional entities of all kinds. These purchasers are financially sophisticated, accredited investors." (emphasis added.))

110.   Considering the wholesale defaults, such ongoing claims are indefensible.

E. **Fraudulent Inducement of May 2024 Investment**

111.   By May 2023, Plaintiffs had a total of $9,180,000 invested with NFN8.  Despite already being NFN8's largest investor, Rodriguez and Moore kept soliciting Dr. Lo to have Plaintiffs make additional investments throughout 2023.  Dr. Lo declined to make additional investments at that time.

112.   From May 2023 until May 2024, NFN8 continued to make lease payments to Plaintiffs.  Dr. Lo and Plaintiffs did not know and had no reason to suspect that there were any material cash flow problems at NFN8.  On information and belief, however, all was not well at NFN8.  While NFN8 had continued to pay Plaintiffs, its largest investors, it had not paid other investors and was already in a default position.  The defaults first occurred, on information and belief, in 2023.

113.   On May 7, 2024 at 2:10 p.m. Pacific Time, Rodriguez reached out to Dr. Lo yet again, this time soliciting an additional investment of $1,000,000.  As with the previous deals, this would involve the purchase of miners in another sale-leaseback contract.  During the 27-minute call, Rodriguez explained that NFN8's immediate strategy was to accumulate as many miners as possible since the amount of future bitcoin to be mined is finite and that NFN8 wanted as many miners online as possible before a significant increase in bitcoin value.  None of these reasons were the true reasons Defendants were aggressively seeking an additional investment.

114.   Dr. Lo had concerns about this request.  First, he already had a significant position with NFN8, and Dr. Lo aims for a degree of diversification in his companies' investments.  Second, Dr. Lo knew that Plaintiffs' first investment – the Mobile Med investment – was ending on July 26, 2024.  Upon ending, under the terms of the Lease, NFN8 would be obligated to repurchase the 34 miners covered by the deal for the initial purchase price of $1,020,000.

115.   Since Rodriguez was insistently soliciting $1,000,000 more, Dr. Lo asked whether

NFN8 was going to use M-M WHS's new $1,000,000 investment to pay off the expiring contract for Mobile Med—in effect, to have one of Dr. Lo's companies pay another of Dr. Lo's companies an obligation owed by NFN8.

116. Rodriguez stated in unequivocal terms that NFN8 would do nothing of the sort. Rodriguez stated that NFN8 did not need the new $1,000,000 investment to fulfill the repurchase of assets for Mobile Med.  Rodriguez also said that, if NFN8 did "that would be a Ponzi Scheme and we don't do that."  Rodriguez then assured Dr. Lo that the money to fulfill the repurchase of assets was set aside in anticipation of the end of the Mobile Med deal.  In fact, Moore and Rodriguez had repeatedly told Dr. Lo that, since all lease contracts have a defined end date, NFN8 always planned far in advance to meet those capital requirements and set aside funds to meet all such obligations.  In addition, as noted above, written statements from NFN8 repeatedly stated that it reserved money to meet such obligations.

117. Suffice it to say, Rodriguez's numerous assurances on behalf of NFN8 were not true.  They were knowingly false statements specifically aimed at securing one more investment from Plaintiffs.  The statements were knowingly false in multiple ways: (i) NFN8 was in desperate need of cash; (ii) NFN8's need for cash was not new, rather it was a longstanding issue dating back to at least 2023; (iii) NFN8 did not have money set aside or reserved to pay Mobile Med; (iv) NFN8 knew, at the time it made these statements, that it was highly likely to default on its repurchase obligation to Mobile Med; (v) NFN8 knew, at the time it made these statements, that it had already defaulted on obligations to investors in 2023; and (vi) NFN8 knew, at the time it made these statements, that it was highly likely to default on lease payments to Plaintiffs.  Moreover, as with the other deals, the miners were still being grossly marked up and Plaintiffs were not informed of this fact.  (This assumes that Defendants were actually using Plaintiffs' money to buy more

miners, which itself is doubtful.)  Despite these facts, NFN8 chose to deceive Dr. Lo and Plaintiffs in flagrant ways that appear from the facts to be obvious and inarguable.

118.     As he had for each of Plaintiffs' prior investments, Dr. Lo believed NFN8 and its representatives.  He trusted them and relied on them.  And, ultimately, on May 24, 2024, he agreed to direct M-M WHS to make the additional $1,000,000 investment.  The investment was similar in material terms to the other investments, except that NFN8 reduced the purchase price from $30,000 to $20,000 (a mere 400% or so markup, as opposed to a 600% markup) and the term was 40 months, instead of 60 months.[7]  Under the terms of the deal, NFN8 was to start making monthly payments on July 26, 2024.

119.     But on July 19, 2024, Rodriguez and Moore informed Dr. Lo that NFN8 not only needed to stop all lease payments, but also did not have the $1,020,000 in reserves to fulfill the asset repurchase from Mobile Med.  This dramatic change in circumstances occurred only ***56 days*** after M-M WHS made its last $1,000,000 investment on the promise that NFN8 had more than adequate reserves to pay all obligations to Plaintiffs.

120.     When Dr. Lo asked Moore about Rodriguez's claims about keeping enough reserves to meet future expenses such as lease payments and asset repurchase obligations, Moore's response—contrary to Rodriguez's prior statements, Moore's prior statements, and the express written promises of NFN8—was "that's not how our business operates, and I would not have made that claim to you as Cory did."

---

[7] Prior to agreeing to purchase the miners for $20,000, Dr. Lo asked Rodriguez to have NFN8 sell M-M WHS the miners at cost, since Rodriguez claimed NFN8 wanted to acquire as many miners as possible and given Defendants' repeated (and apparently false) representation that NFN8's growth and revenue was more dependent on mining revenue than sales of mining equipment. While Rodriguez would not disclose the actual cost of purchasing the miners, the implication from the negotiations was that the cost was close to $20,000.  In fact, as alleged herein, the cost of the miners was much lower.

121.    In the time since this default, the reasons for concern have grown only more pronounced.  NFN8 has denied that Rodriguez provided the assurances that he provided to Dr. Lo prior to M-M WHS making the $1,000,000 investment.  These claims are not true.  The denials suggest not an acceptance of responsibility, but rather a doubling down on NFN8's duplicity.

122.    NFN8 has failed to provide any assurances or evidence that NFN8 used the $1,000,000 to purchase and set up miner; indeed, there is no evidence that it occurred, and Defendants' statements since are inconsistent with this happening.

123.    NFN8 has said that it had a temporary cash flow issue that arose from the shutting down of a mining facility by a provider that went out of business and the need to set up certain new mining facilities.  But this explanation makes no sense.  The need to set up new mining facilities was not a new issue, but an issue known since 2023 and specifically communicated by Rodriguez to Dr. Lo in 2023.  At no time prior to the default did NFN8 intimate directly or indirectly that this business contingency would or might impact its ability pay leases or repurchases.

124.    NFN8 has provided no credible justification for the sudden cessation of all payments after M-M WHS's last investment.  Given that M-M WHS's investments preceded the defaults by only ***56 days***, the only plausible inference is that NFN8 deliberately defrauded Plaintiffs.

125.    NFN8 has recently informed Plaintiffs that, contrary to its written and oral assurances, it does not reserve significant cash to meet its obligations.  The problem is NFN8 never told Plaintiffs about this material supposed change in its cash management (which would, of course, reduce its creditworthiness to any investor in the Sale Leaseback Securities).  In fact, NFN8 made statements that were directly contrary to its more recent admissions, for the sole purpose of

securing Plaintiffs' May 2024 $1,000,000 investment.

126.   There is one more question about NFN8's solicitation of this last investment from M-M WHS.  If, in fact, NFN8's operations were negatively impacted by the need to move operations from one mining facility to new facilities, resulting in the idling of miners, then why would have NFN8 even have needed investments to procure new miners?  It appears NFN8 had no such need and did not actually use the $1,000,000 to procure miners.  In fact, in a telephone conversation on or about July 19, 2024, Rodriguez and Moore told Dr. Lo as much— that NFN8 was purportedly using some of the money Plaintiffs provided with their May 2024 investment to build mining facilities instead.

## III.   THE OFFERING DOCUMENTS CONTAIN UNCONSCIONABLE PROVISIONS AND INADEQUATE RISK DISCLOSURES

127.   There are a number of issues with the Offering Documents for the Sale Leaseback Securities.  First, compared even to other alternative investments, there are almost no descriptions of the underlying economics of the transaction, the nature of the investments, or any real risk disclosures that would allow an investor to make an appropriately informed investment decision.

128.   There are other oddities with the Offering Documents.  While misrepresenting default risk and failing to adequately disclose the material aspects of the Sale Leaseback Securities in the Offering Documents, NFN8 also incorporated unconscionable and unenforceable provisions in the Leases regarding defaults.  For instance,

9) **LIMITATION OF LIABILITY.**
THE PARTIES AGREE THAT IT IS IMPOSSIBLE TO DETERMINE WITH ANY REASONABLE ACCURACY THE AMOUNT OF DAMAGES TO CLIENT UPON THE BREACH BY CAPITAL OF ITS OBLIGATIONS HEREUNDER. THEREFORE, THE PARTIES AGREE THAT CLIENT'S SOLE REMEDY FOR MATERIAL BREACH BY CAPITAL OF ITS

41

OBLIGATIONS HEREUNDER AND THE LEASE AGREEMENT WILL BE
LIQUIDATED DAMAGES, AT THE SOLE ELECTION OF CAPITAL, (a) IN
THE AMOUNT OF $30,000 PER MINING FARM PURCHASED LESS ANY
AMOUNTS PAID UNDER THIS AGREEMENT OR THE LEASE
AGREEMENT OR (b) THE RETURN OF THE EQUIPMENT TO CLIENT.
THE OBLIGATIONS SET FORTH HEREIN UNDER THIS AGREEMENT
AND THE LEASE AGREEMENT SHALL BE IN THE AGGREGATE AND
NOT CUMULATIVE AND ONLY BE COLLECTED ONCE AND NOT
SEPARATELY UNDER BOTH AGREEMENTS. CLIENT HEREBY
WAIVES ALL OTHER CLAIMS FOR DAMAGES OF ANY KIND
AGAINST CAPITAL, ITS MEMBERS, MANAGERS, SHAREHOLDERS,
DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS, AGENTS,
REPRESENTATIVES OR AFFILIATES, INCLUDING, WITHOUT
LIMITATION, ANY CLAIMS FOR ANY LOSS OF USE, INTERRUPTION
OF BUSINESS OR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE
OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING,
WITHOUT LIMITATION LOST PROFITS), REGARDLESS OF THE FORM
OF ACTION WHETHER IN CONTRACT, TORT, STRICT PRODUCT
LIABILITY OR OTHERWISE (EXCEPT AS OTHERWISE SPECIFIED IN
THIS SECTION OF THE AGREEMENT). CLIENT AND CAPITAL AGREE
THAT THE LIQUIDATED DAMAGES SET FORTH ABOVE ARE
REASONABLE AND NOT A PENALTY BASED ON THE FACTS AND
CIRCUMSTANCES OF THE PARTIES AT THE TIME OF ENTERING INTO
THIS AGREEMENT WITH DUE REGARD TO FUTURE
EXPECTATIONS. THESE LIQUIDATED DAMAGES AND THOSE
UNDER THE LEASE AGREEMENT ARE NOT ADDITIVE; THEY SHALL
ONLY BE PAID UNDER THIS AGREEMENT OR THE LEASE
AGREEMENT, NOT UNDER BOTH AGREEMENTS.

129.    This provision is a textbook unenforceable liquidated damages provision.  Among

other things, its premise—i.e., that "IT IS IMPOSSIBLE TO DETERMINE WITH ANY

REASONABLE ACCURACY THE AMOUNT OF DAMAGES TO CLIENT UPON THE BREACH BY CAPITAL OF ITS OBLIGATIONS"— is simply not true and renders the provision unenforceable. On the Leases here, as any other lease, contract damages are the unpaid balance on the lease plus statutory interest. Such damages are simple to calculate and readily ascertainable. Here the total amount owing, exclusive of interest, is $17,933,700 (inclusive of default lease payments, future lease payments, and buyback amounts). Moreover, the provision purporting to insulated individuals from liability is a preemptive attempt to contract around fraud committed by such individuals. As explained herein, Defendants sold the investments based on lies and material omissions and no contract language can exculpate liability for such fraud.

## IV.   THE TRANSFER OF THE NFN8 BUSINESS FROM TEXAS ENTITIES TO NEVADA ENTITIES WITHOUT PLAINTIFFS' CONSENT

130.    As noted above, the counterparty on all but one of the Plaintiffs' "leases" is Cryptotech. All told, Plaintiffs invested over $9 million in principal to purchase 306 miners in exchange for Cryptotech's entering into eight separate leases. Under the terms of the leases, Cryptotech represented that it would use those miners to mine cryptocurrency for its own account, making monthly lease payments to Plaintiffs and assuming a buyback obligation at the end of the lease terms.

131.    Cryptotech's lease payment obligations were supported by (and dependent upon) its use of Plaintiffs' mining machines to successfully mine cryptocurrency, and thus generate revenue, for the company. As such, Cryptotech's right to use Plaintiffs' miners is and was critical to its ability to satisfy its payment obligations.

132.    Plaintiffs have now learned that Cryptotech no longer exists, and no longer has the right to transact business in Texas. According to the Texas Secretary of State, Cryptotech's registration status is "inactive." Moreover, the Secretary of State indicates in is entry for "Right

to Transact Business in Texas" that Cryptotech's "Franchise Tax Ended." The Secretary of State website explains that "Franchise Tax Ended" means that "The entity's franchise tax responsibilities ended because the entity has ceased to exist in its state or country of formation or has ceased doing business in Texas."

## CAUSES OF ACTION

I.   **First Cause Of Action:** **Violation Of Texas Uniform Transfer Act ("Tufta"), Tex. Bus. & Com. Code § 24.001, *Et Seq.* Against All Defendants**

133.    Plaintiffs incorporate by reference the allegations of Paragraphs 1-132 as if fully restated herein.

134.    Defendants have engaged in two discrete fraudulent transfers under TUFTA related to Plaintiff H-M WHS's May 2024 $1,000,000 purchase of Sale Leaseback Securities. First, Defendant NFN8 Holdings' execution of its lease and assumption of lease obligations was fraudulent under Tex. Bus. & Comm. Code §§24.005. Second, Defendant NFN8 Capital's transfer of M-M WHS's funds to third parties for purposes other than the contractually mandated purchase of miners also violates §24.005.

### A.  The May 2024 NFN8 Holdings Lease Violates TUFTA

135.    NFN8 Holdings' assumption of $2.2 million in lease obligations to M-M WHS without receiving from NFN8 Capital the miners it was supposed to operate to generate revenue constitutes a fraudulent transfer under §24.005 both because it was made with actual intent to hinder, delay, or defraud Plaintiffs and because NFN8 Holdings did not receive reasonably equivalent value from NFN8 Capital in exchange for the obligations and *at minimum* reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

136.    Plaintiffs have established actual intent. TUFTA recognizes that actual intent can be difficult to prove with direct evidence. Accordingly, the statute identifies a list of eleven factors

44

courts may consider in determining actual intent. TEX. BUS. & COMM. CODE § 24.005(b).

137. Several of these factors apply here.  First, Defendants concealed the true nature of the transfer or obligation by failing to inform Plaintiffs that NFN8 Holdings assumed only the lease *obligations* without also obtaining the leased *miners*. TEX. BUS. & COMM. CODE § 24.005(b)(3).  Second, because NFN8 Capital did not purchase, and thus could not transfer, the miners M-M WHS was supposed to be buying, the value of the consideration NFN8 Holdings received in exchange for the lease obligations was effectively zero, and was thus nowhere near reasonably equivalent to the $2.2 million obligation it assumed. *Id.* § 24.005(b)(8).  Third, as subsequent events demonstrate, NFN8 Holdings was either already insolvent or became insolvent shortly after the obligation was incurred.  *Id.* § 24.008(b)(9).[8]

138. Fourth, as subsequent events demonstrated, NFN8 Holdings knew or should have known that assuming an additional lease obligation to M-M WHS for $30,000 per month without any miners would result in NFN8 Holdings incurring debts beyond its ability to pay as they came due. TEX. BUS. & COMM. CODE § 24.005(a)(2)(B).

**B. NFN8 Capital's Misuse of M-M WHS's Funds Violates TUFTA**

139. NFN8 Capital's use of M-M WHS's funds for purposes other than the contractually-required purchase of miners also constitutes a fraudulent transfer under TUFTA § 24.005. By failing to purchase the miners and instead using the proceeds of M-M WHS's investment for other purposes (whether for the purported completion of Defendants' data centers or to temporarily ease a cash crunch occasioned by Defendants' Ponzi scheme reaching a tipping point), NFN8 Capital actually intended to hinder, delay, and defraud Plaintiffs. On

---

[8] As Plaintiffs' Complaint details, the true purpose of the May 2024 investment was neither to purchase more miners nor to invest in data centers, but rather to keep Defendants' sham business afloat a while longer.

information and belief, further illegal transfers may have been planned or executed under this scheme and will be uncovered in discovery.

140.    The timeline of events in this dispute from May 2024 to present demonstrates that the true purpose for which Rodriguez and Moore solicited Plaintiffs' May 2024 investment was to obtain capital Defendants could use to extend their charade by several additional months.  The May 2024 investment was thus intended to hinder and delay Plaintiffs' discovery of Defendants' underlying fraud, and was itself fraudulent at two levels.  Even if NFN8 Capital *did* use the money for facility expansion instead, that misuse constitutes an equally fraudulent transfer under § 24.005.  NFN8 Capital's misuse of Plaintiffs' funds even for that purpose directly contravenes its contractual obligations, and thus would still have been both intended to hinder and delay Plaintiffs from learning of Defendants' overarching fraud and fraudulent in its own right. *See* § 24.005(a)(1). The same indicia of fraud from § 24.005 (b)'s laundry list discussed above establish actual intent hinder, delay, and defraud Plaintiffs.

141.    Section 24.008 TUFTA provides the following statutory equitable remedies for such fraudulent transfers:

- avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

- an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practice and Remedies Code relating to ancillary proceedings; or

- subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

  - an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

  - appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

    o   any other relief the circumstances may require.

142.    Plaintiffs' fraudulent transfer—in addition to the overall fraudulent nature of their scheme—calls out for an injunction to prevent Defendants from further moving assets that could make it impossible for Plaintiffs to secure appropriate equitable relief.  Defendants' wholesale fraudulent transfers warrant immediate injunctive relief imposing a freeze of Defendants' assets to prevent any further wrongful dispositions of the assets.

## II.    <u>Second Cause Of Action</u>: Violation Of Section 10(B) Of The Exchange Act Of 1934, 15 U.S.C. § 78j(B), And Rule 10b-5 Against All Defendants

143.    Plaintiffs incorporate by reference the allegations of Paragraphs 1-132 as if fully restated herein.

144.    This cause of action is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5 against all Defendants based on their use of fraudulent, manipulative, and deceptive schemes, projects, and devices made in connection with the sale of unregistered securities.

145.    Defendants directly or indirectly, by means of interstate commerce employed a manipulative or deceptive device in connection with the sale of the securities (i.e., each of the Sale Leaseback Securities) by directly, and through various offering materials, misrepresenting facts and omitting material information necessary for Plaintiffs to make informed decisions regarding their decisions to invest.  As more fully set forth in Paragraphs 1-46 and 60-132, Defendants' manipulative scheme included the misrepresentation and/or omission of genuine information regarding NFN8's creditworthiness, cash reserves, liquidity, market risks, debt-to-equity ratio, the underlying strength of NFN8's business, the technical capabilities of NFN8, and the fact that the price Defendants charged for miners was marked up approximately 500-600%.  Defendants' misrepresentations and omissions created a false impression of safety and security regarding the

securities.  Defendants also defrauded Plaintiffs by misrepresenting and omitting material facts concerning the purpose and use of Plaintiffs' invested funds, including – on information and belief – the diversion of funds designated for the purchase of new miners to repay other investors, defray operational expenses, and facilitate improper payments to Moore, Rodriguez, and affiliated businesses.

146.    Plaintiffs relied on Defendants' misrepresentations in making their decision to purchase $10,180,000 in Sale Leaseback Securities.

147.    Defendants' conduct has directly and proximately caused Plaintiffs to experience damages in an amount to be established at trial.

**III.    Third Cause Of Action:  Offeror Or Seller Liability: Untruth Or Omission Under Tex. Gov't Code § 4008.052(A) Against All Defendants**

148.    Plaintiffs incorporate by reference the allegations of Paragraphs 1-132 as if fully restated herein.

149.    This cause of action is brought pursuant to Tex. Gov't Code § 4008.052(a), on behalf of the Plaintiffs against each of the Defendants based on misrepresentations and omissions that Defendants made in connection with the offer and sale of securities during the relevant time period covered by the Complaint, including the time of each of Plaintiffs' investments with NFN8.

150.    A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to purchase a security because it would significantly alter the total mix of information made available.  As more fully set forth in Paragraphs 1-46 and 60-132, a reasonable investor would consider as material information regarding the support and accuracy of statements regarding NFN8's creditworthiness, cash reserves, liquidity, market risks, debt-to-equity ratio, the underlying strength of NFN8's business, the technical capabilities of NFN8, and the fact that the price Defendants charged for miners was marked up approximately

500-600%.   Further, a reasonable investor would consider information regarding how their investment funds are being used and the availability of cash reserves to ensure the repayment of their capital contribution to be important in their decision to invest with the Defendants.

151.   Defendants misrepresented and omitted material facts concerning the lack of support behind the projected security of Plaintiffs' investments, NFN8's creditworthiness, cash reserves, liquidity, market risks, debt-to-equity ratio, the underlying strength of NFN8's business, the technical capabilities of NFN8, and the fact that the price Defendants charged for miners was marked up approximately 500-600%.  Defendants omitted material facts concerning the purpose and use of investors' funds, including the diversion of funds to repay other investors, defray operational expenses, and facilitate improper payments Moore, Rodriguez, and affiliated businesses.   These misrepresentations and omissions were made with knowledge that they were misleading.  Plaintiffs relied on these misrepresentations and omissions in deciding to purchase $10,180,000 in the Sale Leaseback Securities.

152.   Plaintiffs are within the statute of limitations pursuant to Tex. Gov't Code § 4008.062(b) because it has been less than three years since the Plaintiffs could have been on notice of the Defendants' material misrepresentations and omissions, which only became apparent when Defendants failed to make required payments to Plaintiffs in July 2024.

153.   Defendants' conduct has directly and proximately caused Plaintiffs to experience damages in an amount to be established at trial.

IV.     **Fourth Cause Of Action**:  Control Person Liability Under Tex. Gov't Code §4008.055(A) Against Moore And Rodriguez

154.   Plaintiffs incorporate by reference the allegations of Paragraphs 1-132 as if fully restated herein.

155.   Plaintiffs bring this cause of action pursuant to Tex. Gov't Code § 4008.055(a)

against Defendants Moore and Rodriguez as control persons, within the meaning of 7 Tex. Admin. Code § 107.2(9), of NFN8's solicitation, sale, and marketing of securities.  Moore and Rodriguez are each officers of NFN8 and each possessed the "power to direct or cause the direction of the management and policies of [NFN8], whether through the ownership of voting securities, by contract, or otherwise."

156.    Among other things, Moore and Rodriguez controlled representations NFN8 made to Plaintiffs and other investors, omissions in NFN8's communications regarding investments sold by NFN8, the content of the Offering Documents, marketing materials, sales pitches, business operations, use of cash, setting of cash reserves, and all actions of the NFN8 business.

157.    As such control persons, Moore and Rodriguez are jointly and severally liable pursuant to Tex. Gov't Code § 4008.055(a) with and to the same extent as the above-mentioned Defendants for their violations of 4008.052(a).

158.    Moore and Rodriguez's conduct has directly and proximately caused Plaintiffs to experience damages in an amount to be established at trial.

**V.    <u>Fifth Cause Of Action</u>: Civil Conspiracy To Defraud Under Texas State Law Against All Defendants**

159.    Plaintiffs incorporate by reference the allegations of Paragraphs 1-132 as if fully restated herein.

160.    This cause of action contains requires: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result.

161.    Civil Conspiracy under Texas State law is conditioned on a finding of a tort or statutory violation that proximately caused the damages.

162.    Defendant Moore created a network of individuals and affiliated entities assigned

with the responsibility of promoting, advertising, administering, and selling securities to the public, including to the Plaintiffs. This network of individuals and entities included each of the Defendants, each of who promulgate communications, marketing materials, emails, and other documents containing material misrepresentations and omissions, promoting NFN8's investments.

163. As more fully set forth in Paragraphs 1-46 and 60-132, Defendants engaged the above-mentioned network of Defendants to conduct a common course of action to defraud investors in violation of Tex. Gov't Code §4008.052(a) namely, the misrepresentation and/or omission of genuine information regarding NFN8's creditworthiness, cash reserves, liquidity, market risks, debt-to-equity ratio, the underlying strength of NFN8's business, the technical capabilities of NFN8, and the fact that the price Defendants charged for miners was marked up approximately 500-600%. Defendants also engaged in common-law fraud as discussed more fully below.

164. Defendants' conduct has directly and proximately caused Plaintiffs to experience damages in an amount to be established at trial.

## VI.   <u>Sixth Cause Of Action</u>: Fraud Against All Defendants Under Texas State Law Against All Defendants

165. Plaintiffs incorporate by reference the allegations of Paragraphs 1-132 as if fully restated herein.

166. A fraud cause of action requires a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.

167. As more fully set forth in Paragraphs 1-46 and 60-132, Defendants undertook a consistent course of fraudulent conduct that included the misrepresentation and/ or omission of genuine information regarding NFN8's creditworthiness, cash reserves, liquidity, market risks,

debt-to-equity ratio, the underlying strength of NFN8's business, the technical capabilities of NFN8, and the fact that the price Defendants charged for miners was marked up approximately 500-600%.

168.    Defendants' statements were false when made and their omissions made statements inaccurate, misleading, and false at the time they were made.

169.    Moore and Rodriguez, acting for each of themselves and on behalf of NFN8, knew the statements were false when made or, alternatively, made such statements without good reason to believe such statements were true or based in fact.

170.    Defendants intended Plaintiffs to rely upon such statements.

171.    Plaintiffs, in fact, trusted Defendants and relied upon their false statements.

172.    Defendants' conduct has directly and proximately caused Plaintiffs to suffer damages in an amount to be established at trial.

173.    In doing the alleged acts herein, Defendants acted with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages.

174.    Because the agreements with NFN8 were fraudulently induced, Defendants seek the equitable remedy of rescission, which seeks to restore Plaintiffs to their position before they entered into the NFN8 agreements.

**VII.    Seventh Cause Of Action:  Negligent Misrepresentation Under Texas State Law Against All Defendants**

175.    Plaintiffs incorporate by reference the allegations of Paragraphs 1-132 as if fully restated herein.

176.    This cause of action contains elements derived from *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 443 (Tex. 1991), which requires: "(1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest;

(2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation."

177.    As more fully set forth in Paragraphs 1-46 and 60-132, Defendants undertook a course of fraudulent conduct that included the misrepresentation and/ or omission of genuine information regarding NFN8's creditworthiness, cash reserves, liquidity, market risks, debt-to-equity ratio, the underlying strength of NFN8's business, the technical capabilities of NFN8, and the fact that the price Defendants charged for miners was marked up approximately 500-600%.

178.    Defendants' statements were false when made and their omissions made statements inaccurate, misleading, and false at the time they were made.

179.    Moore and Rodriguez, acting for each of themselves and on behalf of NFN8, failed to exercise reasonable care or competence in failing to communicate complete and accurate information to Plaintiffs.

180.    Defendants intended Plaintiffs to rely upon such statements.

181.    Plaintiffs, in fact, trusted Defendants and relied upon their false statements.

182.    Defendants' conduct has directly and proximately caused Plaintiffs to suffer damages in an amount to be established at trial.

183.    In doing the alleged acts herein, Defendants acted with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages.

**VIII.    <u>Eighth Cause Of Action</u>:  Civil Violations Of The Racketeer Influenced And Corrupt Organization Act (18 U.S.C. § 1962(C)) Against All Defendants**

184.    Plaintiffs incorporate by reference the allegations of Paragraphs 1-132 as if fully restated herein.

185.    Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

186.    Each of the Defendants formed an association-in-fact, whose joint and common purpose was to defraud investors, including Plaintiffs.

187.    As more fully set forth in Paragraphs 1-46 and 60-132, all Defendants received misappropriated monies or benefits derived or resulting from such fraud.

188.    Moore and Rodriguez exercised control over the numerous related individuals and entities that form the enterprise.

189.    Moore and Rodriguez ultimately controlled and managed the operations of the entire association-in-fact and personally directed the day-to-day operations of its related entities as described above.

190.    This association-in-fact is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The enterprise was at all times engaged in interstate commerce and its activities affected and continue to affect interstate commerce.  The interstate nexus includes but is not limited to the transfer of funds to multiple persons and entities in multiple states.

191.    Defendants were each associated with the association-in-fact enterprise and conducted or participated, directly or indirectly, in the conduct of the affairs of this enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(l)(B), 1961(5) and 1962(c).

192.    Moore and Rodriguez, acting on behalf of NFN8 and in the interests of all Defendants, formed a scheme to defraud Plaintiffs of money, through which Moore and Rodriguez

made numerous false statements to defraud investors to invest in NFN8 securities.

193.    In furtherance of this scheme, Moore and Rodriguez used or caused to be used the United States mail and interstate wire communications in violation of 18 U.S.C. §§ 1341 and 1343. Defendants initiated and received documents (including without limitation the Offering Documents) and investor funds across state lines via the use of wires including but not limited to those referenced in Paragraphs 5, 14-15, 104, 111. Moore and Rodriguez also communicated materially false statements and deceitfully omitted material facts to Plaintiffs and others via the use of wires and mails including but in no way limited to the communications and omissions referenced in Paragraphs 2, 10, 7, 18-31, 36-37, 66-103, 105-110, and 112-123.  Each of these wire communications, omissions, misrepresentations, and transfers of investor assets satisfies the transmission "by means of wire, radio, or television communication" element for wire fraud.

194.    In furtherance of this scheme to defraud, scheme to defraud Defendants of their services having a value of $5,000 or more and to defraud investors in NFN8, Moore and Rodriguez acting individually and on behalf of NFN8 used or caused to be used the United States mails or an interstate commercial carrier in violation of 18 U.S.C. § 1341.

195.    By reason of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs suffered injury in an amount to be determined at trial.

196.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages.

197.    In bringing this action, Plaintiffs have and will incur attorneys' fees and are entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**IX.    Ninth Cause Of Action:  Conspiracy To Commit Civil Violations Of The Racketeer Influenced And Corrupt Organizations Act (18 U.S.C. § 1962(D)) – Against All Defendants**

198.    Plaintiffs incorporate by reference the allegations of Paragraphs 1-132 as if fully restated herein.

199.    Defendants conspired with one another within the meaning of 18 U.S.C. § 1962(d) to violate § 1962(c); that is, to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c), as identified more fully in Paragraphs 1-46 and 60-132, above.

200.    By reason of violation of 18 U.S.C. § 1962(d) committed by Plaintiffs suffered injuries in an amount to be proven at trial, within the meaning of 18 U.S.C. § 1962(c).

201.    Pursuant to 18 U.S.C. § 1962(c), Plaintiffs are entitled to treble damages.

202.    In bringing this action, Plaintiffs have and will incur attorneys' fees and are entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

**X.    Tenth Cause Of Action:  Conversion Under Texas State Law Against All Defendants**

203.    Plaintiffs incorporate by reference the allegations of Paragraphs 1-132 as if fully restated herein.

204.     This cause of action contains elements derived from *Texas Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 365–66 (Tex. App. 2009), which requires:  "to establish a claim for conversion, a plaintiff must prove that: (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property.

205.    As more fully set forth in Paragraphs 1-46 and 60-132, Defendants undertook a course of fraudulent conduct that included the misrepresentation and/ or omission of genuine

information regarding NFN8's creditworthiness, cash reserves, liquidity, market risks, debt-to-equity ratio, the underlying strength of NFN8's business, the technical capabilities of NFN8, and the fact that the price Defendants charged for miners was marked up approximately 500-600%.

206.    As a result of Defendants' actions, Plaintiffs paid $10,180,000 to NFN8.  NFN8 acquire these funds on false promises and did not use the funds as Defendants promised Plaintiffs.

207.    Defendants unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner.

208.    Plaintiffs have demanded compensation for this unlawful taking.

209.    Defendants have refused to return Plaintiffs money or otherwise compensated Plaintiffs.

210.    Defendants' conduct has directly and proximately caused Plaintiffs to suffer damages in an amount to be established at trial.

211.    In doing the alleged acts herein, Defendants acted with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages.

## XI.    Eleventh Cause Of Action:  Unjust Enrichment Under Texas State Law Against All Defendants

212.    Plaintiffs incorporate by reference the allegations of Paragraphs 1-132 as if fully restated herein.

213.    This cause of action derives from *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010), which provides the doctrine of unjust enrichment to be available "when one person has obtained a benefit from another by fraud, duress, or the taking of undue advantage."

214.    As more fully set forth in Paragraphs 1-46 and 60-132, Defendants undertook a course of fraudulent conduct that included the misrepresentation and/or omission of genuine

information regarding NFN8's creditworthiness, cash reserves, liquidity, market risks, debt-to-equity ratio, the underlying strength of NFN8's business, the technical capabilities of NFN8, and the fact that the price Defendants charged for miners was marked up approximately 500-600%.

215.   Defendants each accepted and retained a substantial benefit under these circumstances that makes it inequitable for them to retain without payment for its value.

216.   Defendants' conduct has directly and proximately caused Plaintiffs to suffer damages in an amount to be established at trial.

217.   In doing the alleged acts herein, Defendants acted with oppression, fraud, and malice, and Plaintiffs are entitled to punitive damages.

## TOLLING OF APPLICABLE LIMITATIONS PERIODS

218.   Any applicable statutes of limitations have been tolled by the application of the doctrines of the discovery rule and fraudulent concealment,

## JURY TRIAL DEMANDED

219.   Plaintiffs hereby request and demand a jury trial for each and every cause of action permitting trial by jury.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs demand judgment as follows:

220.   For provisional remedies, including an immediate freeze of Defendants' assets, including bank accounts, and preliminary and permanent injunctive relief to prevent the unlawful movement or waste of assets, and further harm to Plaintiffs;

221.   Requiring Defendants to pay compensatory damages jointly and severally in favor of the Plaintiffs for all damages sustained by reason of the acts and transactions alleged herein;

222.   Awarding Plaintiffs rescission, disgorgement, and all other remedies in equity or in law;

223.    Awarding treble damages as allowable by law;

224.    Awarding punitive damages as allowable by law;

225.    Awarding Plaintiffs prejudgment and post-judgment interest, as well as their reasonable attorneys' fees with interest, expert fees, and other costs; and

226.    Awarding such further relief as the Court deems just and proper.

OCTOBER 10, 2024

Respectfully submitted,

STEPTOE LLP
*/s/Hector R. Chavez*
Hector R. Chavez
Texas State Bar No. 24078335
*Admitted to practice in W.D. Tex*
717 Texas Avenue, Suite 2800
Houston, Texas 77002
Telephone (713) 221-2300
hchavez@steptoe.com

Ashwin Ram
*Pro Hac Vice Application Forthcoming*
California State Bar No. 277513
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
aram@steptoe.com

David Isaak
Texas State Bar No. 24012887
*Pro Hac Vice Application Forthcoming*
Paul Stancil
Texas State Bar No. 00797488
*Pro Hac Vice Application Forthcoming*
717 Texas Avenue, Suite 2800
Houston, Texas 77002
Telephone (713) 221-2300
disaak@steptoe.com
pstancil@steptoe.com

-AND-

59

THE DURRANT LAW FIRM, APC


John S. Durrant
*Pro Hac Vice Application Forthcoming*
California State Bar No. 217345
john@durrantlawfirm.com
2337 Roscomare Rd., Suite 2180
Los Angeles, CA 90077
Tel: 424.273.1962
**COUNSEL FOR MOBILE MED WORK HEALTH SOLUTIONS, INC.; JLL VENTURES, INC.; AND M-M WHS LLC**

60