## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **MOBILE MED WORK HEALTH SOLUTIONS, INC.; JLL VENTURES, INC.; and M-M WHS LLC** | § § § § § § § § § | Case No.   1:24-CV-1219 |
| | | Judge: |
| | § § § | |
| *Plaintiffs,* | § § § § | |
| **v.** | § § § § § | |
| | § | |
| **JOSHUA MOORE; CORY RODRIGUEZ; NFN8 GROUP, INC.; NFN8 HOLDINGS, LLC; NFN8 CAPITAL, LLC; NFN8 MEDIA, LLC; NFN8 FOUNDATION; and CRYPTOTECH HOLDINGS, LLC;** | § § § § § § § § § | |
| *Defendants.* | § § § § § § | |

## PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER WITHOUT NOTICE AND MOTION TO SET PRELIMINARY INJUNCTION HEARING AND ORDER EXPEDITED DISCOVERY

Plaintiffs Mobile Med Work Health Solutions, Inc. ("Mobile Med"), JLL Ventures, Inc. ("JLL"), and M-M WHS LLC ("M-M WHS") (collectively, "Plaintiffs") respectfully file this motion requesting that the Court: (1) issue a Temporary Restraining Order; (2) set a date for a preliminary injunction hearing; and (3) authorize expedited discovery.   In support of this motion, Plaintiffs incorporate by reference the Declarations of Dr. Justin Lo, M.D., and Paul Stancil, attached hereto as Exhibits A and B respectively.  Plaintiffs also incorporate by reference in its entirety their Original Complaint. Dkt. 1.

## PRELIMINARY STATEMENT

Defendants have perpetrated a multi-year Ponzi scheme that is now collapsing, defrauding Plaintiffs out of millions of dollars by way of bogus cryptocurrency mining investments.  Plaintiffs thus seek a temporary restraining order under FED. R. CIV. P. 65(b) freezing Defendants' assets pursuant to both the Texas Uniform Fraudulent Transfer Act ("TUFTA"), Tex. Bus. Comm. Code § 24.008 and the Court's general equitable powers.  Such relief is necessary to ensure that Defendants—who have already fraudulently transferred assets for the purpose of avoiding their obligations to Defendants—will not further dissipate the assets available to compensate Plaintiffs for Defendants' egregious fraud.  Plaintiffs also seek (1) an inventory of Defendants' physical assets, including but not limited to any cryptocurrency mining equipment Defendants own; (2) immediate inspection of Defendants' facilities to determine if the machines that Defendants' claim are securing Plaintiffs' investments in fact exist and are being utilized in Defendants' purported business; and (3) identification of any and all cryptocurrency wallets Defendants are now using or have ever used to store cryptocurrency keys associated with any of Defendants' cryptocurrency mining activities[1]

---

[1] Plaintiffs also seek expedited discovery in conjunction with an expedited hearing on their application for a preliminary injunction.

As discussed in detail in this Application and the attached affidavits all of FRCP 65's Rules for a without-notice TRO are met here:

1. **Plaintiffs have a substantial likelihood of prevailing on the merits**. There is a mountain of evidence that Defendants have perpetrated a massive, years-long Ponzi scheme. More particularly, there is evidence that Plaintiffs have in the last month violated TUFTA, thereby depleting the pool of assets available to satisfy their obligations to Plaintiffs.

2. **Plaintiffs will suffer irreparable harm.** If temporary relief is not ordered without notice to the Defendants, Plaintiffs will suffer irreparable injury through the continued dissipation of Plaintiffs' assets.

3. **The balance of the equities and the public interest favor temporary relief.** The evidence strongly indicates that Plaintiffs are the victims of a massive fraud masterminded by Defendant Josh Moore, who has a long history of attempting to dodge creditors—unsuccessfully filing bankruptcy four times before now. The equities thus favor Plaintiffs and a temporary restraining order that freezes Defendants' assets would also serve the public interest (including the interest of Defendants' other victims).[2]

---

[2] Although there is language in the fraudulently obtained contracts committing certain related matters to JAMS arbitration, Plaintiffs contend that its claims are not subject to these clauses. More important for present purposes, even if Plaintiffs are ultimately incorrect regarding the arbitrability of certain of their claims, the arbitration clauses in question call for arbitration under JAMS rules. Even in contexts involving requests for emergency relief, the JAMS rules do not permit ex parte action of the sort Plaintiffs need and seek here to ensure that fraudster Defendants do not dissipate or waste assets in the time between provision of notice and the Emergency Arbitrator's decision. *Compare* JAMS Comprehensive Arbitrations Rules and Procedures §2(c) (authorizing emergency relief but requiring notice to opposing parties and requiring only that Emergency Arbitrator set a schedule for consideration of emergency relief request "[w]ithin two business days, or as soon as practicable thereafter" *with* FED. R. CIV. P. 65(b) (authorizing district courts to issue TROs without notice on showing of immediate and irreparable injury and for good

## INTRODUCTION

Defendants fraudulently induced Plaintiffs to invest over $10 million in nine separate fraudulent sale-leaseback transactions under which Plaintiffs purportedly purchased 356 cryptocurrency mining machines ("miners") from Defendants, then leased those miners back to Defendants in exchange for a guaranteed return. As discussed in the Complaint and in the attached declarations, the evidence makes clear that Defendants were perpetrating classic Ponzi scheme with a high-tech veneer. This fraud came all came crashing down in July this year when Defendants defaulted on a $1,020,000 payment due on Plaintiffs' first lease payment and stopped making their regular payment only two months after Defendants induced Plaintiffs to make a final $1 million investment.

This last $1 million investment in May 2024 forms the basis of Plaintiffs' TUFTA claim. In this transaction, Plaintiff M-M WHS LLC executed a purchase agreement with NFN8 Capital, LLC ("NFN8 Capital Purchase Agreement") and simultaneously entered into a lease agreement with NFN8 Holdings, LLC ("Holdings"). Decl. of Dr. Justin Lo, ¶¶ 11-12 & Ex. A.

Under the NFN8 Capital Purchase Agreement, M-M WHS paid NFN8 Capital $1 million in exchange for what NFN8 Capital described as "50 Infinite Miner(s)." Decl. of Dr. Justin Lo, Ex. A. Under the M-M WHS/NFN8 Holdings lease agreement ("NFN8 Holdings Lease"), NFN8 Holdings (1) was to lease the 50 "Infinite Miners" back from M-M WHS for forty months, paying M-M WHS fixed monthly amounts in exchange for the right to mine cryptocurrency with M-M WHS's miners, and (2) had an obligation to purchase all 50 miners back from M-M WHS at the

cause.) Moreover, the last three leases that Plaintiffs executed specifically permit the parties to seek "provisional remedies in aid of arbitration from a court of appropriate jurisdiction." And the Fifth Circuit has held that a district court has jurisdiction to order temporary equitable relief pending ruling on a motion to compel arbitration. *Janvey v. Alguire*, 647 F.3d 585, 593 (5th Cir. 2011).

end of the 40-month lease term for their full original purchase price.  *Id.*, Ex. B. Together the May 2024 Purchase and Lease agreements, along with the Purchase and Lease agreements associated with Plaintiffs' eight other investments, constitute the Sale Leaseback Securities transactions referenced in the Complaint. [3] *Id.,* Ex. A-F.

In sum, Plaintiff M-M WHS's May 2024 Sale Leaseback Securities purchase gave Defendant NFN8 Capital $1 million with which it was to purchase miners NFN8 Capital would then allow NFN8 Holdings to use for cryptocurrency mining.  The Lease Agreement also obligated NFN8 Holdings to make lease payments to M-M WHS and ultimately to buy back the equipment using some of the revenue it generated from its mining activity to fund those obligations. *Id.*, Ex. B.

Plaintiffs' May 2024 investment took place just two months before Defendants' first lease, originally executed in June 2021, was to expire (and thus their first approximately $1 million end-of-lease principal payment to Plaintiffs was coming due) in July 2024.  *Id.*, Ex. D. Defendants approached Plaintiffs seeking that investment in mid-May 2024, but Plaintiffs were wary about investing because they were concerned that Defendants might simply use the proposed $1 million investment made in May of 2024 to make the end-of-lease buyback payment two months later instead of using the funds to buy additional new miners. *Id.*, ¶¶ 18-23.  Defendants reassured Plaintiffs that the new $1 million investment would not be used to make the end of lease payment because "that would be a Ponzi scheme" and that Defendants kept funds in reserve to make the

---

[3] Plaintiffs' first eight Sale Leaseback Securities investments—made from June 2021 through March 2023 for a total of $9.18 million—were functionally identical, but involved purchase agreements with NFN8 Media, Inc. and lease agreements with Cryptotech Holdings, LLC, a Texas LLC that Defendants merged into NFN8 Holdings earlier this year.

end-of-lease payments. *Id.,* ¶22. After receiving these reassurances and a more favorable rate of return from Defendants, M-M WHS completed its investment on May 24, 2024. *Id.*, ¶23.

Two short months later, Defendants defaulted on *all* of their lease obligations to Plaintiffs. *Id.,* ¶31. That is, they not only failed to return to Plaintiffs' their initial approximately $1 million principal investment but also completely stopped all monthly lease payments all leases. *Id.* As of this filing, Defendants still have not made any of their required payments since June 2024. *Id.*

Defendants' principals refused to provide plausible—much less verifiable—explanations for their defaults in response to Plaintiffs' repeated requests. *See, e.g.*, *id.*, ¶¶ 25-30. Accordingly, Plaintiffs conducted their own investigation into Defendants' conduct. This investigation revealed that Defendants entire business enterprise is an elaborate fraud. Plaintiffs' Original Complaint sets forth the details of this fraud and Plaintiffs' resulting causes of action. *See* Dkt. 1.

Despite Defendants' initial attempt to hide the ball, Plaintiffs' initial attempts to get an explanation of the *en masse* defaults from Defendants were revealing in one respect: During these discussions, Defendant Moore as much as admitted to Plaintiffs' principal that NFN8 Capital had not purchased 50 miners with Plaintiffs' May 2024 investment as required by the NFN8 Capital Purchase Agreement, but instead used those funds for other purposes. *See* Decl. of Dr. Justin Lo. ¶ 38.

This devastating admission makes clear that Defendants violated TUFTA in at least two ways. *See* TEX. BUS. & COMM. CODE ¶24.005. First, NFN8 Holdings accepted from NFN8 Capital an obligation for approximately $2.2 million in lease payments and equipment buyback responsibilities *without receiving the mining assets that would support that obligation by generating revenue from which NFN8 Holdings could pay M-M WHS. See, e.g.* Decl. of Dr. Justin Lo, ¶¶ 25-38. Second, NFN8 Capital diverted Plaintiffs' $1 million investment to purposes for

which it was not intended; NFN8 Capital's transfer of those funds thus leaves it with an obligation to purchase miners for Plaintiffs but without the cash to do so. *See id.* ¶¶ 28-38.

This conduct specifically demonstrates that Defendants have dissipated and are likely to further dissipate and waste assets in response to Plaintiffs' suit. Plaintiffs thus respectfully request that the Court enter a temporary restraining order freezing the assets of *all* Defendants and their affiliates (less an appropriate monthly living allowance for the individual Defendants) under TEX. BUS. & COMM. CODE §24.008. Plaintiffs are also entitled to this relief because they are seeking equitable relief including rescission. *See Deckert v. Independence Shares Corp.*, 311 U.S. 282, 289-91 (1940). Plaintiffs request that the Court grant the requested TRO under FED. R. CIV. P. 65(b) without requiring that Plaintiffs give Defendants notice because providing Defendants with notice before the temporary restraining order issues will give demonstrated fraudsters time and opportunity to hide, move, or further waste assets in ways that will frustrate Plaintiffs' ultimate recovery.[4] The same factual allegations also support issuance of a preliminary injunction, and Plaintiffs thus request a preliminary injunction granting them the same relief for the duration of this dispute, after expedited discovery and hearing.

## RELEVANT FACTS

### A.    Overview of Sale Leaseback Securities Investments

From June 2021 through May 2024, Plaintiffs Mobile-Med Work Health Solutions, Inc., JLL Ventures, Inc., and M-M WHS LLC entered into eight separate investments through which they purchased miners from Defendant NFN8 Media, LLC and then leased those miners to Defendant Cryptotech Holdings, LLC (Investments 1 through 8) or purportedly purchased miners

---

[4] Plaintiffs' requests that the Court order Defendants to provide Plaintiffs with an inventory of Defendants physical assets, access to those assets for inspection, and identification of Defendants cryptocurrency wallets are all ancillary to and in support of Plaintiffs' asset freeze request.

from Defendant NFN8 Capital and then leased those miners to Defendant NFN8 Holdings

(Investment 9). Figure 1 below details each of the nine Sale Leaseback Security transactions:

**Figure 1: Cryptotech Leases**

| Sale Leaseback Securities Purchase Date[5] | Purchase Price (To NFN8 Media or NFN8 Capital) | Number of Miner Units | Monthly "Lease" Payment (From Cryptotech or NFN8 Holdings) | Term of "Lease" (Months) | Contractual Payment End (Purchase Price Due From Cryptotech or NFN8 Holdings) |
|---|---|---|---|---|---|
| 6/28/2021 | $1,020,000 | 34 | $18,700[6] | 36 | 7/26/2024 |
| 3/18/2022 | $1,020,000 | 34 | $20,400 | 60 | 3/26/2027 |
| 5/20/2022 | $1,020,000 | 34 | $20,400 | 60 | 5/28/2027 |
| 5/20/2022 | $1,020,000 | 34 | $20,400 | 60 | 5/28/2027 |
| 8/19/2022 | $2,040,000 | 68 | $40,800 | 60 | 8/27/2027 |
| 12/22/2022 | $1,020,000 | 34 | $20,400 | 60 | 2/23/2028 |
| 3/23/2023 | $1,020,000 | 34 | $20,400 | 60 | 6/30/2028 |
| 3/23/2023 | $1,020,000 | 34 | $20,400 | 60 | 6/30/2028 |
| 5/24/2024 | $1,000,000 | 50 | $30,000 | 40 | 10/29/2027 |

*See generally,* Decl. of Dr. Justin Lo ¶¶ 9-11; *see also id.* Ex. A-F.

---

[5] The dates listed for the first eight transactions are the dates of the Bills of Sale associated with those investments. The date listed for the ninth and final investment is the date Mr. Moore executed the relevant Offering Documents; Defendants never provided a Bill of Sale in connection with the final investment.

[6] For this security, NFN8 was to pay $56,100 quarterly, which equates to $18,700 monthly.

The May 2024 transaction is the most relevant for Plaintiffs' TUFTA claims.  The NFN8 Capital Purchase Agreement purports to sell M-M WHS 50 "Infinite Miners" and expressly states that M-M WHS "is purchasing the Equipment for the purpose of leasing it to NFN8 Holdings, LLC, an affiliate of Capital."  *See* Decl. of Dr. Justin Lo, Ex. A at ¶ 2, Schedule A.  That agreement also expressly states that M-M WHS "is acquiring no interests in the products generated by the Equipment by [NFN8] Holdings, the lessee of the Equipment.  *See id.*, Ex. A at ¶ 13(B).  Similarly, the NFN8 Holdings Lease proceeds from the assumption that M-M WHS has actually purchased from NFN8 Capital equipment it can lease to NFN8 Holdings, and expressly notes that NFN8 Holdings is "leasing Equipment designated by [NFN8 Capital]."  *See* Decl. of Dr. Justin Lo, Ex. B at 1.  In addition, the NFN8 Holdings Lease also obligates NFN8 Holdings to pay M-M WHS $600 per miner per month in lease payments for 40 months (or $30,000 per month) and to repay M-M WHS the entire $1 million purchase price for the miners when the lease expires.  *See id.*, Ex. B.

The NFN8 Holdings Lease further states that NFN8 Holdings "desires to lease 100% of the Equipment and the equipment processing output capacity of the Equipment (the "Capacity") from the Lessor."  *See id.*, Ex. B at 1.  Moreover, the NFN8 Holdings Lease expressly states, "The Lessor is not entitled to any revenues, royalties, or profits from Lessee or from any use or product generated by the Lessee or the Mining Farms."  *See id.*, Ex. B.  In other words, the NFN8 Holdings Lease is supposed to provide NFN8 Holdings with a valuable asset in the form of miners and cryptocurrency mining capacity, and simultaneously create payment obligations for NFN8 Holdings that the parties anticipated NFN8 Holdings would pay from the proceeds of its mining activities using the leased machines.

Defendants provided Plaintiffs with Bills of Sale for the first eight investments.  *See, e.g,* *id.*, Ex. E (Bill of Sale exemplar); *see also id.,* Ex. F (consolidated collection of transactional documents for second through eighth investments, including seven additional Bills of Sale).  These Bills of Sale purported to identify the individual miners Plaintiffs purchased from Defendants by serial number.  *See id.* Defendants have never provided Plaintiffs with a Bill of Sale for M-M WHS's May 2024 investment.  *See id.,* ¶ 14.

### B.    Defendants' Path to Default

Plaintiff received timely payments from Defendants for just under three years. [7]  *See id.,* ¶ 16.  The trouble began as time neared for Defendants to make their first lump-sum return-of-principal payment in July of 2024.  In early May 2024, Defendants contacted Plaintiffs about making another $1 million investment in Defendants' Sale Leaseback Securities.  *See id.,* ¶¶ 18-23.  During a 27-minute phone call on May 7, 2024, Defendant Rodriguez pressed Plaintiffs' principal Dr. Justin Lo to invest additional funds to buy additional miners.  *Id.*  Rodriguez claimed that this was a strategically sound investment because there historically had been a six-to-eighteen-month "lag" before Bitcoin prices increased after a Bitcoin "halving," which had just happened the previous month.[8]  *Id.*  Rodriguez contended that less efficient miners would be dropping out of the market until the price of Bitcoin rose again, and indicated that Defendants were attempting to

---

[7] As the Complaint also explains, this was in large part because Defendants massively overcharged Plaintiffs for the miners, thus creating a "cushion" Defendants could use to make a number of monthly lease payments.  *See* Decl. of Dr. Justin Lo, ¶¶ 33-34;  Dkt. 1 at ¶¶ 28-38.

[8] In simplest terms, the producers of Bitcoin periodically halve the number of Bitcoins they grant to miners who have successfully mined a "block."  In April of 2024, the Bitcoin halving dropped the number of Bitcoins rewarded from 6.25 to 3.125.  The next halving is scheduled to take place in or around April 2028.

maximize the number of purportedly top-of-the-line, highly efficient miners they were operating, to take advantage of the temporary reduction in competition.[9] *Id.*

Notwithstanding a good track record with NFN8 to that point, Dr. Lo felt that he had already invested enough in Defendants' securities; he also expressed concerns about the timing of the proposed investment to Defendant Rodriguez during their May 7, 2024 call. *Id.* Dr. Lo told Rodriguez that he was not interested in investing an additional $1 million in May of 2024 if the purpose of that investment would simply be to provide Defendants with most of the funds they needed to be able to repay Plaintiffs their initial $1,020,000.00 principal investment when that payment came due in July 2024. *Id.* In response, Rodriguez assured Dr. Lo that Defendants were not soliciting a "round-trip" investment, informing Dr. Lo that to do so would be a "Ponzi scheme." *Id.*

Reassured both by Rodriguez's representations and by Defendants' willingness to offer an even higher rate of return for this final investment than for Plaintiffs' earlier investments, Plaintiff M-M WHS LLC invested an additional $1 million with Defendants on May 24, 2024. *Id.,* ¶ 23*; see also id.*, Ex. A, B & C.

On July 19, 2024, Defendants Moore and Rodriguez together called Dr. Lo to request a three-month forbearance both as to Defendants' July 2024 lease payments and as to their principal repayment obligation of $1,020,000 from Plaintiffs' soon-to-expire first lease. *See* Decl. of Dr. Justin Lo, ¶¶ 25-30. Rodriguez and Moore stated that their businesses were having cash-flow problems because they were allegedly building out five new data centers to host their miners, and these projects were consuming very large amounts of cash for capital expenditures, labor, and

---

[9] As Plaintiffs explain in their Complaint, Defendants' claims to have developed customized mining machines are bogus. *See, e.g.*, Dkt. 1 at ¶¶ 28-38.

supplies. *Id.* Moore and Rodriguez also claimed that they were currently operating only 40-50% of their existing miners because the NFN8 Defendants were building new facilities to house their miners, which immediately caused Dr. Lo to doubt Defendants' representations that the $1 million that M-M WHS invested in May 2024 was actually used to purchase new miners. *Id., ¶¶ 26-28.*

When Dr. Lo asked Moore and Rodriguez to detail their monthly costs for these purported build-outs, they refused. *Id.*, ¶ 30. Dr. Lo did not agree to the requested forbearance, and Defendants then defaulted on both their principal repayment for Plaintiffs' first investment and on their monthly lease payments for all nine of Plaintiffs' investments. *Id.*, ¶ 31. Plaintiffs have received no payments from Defendants since. *Id.* Shortly after Dr. Lo's July 19, 2024 call with Moore and Rodriguez, Dr. Lo retained counsel for Plaintiffs and authorized an investigation into Defendants' business. *Id., ¶ 32.*

Plaintiffs, Defendants, and their representatives met by videoconference on September 5, 2024 to discuss Defendants' continuing default on their obligations to Plaintiffs. *Id., ¶¶ 35-38.* During that meeting, Defendants gave Plaintiffs the same explanation for their inability to pay: Defendants purportedly incurred large expenses related to setting up new facilities. *Id.*, ¶ 36. During that same meeting, Plaintiffs expressly asked Moore whether Defendants had purchased any miners since Plaintiffs' May 2024 investment, and whether any such miners had been assigned to M-M WHS. *Id.,* ¶ 37-38. The attorney representing Defendants at that meeting immediately responded that Defendants had indeed purchased the 50 miners as required by the contract, only to be stopped by Defendant Moore, who equivocated. *Id.*, ¶ 38. Moore started to say that *some* miners had been purchased, but then indicated that Defendants had not purchased very many miners since Plaintiffs' May 2024 investment. *Id.*

Moreover, Defendants have never provided Plaintiffs with Bills of Sale or serial numbers for the miners they were supposed to purchase with M-M WHS's $1 million investment in May 2024 even though Defendants provided Plaintiffs with this information in connection with each of Plaintiffs' eight earlier investments. *See* Decl. of Dr. Justin Lo, ¶ 14; *see also id.*, Ex. A at ¶ 4 ("[NFN8] Capital shall provide [M-M WHS] with a Bill of Sale for the Equipment, which will specify the product description of the Equipment."), Ex. F & G (collecting Bills of Sale).

Nothing in the agreements regarding Plaintiffs' purchase of the Sale Leaseback Securities gives Plaintiffs any interest in Defendants' facilities. The NFN8 Holdings Lease expressly notes that NFN8 Holdings "will provide. . . secure warehousing, monitoring, maintenance, upgrading and updating" for the miners Plaintiffs were supposed to be purchasing. *Id.*, Ex. B at 1, Recitals ¶D. Similarly, the NFN8 Capital Purchase Agreement states that it "creates no relationship of employment, joint venture, partnership, limited partnership, fiduciary or agency between the parties and the parties hereby acknowledge that no other facts or relations exist that would create any such relationship between them." *Id.*, Ex. B at ¶ 9. In addition, the NFN8 Capital Purchase Agreement and the NFN8 Holdings Lease also establish that M-M WHS has no interest in the cryptocurrency to be generated by the miners. *See id.*, Ex. A and B. In short, Plaintiffs were supposed to be purchasing 50 miners, and only 50 miners, with their final investment.

## TRO, HEARING, AND DISCOVERY REQUEST

**I.     Plaintiffs are Entitled to a TRO Without Notice Freezing Defendants' Accounts**

**A.     Legal Standard**

**1.     Without-Notice TRO**

As the Fifth Circuit has explained, a temporary restraining order can issue when:

> (1) there is a substantial likelihood that the movant will prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant;

and (4) the granting of the preliminary injunction will not disserve the public interest.

*Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (internal citations omitted).

In other words, a TRO is "simply a highly accelerated and temporary form of preliminary injunctive relief." *Hassani v. Napolitano*, No. 3:09-CV-1201-D, 2009 WL 2044596, at *1 (N.D. Tex. July 15, 2009) (Fitzwater, C.J.).  The purpose of a TRO is to "preserv[e] the status quo and prevent[ ] irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974).

Under FED. R. CIV. P. 65(b)(1), a plaintiff may seek a TRO "without written or oral notice to the adverse party or its attorney only if:  (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."

In the context of a without-notice TRO sought to prevent further dissipation of corporate assets, the "immediate and irreparable injury" requirement of Rule 65(b)(1) is satisfied when the plaintiff demonstrates by affidavit that the defendant is already engaging in the act of dissipating assets and transferring them to third parties not entitled to them.  *See Sanzone Brokerage, Inc. v. J&M Produce Sales, Inc.*, 547 F.Supp.2d 599, 603-04 (N.D. Tex. 2008); *see also Broadspire Services, Inc. v. Wells*, No. 1:22-CV-163-H, 2022 WL 18635654, at *2-5 (N.D. Tex., Nov. 4, 2022); *Western Pacific Produce, Inc. v. Red Wagon Groves, Inc.*, No. SA-23-CV-0042-JKP, 2023 WL 11915703, at *2 (W.D. Tex., Jan. 13, 2023).

When the court issues a TRO or other injunction, the order can bind not only the parties and their officers, agents, servants, employees and attorneys, but also "other persons who are in active concert or participation" with them.  FED. R. CIV. P. 65(d)(2); *see also A.T.N. Indus., Inc. v.*

*Gross*, 632 Fed. App'x. 185, 192 (5th Cir. 2015) (citing rule and affirming district court decision freezing assets of both defendants and non-defendants to prevent further dissipation of assets).

### 2.    Provisional Remedies Under TUFTA

The Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COMM. CODE §§24.001-24.012, both defines fraudulent transfers and sets forth the criteria under which a court can enter provisional relief to prevent further dissipation of assets.  Under §24.005 of TUFTA, a debtor[10] (in this case, both NFN8 Holdings and NFN8 Capital ) has engaged in a fraudulent transfer as to a creditor (here, Plaintiff M-M WHS) if (1) the debtor made a transfer or incurred an obligation either with actual intent to hinder, delay or defraud any creditor of the debtor, or without receiving a reasonably equivalent value in exchange for the transfer or obligation; and (2) the transfer or incurred obligation put the debtor in a position such that it would not have sufficient assets to cover its future obligations.  *See generally* TEX. BUS. & COMM. CODE §24.005.[11]

When a court determines that a transfer is fraudulent under TUFTA, it may grant the creditor provisional relief including "an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the applicable Texas Rules of Civil Procedure and the Civil Practices and Remedies Code relating to ancillary proceedings. TEX. BUS. & COMM. CODE §24.008(2); *see also Gandy*, 2010 WL 11575903 at *5.  In such circumstances, the court can also issue "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property."  TEX. BUS. & COMM. CODE

---

[10] TUFTA defines "debtor" simply as "a person who is liable on a claim." TEX. BUS. & COMM. CODE §24.002(6).

[11] Section 24.005 of TUFTA applies to "Transfers Fraudulent as to Present and Future Creditors." Transfers can also be fraudulent as to present creditors when the transferor did not receive reasonably equivalent value in exchange and the debtor was insolvent at the time or became insolvent as a result of the transfer. *See id.* §24.006.

§24.008(3)(A).  Moreover, the court is also empowered to issue "any other relief the circumstances may require."  TEX. BUS. & COMM. CODE §24.008 (3)(C).

**B.    Argument**

**1.    Plaintiffs Have Pled a TUFTA Claim and Have Established a Substantial Likelihood That They Will Prevail on the Merits.**

Defendant NFN8 Capital accepted $1 million from M-M WHS in May 2024 for the sole contractual purpose of purchasing 50 miners it would then transfer to NFN8 Holdings, and Defendant NFN8 Holdings simultaneously executed a lease agreement with M-M WHS giving NFN8 Holdings the right to mine for cryptocurrency using those miners in exchange for approximately $2.2 million in payments to M-M WHS over 40 months. Accordingly, Plaintiff M-M WHS is a creditor with claims and Defendants NFN8 Capital and NFN8 Holdings are debtors under TUFTA.

M-M WHS has undisputed "right[s] to payment or property" from NFN8 Holdings, both matured (the three months—and counting—of monthly lease payments on which NFN8 Holdings has already defaulted); and unmatured (approximately 3 years of additional $30,000 monthly lease payments plus repayment of $1 million in principal investments).  *See* TEX. BUS. & COMM. CODE §24.002(3); *see also Gandy*, 2010 WL 11575903 at *6.  M-M WHS also had the undisputed right to have Defendant NFN8 Capital use its investment to purchase mining machines, which NFN8 Capital did not do.

Critically, NFN8 Capital has not denied that it failed to use Plaintiffs' money for its contractually mandated purpose.  Instead, NFN8 Capital principal Josh Moore admitted that although he thought NFN8 Capital had purchased some miners since Plaintiffs' May 2024 investment, it was very few miners *total*.  Moore was also unable to specify whether any of this small number of miners had been allocated to Defendants, and Defendants have never provided

Plaintiffs with the required Bill of Sale or serial numbers for the 50 miners they were to have purchased.  Moreover, Defendants' own story regarding the reasons they wanted Plaintiffs to invest in more miners in May contradicts their story about cash flow problems only two months later.  Defendants' stated desire to acquire *additional* miners in May to take advantage of a claimed lull in competition cannot be squared with their claim to have idled up to half of their *existing* capacity while constructing new facilities.[12]

Defendants have engaged in two discrete fraudulent transfers under TUFTA.  First, NFN8 Holdings' execution of its lease and assumption of lease obligations was fraudulent under TEX. BUS. & COMM. CODE §24.005.  Second, NFN8 Capital's transfer of M-M WHS's funds to third parties for purposes other than the contractually mandated purchase of miners violates §24.005 as well.

a.    The NFN8 Holdings Lease Violates TUFTA

NFN8 Holdings' assumption of $2.2 million in lease obligations to M-M WHS without receiving from NFN8 Capital the miners it was supposed to operate to generate revenue constitutes a fraudulent transfer under §24.005 both because it was made actual intent to hinder, delay, or defraud Plaintiffs and because NFN8 Holdings did not receive reasonably equivalent value from NFN8 Capital in exchange for the obligations and *at minimum* reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

Plaintiffs have also established actual intent.  TUFTA recognizes that actual intent can be difficult to prove with direct evidence.  Accordingly, the statute identifies a list of eleven factors courts may consider in determining actual intent.  TEX. BUS. & COMM. CODE § 24.005(b); *see also*

---

[12] As the Complaint explains in detail, Defendants' entire enterprise is just a variant on the classic Ponzi scheme.  The point here is not that Defendants were telling the truth *either* in May or in July, but rather that the stories are inconsistent with one another.

*Qui Phuoc Ho v. MacArthur Ranch, LLC*, 395 S.W.3d 325, 328-29 (Tex. App—Dallas 2013) ("Circumstantial proof may be used to prove fraudulent intent because direct proof is often unavailable;" citing "badges of fraud" list in §24.005(b).)

Several of these factors apply here. First, Defendants concealed the true nature of the transfer or obligation by failing to inform Plaintiffs that NFN8 Holdings assumed only the lease *obligations* without also obtaining the leased *miners*. TEX. BUS. & COMM. CODE § 24.005(b)(3). Second, because NFN8 Capital did not purchase, and thus could not transfer, the miners M-M WHS was supposed to be buying, the value of the consideration NFN8 Holdings received in exchange for the lease obligations was effectively zero, and was thus nowhere near reasonably equivalent to the $2.2 million obligation it assumed. *Id.* § 24.005(b)(8). Third, as subsequent events demonstrate, NFN8 Holdings was either already insolvent or became insolvent shortly after the obligation was incurred. *Id.* § 24.008(b)(9).[13] *See also Kalkan v. Salamanca*, 672 S.W.3d 725, 731-32 (Tex. App.—Houston [14th Dist.] 2023) (no pet.) ("Evidence of a single 'badge of fraud' does not conclusively demonstrate intent, but a confluence of several presents a strong case of fraud.") (internal citations omitted); *Flores v. Robinson Roofing & Constr. Co., Inc.*, 161 S.W.3d 750, 755-56 (Tex. App.—Fort Worth 2005) (no pet.).

Fourth, as subsequent events also demonstrated, NFN8 Holdings knew or should have known that assuming an additional lease obligation to M-M WHS for $30,000 per month without any miners would result in NFN8 Holdings incurring debts beyond its ability to pay as they came due. TEX. BUS. & COMM. CODE § 24.005(a)(2)(B).

        b.       NFN8 Capital's Misuse of M-M WHS's Funds Violates TUFTA

---

[13] As Plaintiffs' Complaint details, the true purpose of the May 2024 investment was neither to purchase more miners nor to invest in data centers, but rather to keep Defendants' sham business afloat a while longer.

NFN8 Capital's use of M-M WHS's funds for purposes other than the contractually-required purchase of miners also constitutes a fraudulent transfer under TUFTA §24.005. By failing to purchase the miners and instead using the proceeds of M-M WHS's investment for other purposes (whether for the purported completion of Defendants' data centers or to temporarily ease a cash crunch occasioned by Defendants' Ponzi scheme reaching a tipping point), NFN8 Capital actually intended to hinder, delay, and defraud Plaintiffs.

The timeline of events in this dispute from May 2024 to present demonstrates that the true purpose for which Rodriguez and Moore solicited Plaintiffs' May 2024 investment was to obtain capital Defendants could use to extend their charade by several additional months. The May 2024 investment was thus intended to hinder and delay Plaintiffs' discovery of Defendants' underlying fraud, and was itself fraudulent at two levels. Even if NFN8 Capital *did* use the money for facility expansion instead, that misuse constitutes an equally fraudulent transfer under §24.005. NFN8 Capital's misuse of Plaintiffs' funds even for that slightly more noble purpose directly contravenes its contractual obligations, and thus would still have been both intended to hinder and delay Plaintiffs from learning of Defendants' overarching fraud and fraudulent in its own right. *See* §24.005(a)(1). The same indicia of fraud from §24.005 (b)'s laundry list discussed above establish actual intent.

### 2. Plaintiffs Are Entitled to a Without-Notice TRO

Defendants' fraud is nothing more than a high-tech variation of the classic Ponzi scheme, and the recent fraudulent transfers described above are the canary in the coal mine signaling that the scheme is now collapsing under its own weight. With Defendants' scheme already unraveling to the point that they are engaging in ever-more-egregious behavior to prop it up, now is the time to freeze their assets to prevent further dissipation. Although FED. R. CIV. P. 65(b) admittedly sets a high bar for the issuance of a temporary restraining order without notice, Plaintiffs have satisfied

the requirements of the rule in this case, and the Court should issue a TRO freezing Defendants' and their associates' financial and physical assets until such time as the Court can schedule an expedited preliminary injunction hearing.

> a.    TUFTA and the Common Law Authorize Preliminary/Provisional Relief

While civil plaintiffs cannot generally seek to freeze assets to secure the legal remedy of damages in advance of judgment, they *can* seek to freeze assets in connection with equitable claims for relief. *See, e.g., In re 2920 ER, L.L.C.,* 607 Fed. App'x. 349, 355 (5th Cir. 2015) (holding that federal law authorizes the prejudgment freezing of assets if the relief requested is "traditionally exercised by courts of equity"); *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 289-91 (1940) (authorizing freezing of assets in securities fraud case seeking equitable relief); *see also Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 324-25 (1999); *Takiguchi v. MRI Intern., Inc.*, 611 Fed.Appx. 919, 921 (9th Cir. 2015) (holding that rule against freezing assets applies only in cases seeking *exclusively* legal damages). Plaintiffs here are seeking rescission of their contacts with NFN8—an equitable remedy—and therefore may seek an injunction freezing assets. *See, e.g. Deckert*, 311 U.S at 289-91; *In re 2920 ER*, 607 Fed.Appx. at 355; *see also Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) (authorizing preliminary injunctive relief freezing assets in conjunction with equitable claims for rescission).

In addition, as discussed above, TUFTA claims carry with them a *statutory* right to provisional relief in appropriate cases. *See* TEX. BUS. & COMM. CODE §§24.008(a)(2) & (3). Texas courts have held that this statutory language creates a right to provisional relief independent of the general rule tying provisional relief to the assertion of equitable claims. *See, e.g., Sargeant v. Al Saleh*, 512 S.W.3d 399, 415 (Tex. App. – Corpus Christi-Edinburg 2016) (no pet.).

3.     **Plaintiffs Have Established the Elements Entitling Them to a TRO, Including the Showing of Immediate and Irreparable Injury, Loss, or Damage Necessary to Obtain Ex Parte Relief.**

a.     Likelihood of Success on the Merits

Plaintiffs' Complaint, Application, and supporting materials demonstrate for TRO purposes that they are likely to succeed on the merits on both their claims for statutory relief under TUFTA and their common-law claims for rescission of their agreements with NFN8. In addition to Plaintiffs' strong TUFTA case, Plaintiffs also have a strong fraud case, which carries with it the equitable remedy of rescission—for which an injunction freezing assets is also an appropriate remedy. *See, e.g., Deckert*, 311 U.S. at 289-91 (recognizing that freezing assets is an appropriate remedy in connection with claim for rescission based on fraud)

Plaintiffs' independent investigation of Defendants' business has uncovered dozens of material misrepresentations, all built around the core of a classic Ponzi scheme with a twist, where the twist involves massively overcharging investors for the "sale" portion of their Sale Leaseback Securities transactions to provide Defendants with additional cushion with which to establish an early history of reliable payments. *See* Dkt. 1 at ¶¶28-38; *see also* Decl. of Paul Stancil, Ex. P (screen shots of Defendants' affiliate BlockOverstock.com website, including screen shots showing specific off-the-shelf miners for sale);   https://ir.mara.com/investors/news-events/press-releases/detail/1251/marathon-digital-holdings-purchases-30000-s19j-pro-bitcoin-miners-from-bitmain (2021: 30,000 miners for $120.7 million, or $4,023 per miner); https://theminermag.com/news/2023-12-04/riot-bitcoin-miner-whatsminer-microbt/   (2023: 66,560 miners for $290.5 million, or $4,364 per miner); https://ir.strongholddigitalmining.com/news-releases/news-release-details/stronghold-announces-addition-1-ehs-through-bitcoin-miner (2023: 5,000 miners for $8.5 million, or $1,700 per miner).

Specifically, the Court can infer likelihood of success from: (1) Defendants' solicitation of additional investment funds from Plaintiffs, ostensibly to purchase new miners, just two months before Defendants were supposed to make their first principal return payment; (2) Defendants' default on that principal return payment obligation and all monthly lease payments from July 2024 forward; (3) Defendants' contradictory and implausible explanations for their cash flow problems; and, (4) Defendants' admission that the May 2024 investment funds were not used to purchase miners, but rather to satisfy other obligations or to pursue other ends.  *Compare Emery v. Sun Cupid Technology (HK) Limited*, No. 3:20-CV-3519-L, 2020 WL 7664766, at *6 (N.D. Tex. – Dallas, December 23, 2020) (finding likelihood of success on merits on fraudulent transfer claim at ex parte TRO stage in light of plaintiff's verified allegations that, *inter alia*, Defendants had "failed to make required installment payments" and were "siphoning off assets.").

## b.    Irreparable Harm

Plaintiffs have also demonstrated the substantial threat of irreparable harm necessary for traditional preliminary injunctive relief; moreover, the facts alleged in the sworn declarations attached to this Application "clearly show that immediate and irreparable injury, loss, or damage will result" if the Court does not immediately freeze Defendants' assets to prevent further dissipation of the funds available to satisfy their obligation to Plaintiffs.

The evidence is clear that that Defendants:

- Sought additional investment funds from Plaintiffs in May 2024 under false pretenses shortly before Defendants' first lump-sum principal repayment obligation was to mature. *See generally* Decl. of Dr. Justin Lo.
- Lied about the purpose for which M-M WHS's May 2024 investment funds were used, thus causing NFN8 Holdings to assume significant lease obligations without the assets the parties contemplated would be used to generate the revenue needed to satisfy those obligations. *See id.*, ¶¶19-20, 25-30, 35-38.
- Defaulted on their obligation to repay Plaintiffs' first principal investment of $1,020,000 in July 2024. *See id.*, ¶31.

- Have established a total of at least eleven different NFN8 entities (including one corporation and ten LLCs) since 2020. *See* Decl. of Paul Stancil, Ex. M.[14]

- Are currently selling off the only meaningful hard assets Plaintiffs have been able to determine Defendants possess: "new and seasoned" miners they are offering on BlockOverstock.com website, despite representations to Plaintiffs that they cannot calculate the fair market value of the miners they own. *See id.*, Ex. N, O, P; Decl. of Dr. Justin Lo, ¶¶33-34.

- Have defaulted and continue to default on all nine of their monthly lease payment obligations to Plaintiffs, to the tune of almost $200,000 per month since July 2024. *See* Decl. of Dr. Justin Lo, ¶¶10, 31.

In addition, Plaintiffs have determined that Defendant Moore and his wife filed for personal bankruptcy four times from 2016 to 2018 without ever obtaining discharge of his debts (including hundreds of thousands of dollars owed to the Internal Revenue Service). *See* Decl. of Paul Stancil, Ex. B-L. Critically, two of their bankruptcy filings were dismissed without discharge for failure to provide complete and truthful information regarding assets and sources of income; the others were dismissed without discharge for failure to complete a court-mandated personal finance course and for defaulting on payment plan obligations after just a few months. *See id.*, Ex. C, F, H, J, K, &L. Of particular interest is the Bankruptcy Trustee's report in connection with the Moores' most recent filing in 2018, in which she notes that Defendant Moore's then-businesses—including a still-operating self-directed IRA advisory business with the same business address as Defendants—were apparently generating almost $50,000 per month in revenue while having a going concern market value of only $200 according to an incomplete asset schedule filed by Moore and his wife. *See id.*, Ex. K.

Finally, cryptocurrency is, by its very nature, confidential and easily hidden; in fact, as Defendants' own promotional materials explain, cryptocurrencies "do not rely on a central bank,

---

[14] One of the entities involved in the transactions—NFN8 Capital, L.L.C.—was formed in September 2023 and is currently in default according to the Nevada Secretary of State. *See* Decl. of Paul Stancil, Ex. M.

monetary authority, or government for regulation." *See* Decl. of Paul Stancil, Ex. A. Defendants actively celebrate this fact, noting that "ownership [of cryptocurrency] is very secure *while remaining anonymous*." *See id.* (emphasis added).

Plaintiffs have thus shown that they will suffer immediate and irreparable injury if the Court forces Plaintiffs to notify Defendants of their TRO Application before rendering a decision Defendants have engaged in fraudulent transfers intended to mask the underlying fraudulent nature of their business from Plaintiffs and other investors and have defaulted on over $1.6 million in lease and buyback obligations they owe to Defendants, with additional defaults accruing every month. Defendant Moore has a history of hiding assets from government scrutiny, and Defendants' business is part of an entire industry designed to provide anonymity in connection with asset flows. These facts put Plaintiffs' showing on par with—or even beyond—the showings made in recent cases in which a federal court deciding a Rule 65(b) application granted TROs. For example, in *Emery v. Sun Cupid Technology (HK) Limited*, No. 3:20-CV-3519-L, 2020 WL 10181571 (N.D. Tex. Dec. 1, 2020), Judge Lindsay granted an ex parte TRO freezing assets because the plaintiff's sworn allegations demonstrated that the defendant had fraudulently transferred assets and had failed to make required installment payments). *See id*. at *2; *see also Emery v. Sun Cupid Technology (HK) Limited*, No. 3:20-CV-3519-L, 2020 WL 10181571 (N.D. Tex. Dec. 23, 2020) (subsequent opinion converting TRO into preliminary injunction with additional background information).

Similarly, in *A.T.N. Industries, Inc. v. Gross*, No. 4:14-cv-02743, Order of September 25, 2014 granting Temporary Restraining Order (S.D. Tex., September 25, 2014) (attached), Judge Hoyt granted plaintiffs' application for an ex parte TRO in connection with a fraudulent transfer

scheme by Defendants against a company. Judge Hoyt concluded that Plaintiffs had satisfied the Rule 65(b) requirements because Plaintiffs showed:

- That the individual defendants had extensive international ties such that they might be able to evade the court's jurisdiction;
- That the defendants were sophisticated in their ability "in using the wires to transfer large amounts of money internationally."
- That, if the individual defendants were to transfer or dissipate additional money, they would be unlikely to satisfy any judgment against them.

*Id.* at 4. The Defendants in *Gross* did not appeal the district court's TRO, but they did take an interlocutory appeal when the district court converted the TRO provisions to a preliminary injunction. The Fifth Circuit affirmed the district court's decision, holding that the district court did not abuse its discretion either in granting a preliminary injunction freezing assets, or in the broad scope of that injunction. *A.T.N. Industries, Inc. v. Gross*, 632 Fed. App'x. 185, 191-92 (5th Cir. 2015); *see also infra.*

Finally, given that the facts here demonstrate that Defendants were engaged in a Ponzi scheme—or something closely akin to one—further dissipation of assets, and therefore irreparable harm, should be presumed. *Janvey v. Alguire*, 647 F.3d 585, 599 (5th Cir. 2011) (agreeing with the district court that plaintiff "was entitled to a presumption that the . . .Defendants would dissipate the frozen assets absent a preliminary injunction because the assets were fraudulently transferred as part of a Ponzi scheme").

Viewed against this backdrop—and with the understanding that Plaintiffs seek a TRO for so long as it takes to conduct the minimum necessary expedited discovery and hold a hearing on their request for a preliminary injunction—Plaintiffs have satisfied both the general irreparable harm standard required for any preliminary relief and the heightened standard required for an ex parte TRO to issue.

        c.      Balance of the equities and public interest.

Finally, the balance of the equities strongly favors Plaintiffs in this context, as does the public interest.  The harm to Plaintiffs if Defendants are permitted to dissipate their assets further will be enormous; by contrast, the countervailing burden on Defendants from granting the TRO, is both short-term and necessary to protect not only Plaintiffs, but also other investors in Defendants' fraudulent products and the public at large. This injunction is necessary, not only to protect Plaintiffs' chance to recover some of their fraudulently obtained assets, but to protect other investors as well and to prevent Defendants from continuing to perpetrate their schemes on an unsuspecting public. *See generally Janvey*, 647 F.3d at 601 (upholding district court decision on balance of hardships and public interest in Ponzi scheme context because of inherently limited "array of assets remaining to provide compensation" to Ponzi scheme victims.).

### 4.    Notice Should Not Be Required

For the reasons set forth above, Plaintiffs should not be required to provide notice to Defendants before the Court issues the requested TRO.  The undersigned counsel certify that they have made no effort as of the time of filing to give Defendants notice of this Application for TRO, and adopt the explanation and argument above as explanation for why that notice should not be required pursuant to Rule 65(b)(1)(B).

### 5.    The Scope of Temporary Restraining Order is Reasonable

Because of the shadowy, interlocking nature of Defendants' business enterprises, and because of the very nature of Plaintiffs' fraudulent transfer and general fraud allegations, Plaintiffs respectfully request that the Court enter a TRO casting a broad net.  The TRO in *Gross*, the core language of which was later approved as a preliminary injunction by the Fifth Circuit, provides a model.  In *Gross*, the operative language of the Court's preliminary injunction was as follows:

> It is further ORDERED that defendants Mauricio Gross a/k/a Mauricio Gross Drach, Clara Gross a/k/a Clara Schwartz, Business Management Services INT. LLC, and

Volanss Systems Co. Limited (collectively, the "Gross Defendants"), and each of their officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with these persons or entities, including but not limited to Rafael Schwartz, the father of Clara Schwartz and father-in-law of Mauricio Gross, are PRELIMINARY ENJOINED from transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien, security interest, or other interest in, or otherwise disposing of, any funds, wherever located, that are (a) owned, controlled, held by, in whole or in part, for the benefit of, or subject to access by, or belonging to, any Gross Defendant; (b) in the actual or constructive possession of any Gross Defendant; (c) in the actual or constructive possession of, or owned, controlled, or held by, or subject to access by, or belonging to, any other corporation, partnership, trust, or any other entity directly or indirectly owned, managed, or controlled by, or under common control with, any Gross Defendant; or (d) directly or indirectly held or controlled by, or under the possession of, Rafael Schwartz, in custody or for the benefit of any Gross Defendant (collectively, the "Frozen Funds").

It is further ORDERED that within fourteen (14) days of this Preliminary Injunction, the Gross Defendants shall file with the Court a schedule identifying the Frozen Funds, and specifically, the amounts and locations of the Frozen Funds.


It is further ORDERED that notwithstanding this Preliminary Injunction, only Mauricio Gross and Clara Gross may access, transfer, withdraw, or spend any of the Frozen Funds in a total amount not to exceed US $20,000 per month,[15] which total amount is designed to provide for reasonable living expenses for Gross and Clara Gross.

*See* Decl. of Paul Stancil, Ex. Q (attaching original TRO and Preliminary Injunction orders in

*A.T.N. Indus., Inc. v. Gross*, No. 4:14-CV-2743); *see also Gross*, 632 Fed.Appx. at 188-192

(upholding district court preliminary injunction). A TRO along these same lines is appropriate

here, and Plaintiffs attach a draft Order for the Court reflecting their best efforts to adapt Judge

Hoyt's language in *Gross* to the circumstances of this case.

---

[15] The Court's original TRO limited personal expenditures to $7,400.00 per month and involved several other largely cosmetic differences.

To further expedite proceedings and to ensure that Defendants' physical assets are maximally preserved, Plaintiffs also request that they be permitted to inspect Defendants' physical assets as set forth in the attached draft Order.

### G.    A Bond Is Not Necessary Here.

FED. R. CIV. P. 65(c) gives the court discretion over whether to require that parties seeking TROs must give security.  *See* FED. R. CIV. P. 65(c); *see also Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) ("In holding that the amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court, we have ruled that the court may elect to require no security at all.").  The Court should not require any security in this case.  Defendants already owe Plaintiffs over $1.6 million in undisputed, unpaid obligations and have been perpetrating a massive fraud on both Plaintiffs and their other investors and in all have taken more than $10 million from Plaintiffs to prop up their scheme.  Under those circumstances, no bond should be required.  *See Gross*, 632 Fed. App'x. at 192 (finding that district court did not abuse discretion in refusing to require a bond in fraud case involving freezing of assets); *see also* Decl. of Paul Stancil, Ex. Q.

## II.    Plaintiffs Request Expedited Discovery in Advance of the Preliminary Injunction Hearing.

This Court has discretion to permit discovery to commence immediately and to set deadlines for responding to discovery or comply with discovery obligations.  FED. R. CIV. P. 26(d)(1), 33(b)(2), & 34(b)(2)(A); *see also El Pollo Loco, SA de C.V. v. El Polio Loco*, Inc., 344 F. Supp. 2d 986, 991 (S.D. Tex. 2004).  The appropriate standard for expedited discovery is one of reasonableness or good cause.  *See id*. "Expedited discovery would be appropriate in cases involving preliminary injunctions," among other instances. *Id*.; *see also Intel Corp. v. Rais*, No. 1:19-CV-20-RP, 2019 WL 164958, at *7 (W.D. Tex. Jan. 10, 2019) (finding good cause in light

of pending preliminary injunction motion and granting expedited request for requests for production, requests for inspection, and interrogatories); *Ensor v. Does 1-15*, No. A-19-CV-00625-LY, 2019 WL 4648486, at *1 (W.D. Tex. Sept. 23, 2019) (restating good cause standard and granting early discovery prior to appearance of any defendant).

As described above in this Application and throughout Plaintiffs' Complaint, good cause exists for the Court to protect Plaintiffs via expedited injunctive relief here.

As Defendants will no doubt attempt to raise factual defenses before any hearing on a temporary injunction, Plaintiffs request reasonable expedited discovery in advance of the hearing. Plaintiffs request that each side exchange 5 interrogatories and 5 requests for production and that each side select two witnesses for a 2-hour deposition for any temporary injunction hearing.  In addition, as set forth in the attached draft Order, Plaintiffs request that the Court order Defendants to identify any and all accountants they have retained (whether internally or externally) so that Plaintiffs can depose one or more of these individuals, with such depositions not to count against the two-witness total.

Plaintiffs also request that the Court order Defendants to identify all cryptocurrency wallets they hold or have held, including but not limited to all cryptocurrency wallets that hold or have held cryptocurrency keys for cryptocurrency mined by Defendants.  Similarly, Plaintiffs request that the Court order Defendants to produce 36 months of bank statements for all Defendants.

## III.   Plaintiffs Request that the Court Schedule a Preliminary Injunction Hearing on an Expedited Basis

Plaintiffs also request a preliminary injunction to run with the case on the same grounds that justify their application for a TRO Both the nature of Plaintiffs' underlying claims and the nature of the TRO relief Plaintiffs seek counsel in favor of the earliest possible hearing date for that request after limited expedited discovery has been completed.  *See* Fed. R. Civ. P. 65(b)(3)

(preliminary injunction hearing for without-notice TRO "must be set for the earliest possible time, taking precedence over all other matters except hearings on older matters of the same character.").

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiffs respectfully requests that the Court: (1) set a date for a preliminary injunction hearing; (2) grant expedited discovery in advance of the preliminary injunction hearing; and (3) issue a TRO.

October 10, 2024

Respectfully submitted,

STEPTOE LLP
*/s/Hector R. Chavez*
Hector R. Chavez
Texas State Bar No. 24078335
*Admitted to practice in W.D. Tex*
717 Texas Avenue, Suite 2800
Houston, Texas 77002
Telephone (713) 221-2300
hchavez@steptoe.com

Ashwin Ram
*Pro Hac Vice Application Forthcoming*
California State Bar No. 277513
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
aram@steptoe.com

David Isaak
Texas State Bar No. 24012887
*Pro Hac Vice Application Forthcoming*
Paul Stancil
Texas State Bar No. 00797488
*Pro Hac Vice Application Forthcoming*
717 Texas Avenue, Suite 2800
Houston, Texas 77002
Telephone (713) 221-2300
disaak@steptoe.com
pstancil@steptoe.com

-AND-

**COUNSEL FOR MOBILE MED WORK
HEALTH SOLUTIONS, INC.;
JLL VENTURES, INC.; AND
M-M WHS LLC**

THE DURRANT LAW FIRM, APC

John S. Durrant
*Pro Hac Vice Application Forthcoming*
California State Bar No. 217345
john@durrantlawfirm.com
2337 Roscomare Rd., Suite 2-180
Los Angeles, CA 90077
Tel: 424.273.1962
**COUNSEL FOR MOBILE MED WORK
HEALTH SOLUTIONS, INC.;
JLL VENTURES, INC.; AND
M-M WHS LLC**