# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **MOBILE MED WORK HEALTH SOLUTIONS, INC.;** **JLL VENTURES, INC.; AND** **M-M WHS LLC** | § § § § § § § § § | Case No. Judge: |
| **Plaintiffs,** | § § § § | |
| v.- | § § § § § | |
| **JOSHUA MOORE; CORY RODRIGUEZ; NFN8 GROUP, INC.; NFN8 HOLDINGS, LLC; NFN8 CAPITAL, LLC; NFN8 MEDIA, LLC; NFN8 FOUNDATIONand CRYPTOTECH HOLDINGS, LLC;** | § § § § § § § § § § § | |
| **Defendants.** | § § | |

## DECLARATION OF DR. JUSTIN LO, M.D.

Pursuant to 28 U.S.C. § 1746(2), I declare as follows:

1.   My name is Dr. Justin Lo, M.D.  I am fully competent to make this Declaration, and all statements herein are true and correct and are within my personal knowledge.  I submit this Declaration in support of the Application for Temporary Restraining Order Without Notice and Motion to Set Preliminary Injunction Hearing and Order Expedited Discovery of Plaintiffs Mobile

Med Work Health Solutions, Inc. ("Mobile Med"), JLL Ventures, Inc. ("JLL"), and M-M WHS LLC ("M-M WHS") (collectively, "Plaintiffs"). I intend this Declaration to address the facts relevant to the Application and not an exhaustive recitation of all facts relevant to this lawsuit.

2. I am the Chief Executive Officer and/or most senior manager of each of Plaintiffs. I am a medical doctor by training. I am not a financial or investing professional. I have no formal legal training.

3. This Declaration concerns investments Plaintiffs made with a business enterprise that I understand includes, at minimum, NFN8 Group, Inc. ("NFN8 Group"), NFN8 Holdings, LLC ("NFN8 Holdings"), NFN8 Capital, LLC ("NFN8 Capital"), NFN8 Media, LLC ("NFN8 Media"), NFN8 Foundation, Cryptotech Holdings, LLC ("Cryptotech" and, collectively, with NFN8 Holdings, NFN8 Group, NFN8 Media, and NFN8 Foundation, "NFN8 Defendants" or "NFN8").

4. Based on my extensive dealings with the NFN8 Defendants, I understand that Joshua Moore ("Mr. Moore") and Cory Rodriguez ("Mr. Rodriguez") manage the NFN8 Defendants. In this Declaration, I use the word "Defendants" as including Mr. Moore, Mr. Rodriguez, and the NFN8 Defendants.

5. Beginning in 2021, Defendants approached me about investing in certain cryptocurrency mining sale-leaseback securities (the "Sale Leaseback Securities"). The investments were complicated and, prior to making the initial investment, unfamiliar to me. Throughout my dealings with NFN8, I relied on the explanations provided by Defendants regarding the Sales Leaseback Securities, as well as promotional materials distributed by Defendants related to the Sales Leaseback Securities.

Doc ID: 692fe5bddbe0e80bfb9f51117ff8e76151553ee4

6.      Based on such representations, I understood that investing in each Sale Leaseback Security meant that NFN8 would first purchase certain brand new, state-of-the-art cryptocurrency mining machines, which one of the Plaintiffs would in turn purchase from NFN8.  Immediately thereafter, Plaintiff would lease back the newly purchased machines to NFN8 for the mining of cryptocurrency.

7.      Defendants told me that they had special capabilities in cryptocurrency mining that included the ability to mine cryptocurrency much more efficiently and profitably than others in the industry and the ability to procure new cryptocurrency mining computers (*i.e.*, "miners") that were not generally available in the marketplace.  They said they had special software and trading strategies that enabled them to operate at extraordinary profitability.

8.      Defendants also told me that their leaseback of purchased equipment typically lasted 3-5 years, during which time NFN8 Defendants would make lease payments to the relevant investing Plaintiff.  Defendants also indicated that at the end of the lease, NFN8 would make a balloon payment (called a "repurchase") through which NFN8 bought back the miners from the relevant Plaintiff at the original price they charged to Plaintiff.

9.      Each deal consisted of two contracts: (i) a Services and Purchase Agreement ("Purchase Agreement"); and (ii) a "Lease Agreement."  I use the word "Offering Documents" to collectively describe the Lease Agreements and Purchase Agreements.

Doc ID: 692fe5bddbe0e80bfb9f51117ff8e76151553ee4

10. Below is a true and correct list of the investments that Plaintiffs made:

| Sale Leaseback Securities Purchase Date[1] | Purchase Price (To NFN8 Media or NFN8 Capital) | Number of Miner Units | Monthly "Lease" Payment (From Cryptotech or NFN8 Holdings) | Term of "Lease" (Months) | Contractual Payment End (Purchase Price Due From Cryptotech or NFN8 Holdings) |
|---|---|---|---|---|---|
| 6/28/2021 | $1,020,000 | 34 | $18,700[2] | 36 | 7/26/2024 |
| 3/18/2022 | $1,020,000 | 34 | $20,400 | 60 | 3/26/2027 |
| 5/20/2022 | $1,020,000 | 34 | $20,400 | 60 | 5/28/2027 |
| 5/20/2022 | $1,020,000 | 34 | $20,400 | 60 | 5/28/2027 |
| 8/19/2022 | $2,040,000 | 68 | $40,800 | 60 | 8/27/2027 |
| 12/22/2022 | $1,020,000 | 34 | $20,400 | 60 | 2/23/2028 |
| 3/23/2023 | $1,020,000 | 34 | $20,400 | 60 | 6/30/2028 |
| 3/23/2023 | $1,020,000 | 34 | $20,400 | 60 | 6/30/2028 |
| 5/24/2024 | $1,000,000 | 50 | $30,000 | 40 | 10/29/2027 |

11. A true and correct copy of the May 24, 2024 Purchase Agreement and Lease Agreement are attached hereto as Exhibits A and B, respectively.

---

[1] The dates listed for the first eight transactions are the dates of the Bills of Sale associated with those investments. The date listed for the ninth and final investment is the date Mr. Moore executed the relevant Offering Documents; Defendants never provided me with a Bill of Sale in connection with the final investment.

[2] For this security, NFN8 was to pay $56,100 quarterly, which equates to $18,700 monthly.

Doc ID: 692fe5bddbe0e80bfb9f51117ff8e76151553ee4

12. True and correct copies of the April 2021 Purchase Agreement, the April 2021 Lease Agreement, and the corresponding June 28, 2021 Bill of Sale for that transaction are attached hereto as Exhibits C, D, and E, respectively.

13. A true and correct copy of the remaining Offering Documents and Bills of Sale related to the other Sale Leaseback Securities listed on the above chart are attached hereto as a Consolidated Exhibit F.

14. I never received a Bill of Sale related to the May 2024 transaction. I also never received a list of serial numbers for the miners M-M WHS purchased related to this transaction, even though I received lists of supposed serial numbers for each of the other deals.

15. I understood each of the nine Sale Leaseback Securities transactions to be materially identical other than – as indicated in the above chart – changes in the number of miners, the length of the lease term, and, for the final May 24, 2024 deal, the price paid for each miner and thus the increased rate of return for that transaction.

16. From when Plaintiffs made their initial investment until June 30, 2024, NFN8 made all payments under the Lease Agreements in an approximately timely manner.

17. From March 2023 until May 2024, Plaintiffs did not make additional investments in the Sale Leaseback Securities. The reason for this is that, by March 2023, Plaintiffs had already invested more than $9 million in the Sale Leaseback Securities, and I thought Plaintiffs should have exposure to other sorts of investments in different industries. Over that intervening 14-month period, Mr. Rodriguez asked me multiple times to have my companies make additional investments in the Sale Leaseback Securities, offering different terms to try to make the deals more attractive to Plaintiffs. I consistently declined to make further investments.

Doc ID: 692fe5bddbe0e80bfb9f51117ff8e76151553ee4

18.     In early May 2024, Mr. Rodriguez contacted me again by telephone about making another $1 million investment in Defendants' Sale Leaseback Securities. I had previously talked to Mr. Rodriguez many times before about the Sale Leaseback Securities. I personally liked Mr. Rodriguez. We had a friendly and professional relationship  I placed a high degree of trust in him.

19.     During a 27-minute phone call on May 7, 2024, Mr. Rodriguez pressed me to invest additional funds in the Sale Leaseback Securities. Mr. Rodriguez claimed that this was a strategically sound investment because there historically had been a six-to-eighteen-month "lag" before Bitcoin prices increased after a Bitcoin "halving," which had just happened the previous month.  Rodriguez contended that less efficient miners would be dropping out of the market until the price of Bitcoin rose again. Mr. Rodriguez indicated that Defendants were attempting to maximize NFN8's deployment of purportedly top-of-the-line, highly efficient miners, to take advantage of the temporary reduction in competition.

20.     At no time during the call did Mr. Rodriguez state, imply, or indicate that any of the NFN8 Defendants had any:

    a. potential cash flow issues;

    b. unusual or unexpected expenses;

    c. possibility of defaults on existing obligations;

    d. prior defaults on any bills or obligations;

    e. vulnerabilities to competition

    f. limitations in NFN8's claimed technical expertise;

    g. difficulty procuring state-of-the-art mining devices that were not generally available in the marketplace as NFN8 had promised;

Doc ID: 692fe5bddbe0e80bfb9f51117ff8e76151553ee4

    h.  inability to put miners into service for any reason;

    i.  potential operating problems that might pose a risk to the amount invested by Plaintiffs or the past or future obligations to pay Plaintiffs; or

    j.  possibility that the amount invested by Plaintiffs might be used for a purpose other than purchasing miners.

21. Although NFN8 had a good track record of making payments to that point, and although Defendants had repeatedly represented that NFN8 had never missed a payment to any investor for any reason, I was also concerned about the timing of the proposed investment. I knew that a couple of months after making the proposed investment, NFN8 had a balloon payment (i.e., "repurchase") on the very first investment Plaintiffs made with NFN8. Under the terms of that deal, NFN8 needed to pay Plaintiffs $1,020,000 by July 26, 2024.

22. So, I told Mr. Rodriguez that I was not interested in investing an additional $1 million in May of 2024 if the purpose of that investment would simply be to provide Defendants with most of the funds they needed to be able to repay Plaintiffs their initial $1,020,000 principal investment when that payment came due on July 26, 2024. In response, Rodriguez assured me that Defendants were not soliciting a "round-trip" investment, and saying to me that to do so would be a "Ponzi scheme." More than that, Mr. Rodriguez promised me that, consistent with NFN8's ordinary practices, NFN8 had money set aside and reserved to make that $1,020,000 payment.

23. I trusted Mr. Rodriguez. His confident statements gave me strong assurance that my concerns were misplaced that NFN8 would not round-trip the amount of the May 2024 investment to Plaintiffs. I fully expected NFN8 to continue to make all payments to me – both the lease payments and repurchase amounts. On or about May 24, 2024, I therefore ultimately agreed to have M-M WHS make a $1 million investment with NFN8.

Doc ID: 692fe5bddbe0e80bfb9f51117ff8e76151553ee4

24. And, after making the investment, NFN8 made its monthly payments as scheduled for May 2024 and June 2024.

25. On July 19, 2024, Messrs. Rodriguez and Moore called me on the telephone. They were both on the line when we spoke. What they said came as a complete surprise. They requested a three-month forbearance not only on NFN8's July 2024 lease payments but also on their repayment obligation of $1,020,000 on the first of Plaintiffs' Sale Leaseback Securities.

26. For the very first time, Messrs. Rodriguez and Moore stated that NFN8 was having cash flow problems because it was allegedly building out five new data centers to host NFN8's miners. They said that these projects were consuming very large amounts of cash for capital expenditures, labor, and supplies. This was the first I was hearing about these supposed issues. Messrs. Rodriguez and Moore also noted that they were currently operating only 40-50% of their existing miners because the NFN8 Defendants were building new facilities to house their miners.

27. The July 19, 2024 call concerned me. In the first, place, NFN8 had very recently induced Plaintiffs to invest another $1 million to buy additional miners and none of these issues were mentioned or suggested in any way. If Mr. Rodriguez had said anything about potential cash flows issues, I obviously would have never made the investment (which I was reluctant to make anyway, as noted above). I also relied on Mr. Rodriguez's statements about the liquidity of NFN8 and its practice of reserving adequate funds to meet all obligations. Before making the May 24, 2024 investment, I had asked about the $1,020,000 repurchase payment on the first investment that was due on July 26, 2024 and Mr. Rodriguez had assured me not to worry and that all would be taken care of as promised, because NFN8 had the money set aside to pay the repurchase amount. The fact that now NFN8 was not only failing to make that repurchase payment

Doc ID: 692fe5bddbe0e80bfb9f51117ff8e76151553ee4

but also each and every lease payment due to Plaintiffs made it clear to me that NFN8 did not have adequate money reserved to meet its obligations as promised.

28. The sudden and unexpected default concerned me for other reasons. First, no one ever told me that the setting up of new facilities would cause any potential cash flow issues that could directly or indirectly impact. Rather, I was always told that NFN8 had special software, hardware, and strategies that allowed NFN8 to be extraordinarily profitable and made Plaintiffs' investments secure in a competitive industry. Now, Messrs. Rodriguez and Moore were saying something totally different – that their operations were so impaired that they could not even put miners into service. I began asking myself the following questions: If NFN8 had a large volume of idle miners in late May 2024, then why would they possibly need Plaintiffs' money to buy additional miners that could not be used to immediately generate revenue? It made no sense. Why buy machines contractually obligated to immediately generate revenue for leases, if you couldn't use the miners? And, given the claims that NFN8 had large business expenses, this led me to believe that M-M WHS's $1 million had been used for purposes other than purchasing miners. Moreover, unlike any of the other deals, I never received Bill of Sale with a list with the serial numbers of the machines NFN8 purchased for the May 24, 2024 deal, even though Defendants' contract required them to provide me with one.

29. After making this surprise announcement that NFN8 would default and the surprise request for forbearance, I tried to clarify with Messrs. Rodriguez and Moore how this could possibly have happened given everything Defendants had told me. While Messrs. Rodriguez and Moore said this all arose from the need to set up new facilities, I cannot plausibly see how that would be an issue that they would have only suddenly discovered. Setting up data centers and

Doc ID: 692fe5bddbe0e80bfb9f51117ff8e76151553ee4

mining facilities takes time – a business has to acquire very large, warehouse-like facilities, build them out, work out deals with electrical utilities, etc.

30. On and around July 19, 2024 and thereafter I asked Messrs. Moore and Rodriguez multiple times to detail their monthly costs for these purported buildouts, their burn rate, and their revenue. They refused to share this information. I asked other questions on the call to try to understand what had happened and how on multiple occasions, the situation could be fixed, but I did not receive any sort of a coherent or truthful explanation.

31. I did not agree to the three-month requested forbearance, and NFN8 then defaulted on both their repurchase payment for the first investment and on their monthly lease payments for all nine of Plaintiffs' investments. Plaintiffs have received no payments from Defendants since.

32. Shortly after the July 19, 2024 call, Plaintiffs retained counsel to evaluate the situation. I thereafter authorized an investigation into Defendants' business.

33. In late July 2024 or early August 2024, in order to try to corroborate claims by Messrs. Moore and Rodriguez that NFN8 was creditworthy such that I should consider agreeing to forbearance, I requested information concerning the assets of NFN8. Weeks after my request, on August 27, 2024, NFN8 through my counsel provided cursory information not of their *assets*, but of the claimed *original purchase price* of the miners owned by NFN8. NFN8 claimed the miners that NFN8 owned cost NFN8 $31,350,990.56. I understand that a copy of the email sent from counsel for NFN8 to Plaintiffs' counsel, John Durrant will be attached to the Declaration of Paul Stancil of Steptoe and will be filed and served concurrently with this Declaration. I have no idea the information provided by NFN8 is accurate, but it was not what I requested; I wanted to know the current value of the machines (i.e., what they are worth now) which related to creditworthiness, not what NFN8 paid for the machines before they depreciated.

Doc ID: 692fe5bddbe0e80bfb9f51117ff8e76151553ee4

34. As my efforts to get additional information regarding creditworthiness continued, counsel for NFN8 emailed Plaintiffs' counsel, John Durrant, stating that NFN8 owned "over 6000" miners. I understand a copy of the email sent from counsel for NFN8 to Plaintiffs' counsel, John Durrant will be attached to the Declaration of Paul Stancil of Steptoe and will be filed and served concurrently with this Declaration. I have no idea if this information is accurate, but if it were accurate, it would suggest that NFN8 acquired miners for approximately $5,200 ($31,350,990.56 / 6,000 = $5,225.17). Of course, Plaintiffs had been charged much more by NFN8 for the miners: $30,000 for most of the miners they purchased and $20,000 for the other miners.

35. Plaintiffs, Defendants, and their representatives met by videoconference on September 5, 2024 to discuss Defendants' continuing default on their obligations to Plaintiffs. Messrs. Moore and Rodriguez were invited to attend the call, but only Mr. Moore attended, even though most of my prior interactions and sales discussions had been with Mr. Rodriguez.

36. During that videoconference, Mr. Moore gave the same explanation for NFN8's inability to pay: Defendants purportedly incurred large expenses related to setting up new facilities.

37. During that same meeting, we asked whether Defendants had purchased any miners since Plaintiffs' May 2024 investment, and whether any such miners had been assigned to M-M WHS.

38. Counsel for NFN8 immediately responded that they had been purchased; he apparently believed that the Defendants had indeed purchased the miners as NFN8 had promised. But, immediately thereafter, Mr. Moore appeared to correct his lawyer, saying that some miners

11

had been purchased, but then indicated that Defendants had not purchased very many miners since Plaintiffs' May 2024 investment.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Santa Clara County, California on  10 / 09 / 2024  .

_____
Justin Lo

Doc ID: 692fe5bddbe0e80bfb9f51117ff8e76151553ee4

![Dropbox Sign]

Audit trail

| | |
|---|---|
| Title | 241009 (916p) Declaration of Justin Lo.pdf |
| File name | 241009%20%28916p%...20Justin%20Lo.pdf |
| Document ID | 692fe5bddbe0e80bfb9f51117ff8e76151553ee4 |
| Audit trail date format | MM / DD / YYYY |
| Status | ● Signed |

This document was requested from app.clio.com

## Document History

**SENT**
**10 / 10 / 2024**
04:19:20 UTC
Sent for signature to Justin Lo (justin@justinlomd.com) from john@durrantlawfirm.com
IP: 84.17.44.142

**VIEWED**
**10 / 10 / 2024**
04:19:49 UTC
Viewed by Justin Lo (justin@justinlomd.com)
IP: 107.214.150.164

**SIGNED**
**10 / 10 / 2024**
04:20:46 UTC
Signed by Justin Lo (justin@justinlomd.com)
IP: 107.214.150.164

**COMPLETED**
**10 / 10 / 2024**
04:20:46 UTC
The document has been completed.

Powered by Dropbox Sign