# EXHIBIT F-10

Purchase-506(c)-5yr-24-sg-05-24-2022



**If to NFN8 Media:**
13809 Research Blvd.
Suite 785
Austin, TX 78750
Fax: (512) 857-8176
info@nfn8.com

**If to Client:**
At the address and telephone number set forth below Client's signature.

11) **LIMITATION OF LIABILITY.**

THE PARTIES AGREE THAT IT IS IMPOSSIBLE TO DETERMINE WITH ANY REASONABLE ACCURACY THE AMOUNT OF DAMAGES TO CLIENT UPON THE BREACH OF NFN8 MEDIA OBLIGATIONS UNDER THIS AGREEMENT. THEREFORE, THE PARTIES AGREE THAT CLIENT'S SOLE REMEDY FOR MATERIAL BREACH OF NFN8 MEDIA OBLIGATIONS UNDER THIS AGREEMENT AND THE ACCOMPANYING LEASE AGREEMENT WILL BE LIQUIDATED DAMAGES IN THE AMOUNT OF THE EQUIPMENT PURCHASE FEE PAID BY CLIENT TO NFN8 MEDIA PLUS TEN DOLLARS ($10.00) LESS ANY LEASE PAYMENTS REMEDIES, AND DAMAGES PAID UNDER THE ACCOMPANYING LEASE AGREEMENT TO THE CLIENT FROM LEASING THE HASHING ABILITY OF THE MINING FARM(s). CLIENT HEREBY WAIVES ALL OTHER CLAIMS FOR DAMAGES OF ANY KIND AGAINST NFN8 MEDIA, ITS MEMBERS, MANAGERS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS, AGENTS, REPRESENTATIVES OR AFFILIATES, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS FOR ANY LOSS OF USE, INTERRUPTION OF BUSINESS OR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING, WITHOUT LIMITATION LOST PROFITS), REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT, STRICT PRODUCT LIABILITY OR OTHERWISE (EXCEPT AS OTHERWISE SPECIFIED IN THIS SECTION OF THE AGREEMENT). CLIENT AND NFN8 MEDIA AGREE THAT THE LIQUIDATED DAMAGES SET FORTH ABOVE ARE REASONABLE AND NOT A PENALTY BASED ON THE FACTS AND CIRCUMSTANCES OF THE PARTIES AT THE TIME OF ENTERING INTO THIS AGREEMENT WITH DUE REGARD TO FUTURE EXPECTATIONS.

12) **GOVERNING LAW.**

This Agreement and any dispute arising from or in connection with this Agreement shall be interpreted under and governed by Texas law, without regard to conflict of laws principles.

13) **BINDING ARBITRATION.**

NFN8 and the Client agree that any disputes, claims, suits, actions, causes of action, demands or proceedings (collectively, "Disputes") arising from or related to the terms of the Agreement shall not be resolved in a court, and (ii) hereby waive the Client's

Purchase-506(c)-5yr-24-sg-05-24-2022



and NFN8's respective rights to a jury trial. Instead, the Client and NFN8 will arbitrate Disputes through binding arbitration (which is the referral of a Dispute to one or more persons charged with reviewing the Dispute and making a final and binding determination to resolve it instead of having the Dispute decided by a judge or jury in court).

a) **No Class Arbitrations, Class Actions, or Representative Actions.** Any Dispute arising out of or related to the Agreement is personal to the Client and NFN8 and will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding. There will be no class arbitration or arbitration in which an individual attempts to resolve a Dispute as a representative of another individual or group of individuals. Further, a Dispute cannot be brought as a class or other type of representative action, whether within or outside of arbitration, or on behalf of any other individual or group of individuals.

b) **Federal Arbitration Act.** The Agreement affects interstate commerce and the enforceability of this section 14 will be both substantively and procedurally governed by and construed and enforced in accordance with the federal arbitration act, 9 U.S.C. § 1 et seq. (the "FAA"), to the maximum extent permitted by applicable law.

c) **Notice.** Each party will notify the other party in writing of any Dispute within thirty (30) days of the date it arises, so that the parties can attempt in good faith to resolve the Dispute informally. Notice shall be sent pursuant to the notice provisions of this Agreement. The Client's notice must include (i) the Client's name, postal address, email address, and telephone number, (ii) a description in reasonable detail of the nature or basis of the Dispute, and (iii) the specific relief that the Client is seeking. If the Client and NFN8 cannot agree how to resolve the Dispute within thirty (30) days after the date notice is received by the applicable party, then either the Client or the NFN8 may, as appropriate and in accordance with this Section 14, commence an arbitration proceeding.

d) **Process.** Any arbitration will occur in Dallas, Texas. Arbitration will be conducted confidentially by a single arbitrator in accordance with the rules of the Judicial Arbitration and Mediation Services ("JAMS"), which are hereby incorporated by reference. The state and federal courts located in Texas will have exclusive jurisdiction over any appeals and the enforcement of an arbitration award.

e) **Authority of Arbitrator.** As limited by the FAA, the Agreement and the applicable JAMS rules, the arbitrator will have (i) the exclusive authority and jurisdiction to make all procedural and substantive decisions regarding a Dispute, including the determination of whether a Dispute is arbitrable, and (ii) the authority to grant any remedy that would otherwise be available in court; provided, however, that the arbitrator does not have the authority to conduct a class arbitration or a representative action, which is prohibited by the Agreement. The arbitrator may only conduct an individual arbitration and may not consolidate more than one

Purchase-506(c)-5yr-24-sg-05-24-2022



individual's claims, preside over any type of class or representative proceeding or preside over any proceeding involving more than one individual.

f) **Rules of JAMS.** The rules of JAMS and additional information about JAMS are available on the JAMS (https://www.jamsadr.com/). By agreeing to be bound by the Agreement, the Client either (i) acknowledges and agrees that the Client has read and understands the rules of JAMS, or (ii) waives its opportunity to read the rules of JAMS and any claim that the rules of JAMS are unfair or should not apply for any reason.

g) **Severability of Dispute Resolution and Arbitration Provisions**. If any term, clause or provision of Section 14 is held invalid or unenforceable, it will be so held to the minimum extent required by law, and all other terms, clauses and provisions of Section 14 will remain valid and enforceable. Further, the waivers set forth in Section 14.A are severable from the other provisions of the Agreement and will remain valid and enforceable, except as prohibited by applicable law.

14) **WAIVER**.

The failure of either party to insist upon the performance of any obligation or term of this Agreement or to exercise any right hereunder shall not constitute a waiver of that obligation or term. No waiver of any right or obligation under this Agreement shall be effective unless in writing and signed by both parties.

15) **ASSET PURCHASE ONLY – NO OTHER RELATIONSHIP**

The Client is not investing in any company or entity. The Client is not purchasing shares or part of any company or entity. By executing this agreement, the Client is not purchasing cryptocurrency. The Client is purchasing 100% of the Computer Equipment described herein. This Agreement creates no relationship of employment, joint venture, partnership, limited partnership, fiduciary, or agency between the parties and the parties hereby acknowledge that no other facts or relations exist that would create any such relationship between them. The parties are engaging in this Agreement as independent parties with respect to each other.

16) **SUCCESSORS AND ASSIGNS**.

This Agreement shall inure to the benefit of and will be binding upon and enforceable by the parties and their respective heirs, representatives, successors and permitted assigns.

17) **ENTIRE AGREEMENT; AMENDMENT**.

This Agreement and the schedules attached hereto constitute the entire understanding and agreement between the parties with respect to the subject matter set forth in this Agreement and supersedes any and all prior agreements, understandings, promises, conduct and representations made concerning the subject matter of this Agreement. This Agreement may only be amended in writing, signed by each party to this Agreement.

Purchase-506(c)-5yr-24-sg-05-24-2022



18) **COUNTERPARTS; ELECTRONIC SIGNATURES**.

This Agreement may be executed in counterparts, each of which taken together shall constitute an original, single, binding agreement between the parties. Any signature of a party required by this Agreement may be transmitted to the other party via facsimile or other electronic transmission and such facsimile or electronically transmitted signature shall be deemed an original signature binding upon the signing party for all purposes.

19) **ATTORNEYS' FEES AND COSTS**.

If either party resorts to legal action in order to enforce the provisions of this Agreement or to defend such action, the prevailing party will be entitled to receive reimbursement from the non-prevailing party for all reasonable attorneys' fees and all other costs incurred in commencing or defending such action, or in enforcing this Agreement, including but not limited to post judgment costs.

20) **SEVERABILITY**.

If any term, provision, covenant or condition of this Agreement is found to be invalid, void, or unenforceable by any court of competent jurisdiction, the remaining provisions hereof will continue in full force and effect and will in no way be affected, impaired or invalidated.

21) **SURVIVAL**.

Sections 11 through 22 of this Agreement will survive the expiration, termination, and cancellation of this Agreement.

Purchase-506(c)-5yr-24-sg-05-24-2022



**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the date first written above.

**NFN8 Media, LLC,** a Texas limited liability company

Name: _____

Title: _____

Signature: _____

Date: _____

**CLIENT**

Mobile-Med Work Health Solutions

Signature: _____  12/21/2022
DocuSigned by: Justin Lo
F2E8630B7F61400...
By: Justin Lo

Address:
2101 Forest Ave. #220
San Jose, CA 95128
(650) 280-0816
justin@justinlomd.com

13809 Research Blvd Suite 785 Austin, TX 78750        8

Purchase-506(c)-5yr-24-sg-05-24-2022



## SCHEDULE A
### (Purchased Mining Farm Equipment)

**YOUR PURCHASE CONSISTS OF THE FOLLOWING EQUIPMENT PACKAGE**

| **EQUIPMENT** | **SERIAL NUMBER** |
|---|---|
| THIRTY-FOUR (34) Infinite Blockchain Miner(s) | Issued Upon Purchase |

**Each Blockchain Miner Incorporates Components Below**

**Hardware**
- Custom Mining Server Setup
- High-Grade Aluminum Casing
- CPU Rack with Multivariate Outputs – Multiple Nodes
- Sha 256 Microprocessors
- Field-Programmable Gate Array (FPGA)
- 500 Min. Application Specific Integrated Circuit Chips
- Computer Controlled Fans for Cooling and Heat Dissipation
- PCI Slots
- Power Adapters
- Redundant Transfer Devices
- Incoming Power Management Controllers
- Variable Inline Capacitors
- Customized Power Managed Connecting Cables
- Proprietary Managed Dashboard Sync
- Connectors for Monitors

**Software and Firmware**
- Custom Firmware for End User Interface, Wallet Pool Management
- Thermal Load Management Software
- Proprietary Cooling Solution Software
- Metering and Monitoring Chip Efficiency Solution Software
- Proprietary Thermal Load Management Software
- Proprietary Mining Farm Software License
- Proprietary Multi-Software Sync License

(1) The purchased assets are procured, assembled, and tested by the Company. (2) Mining Software is installed, tested, managed and updated. (3) The purchased assets are transported, installed, and warehoused at a data center where power, cooling, and venting are carefully controlled. (4) The data center is protected, alarmed, and insured. (5) The equipment components may be modified, updated or both at any time at the discretion of NFN8 Media. (6) The software referenced above is part of the services provided in this agreement. It is not owned by the client. (7) The company employs a proprietary trading platform. The equipment purchaser pays no additional fees for (1) through (7). The exact location and address of the data center is not disclosed herein for security and safety reasons.

13809 Research Blvd Suite 785 Austin, TX 78750                                                              9

DocuSign Envelope ID: CDB3F5A8-2A4A-4E4A-BA66-ACD4BCB5A9B6
Case 1:24-cv-01219-RP    Document 2-17    Filed 10/10/24    Page 8 of 17

Purchase-506(c)-5yr-24-sg-05-24-2022



## GENERAL INFORMATION

THE INFORMATION CONTAINED HEREIN (THE "INFORMATION") HAS BEEN PREPARED BY NFN8 MEDIA FOR THE PRIVATE AND CONFIDENTIAL USE OF PROSPECTIVE CLIENTS CONSIDERING THE PURCHASE OF THE COMPUTER EQUIPMENT HEREIN AND IS NOT TO BE REPRODUCED OR DISTRIBUTED BY SUCH PROSPECTIVE CLIENTS, OTHER THAN IN CONNECTION WITH CONFIDENTIALLY SHARING SUCH INFORMATION WITH SUCH PROSPECTIVE CLIENTS' FINANCIAL ADVISORS OR CONSULTANTS.

BY ACCEPTING THIS CONFIDENTIAL AGREEMENT, THE RECIPIENT AGREES: (I) NOT TO DISTRIBUTE OR REPRODUCE THIS AGREEMENT, IN WHOLE OR IN PART, AT ANY TIME, WITHOUT THE PRIOR WRITTEN CONSENT OF NFN8 MEDIA; AND (II) TO KEEP CONFIDENTIAL THE EXISTENCE OF THIS DOCUMENT AND THE INFORMATION CONTAINED HEREIN OR MADE AVAILABLE IN CONNECTION WITH ANY FURTHER INVESTIGATION OF NFN8 MEDIA.

THE INFORMATION CONTAINS CERTAIN "FORWARD-LOOKING" STATEMENTS. YOU CAN IDENTIFY FORWARD-LOOKING STATEMENTS BY TERMINOLOGY SUCH AS "MAY," "WILL," "WOULD," "COULD," "SHOULD," "EXPECTS," "INTENDS," "PLANS," "ANTICIPATES," "BELIEVES," "ESTIMATES," "PREDICTS," "POTENTIAL," "CONTINUES" OR THE NEGATIVE OF THESE TERMS OR OTHER COMPARABLE TERMINOLOGY. FORWARD-LOOKING" STATEMENTS ARE BASED ON VARIOUS ASSUMPTIONS MADE BY NFN8 MEDIA; WHICH ASSUMPTIONS MAY PROVE TO BE INCORRECT. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT SUCH FORWARD-LOOKING STATEMENTS WILL ACCURATELY PREDICT FUTURE EVENTS OR NFN8 MEDIA'S ACTUAL PERFORMANCE. IN ADDITION, ANY PROJECTIONS AND REPRESENTATIONS, WRITTEN OR ORAL, WHICH DO NOT CONFORM TO THOSE CONTAINED IN THIS AGREEMENT, MUST BE DISREGARDED, AND THEIR USE IS A VIOLATION OF LAW. NO REPRESENTATION OR WARRANTY CAN BE GIVEN THAT THE ESTIMATES, OPINIONS OR ASSUMPTIONS MADE HEREIN WILL PROVE TO BE ACCURATE. WE ASSUME NO OBLIGATION TO UPDATE SUCH FORWARD-LOOKING STATEMENTS OR TO UPDATE THE REASONS ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN SUCH FORWARD-LOOKING STATEMENTS. BECAUSE MANY FACTORS ARE UNFORESEEABLE, THE FOREGOING SHOULD NOT BE CONSIDERED AN EXHAUSTIVE LIST AND READERS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON FORWARD-LOOKING STATEMENTS.

BY READING THE INFORMATION CONTAINED WITHIN THIS DOCUMENT, THE RECIPIENT AGREES WITH NFN8 MEDIA TO MAINTAIN IN CONFIDENCE SUCH INFORMATION, TOGETHER WITH ANY OTHER NON-PUBLIC INFORMATION REGARDING NFN8 MEDIA OBTAINED FROM NFN8 MEDIA OR ITS AGENTS DURING THE COURSE OF THE PROPOSED FINANCING. NFN8 MEDIA HAS CAUSED THESE MATERIALS TO BE DELIVERED TO YOU IN RELIANCE UPON SUCH AGREEMENT AND UPON RULES PROMULGATED UNDER REGULATION FD BY THE SECURITIES AND EXCHANGE COMMISSION.

Purchase-506(c)-5yr-24-sg-05-24-2022



## ADDITIONAL INFORMATION FOR ALL CLIENTS

As used in this Agreement and unless otherwise expressly stated or the context otherwise indicates, all references to "we", "our", "us", or the "Company" refer to NFN8 Media, LLC, a Texas limited liability company.

WE HAVE THE SOLE AUTHORITY TO NEGOTIATE THE TERMS OF THIS PURCHASE OF COMPUTER EQUIPMENT WITH ANY RECIPIENT OF THIS AGREEMENT, OR ANY OTHER PERSON AT ANY TIME AND TO ENTER INTO A DEFINITIVE AGREEMENT, OR TERMINATE ALL NEGOTIATIONS, WITHOUT PRIOR NOTICE TO ANY PROSPECTIVE CLIENT OR ANY OTHER PERSON. WE RESERVE THE RIGHT, IN OUR SOLE DISCRETION AND FOR ANY REASON WHATSOEVER, TO MODIFY, AMEND AND/OR WITHDRAW ALL OR A PORTION OF THE PURCHASE AND/OR TO ACCEPT OR REJECT IN WHOLE OR IN PART ANY PROSPECTIVE PURCHASE OF THE COMPUTER EQUIPMENT OR TO ALLOT TO YOU LESS THAN THE QUANTITY OF EQUIPMENT THAT YOU MAY WISH TO PURCHASE.

BEFORE PURCHASING THE COMPUTER EQUIPMENT, NFN8 MEDIA: (1) WILL GRANT EACH PROSPECTIVE CLIENT THE OPPORTUNITY TO REVIEW ADDITIONAL DOCUMENTS AND TO ASK QUESTIONS OF, AND TO RECEIVE ANSWERS FROM, THE OFFICERS OF NFN8 MEDIA CONCERNING NFN8 MEDIA AND THE TERMS AND THE CONDITIONS OF THIS PURCHASE OR ANY OTHER MATTER SET FORTH HEREIN; AND (2) SUPPLY ANY ADDITIONAL INFORMATION, TO THE EXTENT NFN8 MEDIA POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN.

## WHERE YOU CAN FIND MORE INFORMATION

We are not subject to the informational and reporting requirements under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

For additional information you may also contact us at: **737-900-2539**

## THE SALE OF COMPUTER EQUIPMENT (MINING FARM COMPUTERS)

NFN8 Media is offering to sell up to a total of Indefinite number of computer equipment systems called Mining Farm Computers to be used in cryptocurrency mining operations (the "Computer Equipment"). **The above Services and Purchase Agreement is for a purchase of THIRTY-FOUR (34) Mining Farm Computer(s) for a Total Fee of $1,020,000.00.** Since the purchase of the Mining Farm Computers offered in each **Services and Purchase Agreement** along with an opportunity to immediately lease back the Mining Farm Computers to an NFN8 Media affiliated company could potentially be construed as a sale of a "security" by Federal and State regulators, we are only allowing "accredited investors", as defined below, to participate in this purchase and lease-back transaction

13809 Research Blvd Suite 785 Austin, TX 78750                                                                 11

Purchase-506(c)-5yr-24-sg-05-24-2022



(The **Services and Purchase Agreement and the Lease Agreement**). NFN8 Media reserves the right to increase the amount of the sale of computer equipment in its sole discretion. The initial closing of each **Services and Purchase Agreement** (the "Initial Closing") will occur as soon as practicable after NFN8 Media has accepted the initial **Services and Purchase Agreement**. It is currently contemplated that the proceeds each **Services and Purchase Agreement** will be delivered to NFN8 Media at one or more closings. Following the Initial Closing, NFN8 Media may conduct one or more subsequent closings (consummation of each individual **Services and Purchase Agreement**) until the earlier of (i) December 31, 2021, subject to the right of NFN8 Media to extend the sale of computer equipment or (ii) the date on which the maximum sale of computer equipment equals Indefinite. If the sale of all computer equipment is successful, NFN8 Media may sell additional MINING FARM Computer Equipment, for an additional aggregate price of up to Indefinite. NFN8 Media may employ registered commissioned selling agents in connection with the offer to sell Mining Farm computers to Clients, who will purchase them and lease them back.

Although NFN8 Media is attempting to sell up to Indefinite number of Computer Equipment pursuant to the terms of each individual **Services and Purchase Agreement** (the aggregated total of all **Services and Purchase Agreements** which equals the total computer equipment sales described in (ii) above), it is not obligated to sell or lease-back the maximum amount of computer equipment described in (ii) above, and it cannot make any assurances that such amount will be sold or leased or both. All proceeds from the regular business account of NFN8 Media, and no escrow account will be established. NFN8 Media will forthwith prepare and deliver the Mining Farm Computers to the designated data center that NFN8 chooses on behalf of the client.

Upon closing any **Services and Purchase Agreement**, NFN8 Media will immediately begin to utilize the proceeds received therefrom, notwithstanding the fact that NFN8 Media has not received purchases for all or even substantially all of the Mining Farm Computer Equipment. NFN8 Media is not obligated to sell all of the Computer Equipment pursuant to this Agreement.

## USE OF PROCEEDS

| | |
|---|---|
| **Total amount to be Purchased:** | Indefinite |
| PLEASE SEE SCHEDULE A FOR DETAILED INFORMATION CONCERNING THE USE OF PROCEEDS | |
| Hardware, Software, Services | Proposed use |
| | _____ |

13809 Research Blvd Suite 785 Austin, TX 78750                    12

Purchase-506(c)-5yr-24-sg-05-24-2022

NFN8 MEDIA

# ADDITIONAL INFORMATION

**The address of the principal executive offices of NFN8 Media is:**

13809 Research Blvd.
Suite 785
Austin, TX 78750

For additional information concerning this Purchase, contact Josh Moore, President, at 737-900-2539 or josh@nfn8.com.

## PURCHASE ONLY FOR ACCREDITED INVESTORS

This Purchase is being extended to "Accredited Investors" only pursuant to Rule 506 of Regulation D of the Securities Act of 1933. Under the Act, and for purposes of this Agreement, an "Accredited Investor" is defined as follows:

(1) Any bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000, or, if a self-directed plan, with investment decisions made solely by persons that are Accredited Investors;

(2) Any private business development company as defined in Section 202(a) (22) of the Investment Advisers Act of 1940;

(3) Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, or similar business trust, or partnership, not formed for the specific purpose or acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer or general partner of a general partner of that issuer;

Purchase-506(c)-5yr-24-sg-05-24-2022



(5) Any natural person whose individual net worth or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are Accredited Investors.

## SECURITIES ACT AND EXCHANGE ACT COMPLIANCE

Enacted in 2012, Section 201(a) of the Jumpstart or Business Startups Act (JOBS Act) eliminated the prohibition on using general solicitation under Rule 506(c) where all purchasers of the securities are accredited investors and the issuer takes reasonable steps to verify that the purchasers are accredited investors. An "accredited investor" includes a natural person who earned income that exceeded $200,000 (or $300,000 together with a spouse) in each of the prior two years, and reasonably expects the same for the current year, or a natural person who has a net worth of over $1 million, either alone or together with a spouse (excluding the value of a person's primary residence). An "accredited investor" may also be a non-human entity such as a bank, partnership, corporation, nonprofit or trust, when certain criteria are satisfied. A more detailed definition of "accredited investor" in included in the Definitions section supra and is available in full within Section 501 of the SEC's Regulation D.

The JOBS Act requires that issuers wishing to engage in Rule 506(c) general solicitation must take "reasonable steps" to verify the accredited investor status of purchaser. One of the most common ways for an issuer to meet this standard is to obtain written confirmation from a licensed attorney stating that such person or entity has taken reasonable steps to verify that the purchaser is an accredited investor. In this particular offering, legal counsel, a broker dealer, accountant or third-party verification service (collectively hereinafter referred to as the "Service"), on behalf of NFN8 Media, will make an objective determination as to whether the steps taken are "reasonable" in the context of the particular facts and circumstances of each Client and transaction. The Service will consider all relevant factors illustrated by Rule 506(c), which may include but are not limited to the following considerations:

- The nature of the Client and the type of accredited investor that the Client claims to be.

- The amount and type of information that NFN8 Media has about the Client.

Purchase-506(c)-5yr-24-sg-05-24-2022



- The nature of the offering, such as the manner in which the Client was solicited to participate in the offering, and the terms of the offering, such as minimum investment amount.

Furthermore, the Service will require documentation to verify that a Client is qualified as an accredited investor. The following is a non-exclusive list of verification methods that the Service may use when seeking greater certainty that a Client satisfies the verification requirement with respect to natural person Clients:

- Verification based on income, by reviewing copies of any Internal Revenue Service form that reports income, such as a Form W-2, Form 1099, Schedule K-1 of Form 1065, and a filed Form 1040.

- Verification on net worth, by reviewing specific types of documentation dated within the prior three months, such as bank statements, brokerage statements, certificates of deposit, tax assessments and a credit report from at least one of the nationwide consumer reporting agencies, and obtaining a written representation from the investor.

- A written confirmation from a registered broker-dealer, an SEC-registered investment adviser, a licensed attorney or a certified public accountant stating that such person or entity has taken reasonable steps to verify that the Client is an accredited investor within the last three months and has determined that such Client is an accredited investor.

13809 Research Blvd Suite 785 Austin, TX 78750                                    15



# Bill of Sale

Dated     12/22/2022

### EQUIPMENT
**INFINITE BLOCKCHAIN MINER**

### CUSTOMER NUMBER
NFN8-0310-22911-202118-092026

CUSTOM MINING SERVER SETUP
HIGH-GRADE ALUMINUM CASING
CPU RACKS WITH MULTIVARIATE OUTPUTS – MULTIPLE NODES
SHA 256 MICROPROCESSORS
FIELD-PROGRAMMABLE GATE ARRAY (FPGA)
500 MIN. APPLICATION SPECIFIC INTEGRATED CIRCUIT CHIPS
COMPUTER CONTROLLED FANS FOR COOLING AND HEAT DISSIPATION
PCI SLOTS
POWER ADAPTERS
REDUNDANT TRANSFER DEVICES
INCOMING POWER MANAGEMENT CONTROLLERS
VARIABLE INLINE CAPACITORS
CUSTOMIZED POWER MANAGED CONNECTING CABLES
PROPRIETARY MANAGED DASHBOARD SYNC UP
CONNECTIONS FOR MONITORS
CUSTOM FIRMWARE FOR END USER INTERFACE, WALLET AND POOL MGMT
THERMAL LOAD MANAGEMENT SOFTWARE
PROPRIETARY COOLING SOLUTION SOFTWARE
METERING AND MONITORING CHIP EFFICIENCY SOFTWARE
PROPRIETARY MINING FARM SOFTWARE
PROPRIETARY MULTI-SOFTWARE SYNC LICENSE

**Serial Numbers**

| | | | |
|---|---|---|---|
| SMTTD4CBAJIAD0112 | SMTTD4CBAJIAH0074 | NGSBD4CBAJIAG0127 | NGSBD4CBAJIAG1198 |
| PIEMD4CBAJIAG4061 | PIEMD4CBAJIAF3369 | NGSBD4CBAJIAD7646 | NGSBD4CBAJIAD4588 |
| PIEMD4CBAJIAG4152 | SMTTD4CBAJIAD0091 | SMTTD4CBAJIAC0098 | NGSBD4CBAJIAG1041 |
| PIEMD4CBAJIAG4054 | NGSBD4CBAJIAG1162 | NGSBD4CBAJIAG1042 | NGSBD4CBAJHCA0591 |
| PIEMD4CBAJIAG4060 | NGSBD4CBAJIAG1149 | NGSBD4CBAJIAG1681 | |
| SMTTD4CBAJIAH0013 | SMTTD4CBAJIAH0012 | NGSBD4CBAJIAD9922 | |
| PIEMD4CBAJIAG4059 | NGSBD4CBAJIAG1178 | NGSBD4CBAJIAG1132 | |
| PIEMD4CBAJIAF3496 | SMTTD4CBAJIAH0073 | NGSBD4CBAJIAG1195 | |
| SMTTD4CBAJIAD0082 | NGSBD4CBAJHAG9937 | SMTTD4CBAJIAH0005 | |
| NGSBD4CBAJIJF0617 | SMTTD4CBAJIAD0127 | NGSBD4CBAJIJF0596 | |

| | | |
|---|---|---|
| **Sales Price** | $ | 1,020,000.00 |
| **Amount Paid** | $ | 1,020,000.00 |
| **Amount Due** | $ | - |

Sold to:    Mobile-Med Work Health Solutions
Justin Lo
2101 Forest Ave #220
San Jose, CA 95128
(650) 280-0816
justin@justinlomd.com

Thank you for your business!



# LEASE AGREEMENT

This Lease Agreement ("**Lease Agreement**") is dated March 20, 2023 (the "**Effective Date**"), by and between CryptoTech Holdings, LLC, a Texas limited liability company, ("**CTH**" or the "**Lessee**") and the other person or entity who has executed this Lease Agreement ("**Lessor**").

## RECITALS

A. Lessor owns the equipment described on Schedule A hereto (the "**Equipment**"), which is part of the Lease Agreement. Lessor possesses the obligation of NFN8 Media, LLC ("**Media**") to service the Equipment. The Equipment was purchased pursuant to a Purchase and Services Agreement with Media dated of even date herewith (the "**Purchase Agreement**").

B. CTH desires to lease 100% of the Equipment and the equipment processing output capacity of the Equipment (the "**Capacity**") from the Lessor and the Lessor desires to lease such Equipment and Capacity to CTH pursuant to the terms and conditions of this Lease Agreement.

C. CTH will provide software (but not ownership), secure warehousing, monitoring, maintenance, upgrading and updating of the Equipment to ensure proper and continuous operation of the Lessor's Equipment.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained in this Lease Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, CTH and Lessor agree as follows:

1. **LEASE**

    Lessor agrees to lease to CTH and CTH agrees to lease from the Lessor, 100% of the Equipment and the Capacity. The Lessor will be paid a fee (the "**Lease Fee**") for a total lease term of 5 years (the "**Lease Period**"). The Lease Fee will be paid in equal monthly installments (each such monthly payment, a "**Lease Fee**") by deposit to the Lessor's bank account (bank name and account number supplied by the Lessor). The Lease Fees are set forth in Schedule B hereto. The payments shall begin from the date that the Equipment and Capacity are available and ready for operation, (the "**Commencement Date**"). CTH will pay the Lessor the Lease Fees by the end of the third week of every month for the 5 year period that payments are required to be made under this Lease Agreement. The Lease Fee shall continue to be paid until all payments due have been paid; provided, however, if the Lease Agreement is terminated due to the actions or inactions or fault of Lessor, such payments shall cease immediately.

2. **END OF LEASE**

    At the end of the Lease Period, Lessor shall have the right to claim or not claim the Equipment. The Lessor must notify Lessee of its intention to claim or not claim the Equipment at least 30 days prior to the end of the Lease Period. Upon such notice, Lessee shall arrange to ship (at Lessee's expense) or return the Equipment to the Lessor or if the Lessor does not claim the Equipment, CTH will be obligated to purchase each Mining Farm bought by Lessor and leased by Lessee for the amount of $30,000.

3. **FORCE MAJEURE.**

6065665



Neither CTH nor Lessor shall be liable to the other for failure to perform its obligations under this Lease Agreement if prevented from doing so because of an Act of God, strike, fire, terrorism, flood, war, civil disturbance, interference by civil, government, or military authority, pandemic or other causes beyond the reasonable control of the party. Upon the occurrence of such an event the party seeking to rely on this provision shall promptly give written notice to the other party of the nature and consequences of the event.

4. **NOTICES.**

   All notices and other communications under this Lease Agreement must be in writing and must be given by facsimile, email, or first-class mail, certified with return receipt requested, and will be deemed to have been duly given 24 hours after transmission of a facsimile or email, or three (3) days after mailing, to the respective persons and entities named following this paragraph. Either party may change its address, telephone number, facsimile number, email address, or contact name by providing notice thereof to the other party in the manner specified above.

   **If to CryptoTech Holdings, LLC**:
   13809 Research Blvd.
   Suite 785
   Austin, TX 78729
   Fax: (512) 857-8176
   info@nfn8.com

   *If to Lessor:*
   At the address and telephone number set forth below Lessor's signature.

5. **LIMITATION OF LIABILITY.**

   THE PARTIES AGREE THAT IT IS IMPOSSIBLE TO DETERMINE WITH ANY REASONABLE ACCURACY THE AMOUNT OF DAMAGES TO LESSOR UPON THE BREACH BY CTH OF ITS OBLIGATIONS HEREUNDER AND THE PURCHASE AND SERVICES AGREEMENT. THE AMOUNT OF DAMAGES SHALL BE DEEMED TO BE LIQUIDATED DAMAGES, AT THE SOLE ELECTION OF CTH (a) IN THE AMOUNT OF $30,000 PER MINING FARM LEASED LESS ANY PAYMENT PAID UNDER THIS LEASE AGREEMENT OR THE PURCHASE AGREEMENT OR (b) THE RETURN OF THE EQUIPMENT TO LESSOR. THE OBLIGATIONS SET FORTH HEREIN UNDER THIS LEASE AGREEMENT AND THE PURCHASE AGREEMENT SHALL BE IN THE AGGREGATE AND NOT CUMULATIVE AND CAN ONLY BE COLLECTED ONCE AND NOT SEPARATELY UNDER BOTH AGREEMENTS. LESSOR HEREBY WAIVES ALL OTHER CLAIMS FOR DAMAGES OF ANY KIND AGAINST CTH, ITS MEMBERS, MANAGERS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS, AGENTS, REPRESENTATIVES OR AFFILIATES, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS FOR ANY LOSS OF USE, INTERRUPTION OF BUSINESS OR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING WITHOUT LIMITATION, LOST PROFITS), REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT, STRICT PRODUCT LIABILITY OR OTHERWISE. LESSOR AND CTH AGREE THAT THE LIQUIDATED DAMAGES SET FORTH ABOVE ARE REASONABLE AND NOT A PENALTY BASED ON THE FACTS AND

2

6065665



CIRCUMSTANCES OF THE PARTIES AT THE TIME OF ENTERING INTO THIS LEASE AGREEMENT WITH DUE REGARD TO FUTURE EXPECTATIONS. THESE LIQUIDATED DAMAGES AND THOSE UNDER THE PURCHASE AGREEMENT ARE NOT ADDITIVE; THEY SHALL ONLY BE PAID UNDER THIS AGREEMENT OR THE PURCHASE AGREEMENT, NOT UNDER BOTH AGREEMENTS.

6. **GOVERNING LAW.**

    This Lease Agreement and any dispute arising from or in connection with this Lease Agreement shall be interpreted under and governed by Texas law, without regard to conflict of laws principles.

7. **BINDING ARBITRATION.**

    CTH and the Lessor agree any dispute, claim or controversy arising out of or relating to this Lease Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Lease Agreement to arbitrate, shall be determined by arbitration in Dallas, Texas before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. Judgment on any award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

8. **WAIVER.**

    The failure of either party to insist upon the performance of any obligation or term of this Lease Agreement or to exercise any right hereunder shall not constitute a waiver of that obligation or term. No waiver of any right or obligation under this Lease Agreement shall be effective unless in writing and signed by both parties.

9. **AKNOWLEDGEMENT**

    (A) In accordance with the rules and regulations promulgated by the U.S. Securities and Exchange Commission (the "**SEC**"), the interest acquired through the execution of this Lease Agreement and the Purchase Agreement as described in an Executive Summary relating to this transaction which has been previously delivered to Lessor (the "**Executive Summary**") is deemed to be a "security" as such term is defined in the Act. As a result, such interest is subject to the SEC's rules and regulations governing securities.

    (B) The Lessor is not entitled to any revenues, royalties or profits from Lessee or from any use or product generated by the Lessee or the Mining Farms.

    (C) By leasing the Mining Farm(s), the Lessor is not mining or purchasing cryptocurrency.

    (D) This Lease Agreement creates no employment, relationship of joint venture, partnership, limited partnership, fiduciary, or agency between the parties and the parties hereby acknowledge that no other facts or relations exist that would create any such relationship between them.

    (E) Lessor acknowledges and agrees that all service obligations of Media under the Purchase Agreement will be assumed by CTH immediately upon execution of this Lease Agreement and the simultaneous execution of the Purchase Agreement. Lessor will no longer look to Media to perform or be liable for such service obligations.

3