# EXHIBIT F-11

DocuSign Envelope ID: AC31AB70-8C68-4E03-9460-E0D23C4B58F5



(F) CTH, at its discretion, shall be able to replace any equipment on the terms and conditions set forth in the Purchase Agreement which right Media had. CTH will perform any and all service obligations on the replaced equipment as CTH was obligated to do on the original leased equipment

10. **SUCCESSORS AND ASSIGNS.**

This Lease Agreement shall inure to the benefit of and will be binding upon and enforceable by the parties and their respective heirs, representatives, successors and permitted assigns; provided that Lessor cannot assign its rights under this Lease Agreement without the prior written consent of Lessee, which consent may be withheld for any reason.

11. **ENTIRE UNDERSTANDING; AMENDMENT.**

This Lease Agreement and the schedules attached hereto, the Purchase Agreement and the Executive Summary constitute the entire understanding and agreement between the parties with respect to the subject matter set forth in this Lease Agreement and supersede any and all prior agreements, understandings, promises, conduct and representations made concerning the subject matter of this Lease Agreement. This Lease Agreement may only be amended in writing, signed by each party to this Lease Agreement.

12. **COUNTERPARTS; ELECTRONIC SIGNATURES.**

This Lease Agreement may be executed in counterparts, each of which taken together shall constitute an original, single, binding agreement between the parties. Any signature of a party required by this Lease Agreement may be transmitted to the other party via facsimile or other electronic transmission and such facsimile or electronically transmitted signature shall be deemed an original signature binding upon the signing party for all purposes.

13. **ATTORNEYS' FEES AND COSTS**.

In the event that either party must resort to legal action in order to enforce the provisions of this Lease Agreement or to defend such action pursuant to the arbitration provisions set forth in paragraph 8 above, the prevailing party will be entitled to receive reimbursement from the non-prevailing party for all reasonable attorneys' fees and all other costs incurred in commencing or defending such action, or in enforcing this Lease Agreement, including but not limited to post-judgment costs.

14. **SEVERABILITY**.

If any term, provision, covenant or condition of this Lease Agreement is found to be invalid, void, or unenforceable by any court of competent jurisdiction or arbitrator, the remaining provisions hereof will continue in full force and effect and will in no way be affected, impaired or invalidated.

15. **SURVIVAL.**

Sections 3, 5, 6, 7, 9, 10, 11, 13, 14, and 15 of this Lease Agreement will survive the expiration, termination or cancellation of this Lease Agreement.

4

6065665



**IN WITNESS WHEREOF**, the parties have caused this Lease Agreement to be executed on the date first written above.

**CryptoTech Holdings, LLC, a Texas limited liability Company**

Name: _____

Title: _____

Signature: _____

Date: _____


**LESSOR**

**JLL Ventures**

*Justin Lo*  3/21/2023

Signature: Justin Lo

Address: 2101 Forest Ave. #220 San Jose, CA 95128
Phone Number: (650) 280-0816
Social Security # / Tax ID:
Email: justin@justinlomd.com

5

6065665



SCHEDULE A
LEASED MINING FARM EQUIPMENT

YOUR LEASE CONSISTS OF THE FOLLOWING EQUIPMENT PACKAGE:

| EQUIPMENT | SERIAL NUMBER |
|---|---|
| THIRTY-FOUR (34) Infinite Miner(s) | Number issued upon lease |

EACH MINER INCORPORATES COMPONENTS BELOW AS DETAILED

IN THE PURCHASE AGREEMENT

## *HARDWARE*

CUSTOM MINING SERVER SETUP
HIGH-GRADE ALUMINUM CASING
CPU RACK WITH MULTIVARIATE OUTPUTS – MULTIPLE NODES
SHA 256 MICROPROCESSORS
FIELD-PROGRAMMABLE GATE ARRAY (FPGA)
500 MIN. APPLICATION SPECIFIC INTEGRATED CIRCUIT CHIPS
COMPUTER CONTROLLED FANS FOR COOLING AND HEAT DISSIPATION
PCI SLOTS
POWER ADAPTERS
REDUNDANT TRANSFER DEVICES
INCOMING POWER MANAGEMENT CONTROLLERS
VARIABLE INLINE CAPACITORS
CUSTOMIZED POWER MANAGED CONNECTING CABLES
PROPRIETARY MANAGED DASHBOARD SYNC
CONNECTORS FOR MONITORS

## *SOFTWARE AND FIRMWARE*

CUSTOM FIRMWARE FOR END USER INTERFACE, WALLET POOL MANAGEMENT
THERMAL LOAD MANAGEMENT SOFTWARE
PROPRIETARY COOLING SOLUTION SOFTWARE
METERING AND MONITORING CHIP EFFICIENCY SOLUTION SOFTWARE
PROPRIETARY THERMAL LOAD MANAGEMENT SOFTWARE
PROPRIETARY MINING FARM SOFTWARE LICENSE
PROPRIETARY MULTI-SOFTWARE SYNC LICENSE

6

6065665



## SCHEDULE B
## LEASE FEE DETAILS

CTH will pay the Lessor the Lease Fees by the end of the third week of every month for the 5 year period that payments are required to be made under this Lease Agreement. Lease Fees are paid on the following schedule beginning 30 days after the Commencement Date. These fees are paid directly into the Lessor's (supplied) bank account.

### LEASE FEES FOR ONE (1) MINING FARM

| YEAR | PAID EACH MONTH FOR 12 MONTHS | Total for Year |
|---|---|---|
| Year 1 | $600.00 | $7,200.00 |
| Year 2 | $600.00 | $7,200.00 |
| Year 3 | $600.00 | $7,200.00 |
| Year 4 | $600.00 | $7,200.00 |
| Year 5 | $600.00 | $7,200.00 |
| TOTAL LEASE FEES | | $36,000.00 |

To determine the total Lease Fees payable for any applicable period multiple the number of Mining Farms purchased times the amounts set forth on the above chart.

7

6065665



# LEASE AGREEMENT

This Lease Agreement ("**Lease Agreement**") is dated March 20, 2023 (the "**Effective Date**"), by and between CryptoTech Holdings, LLC, a Texas limited liability company, ("**CTH**" or the "**Lessee**") and the other person or entity who has executed this Lease Agreement ("**Lessor**").

## RECITALS

A. Lessor owns the equipment described on Schedule A hereto (the "**Equipment**"), which is part of the Lease Agreement. Lessor possesses the obligation of NFN8 Media, LLC ("**Media**") to service the Equipment. The Equipment was purchased pursuant to a Purchase and Services Agreement with Media dated of even date herewith (the "**Purchase Agreement**").

B. CTH desires to lease 100% of the Equipment and the equipment processing output capacity of the Equipment (the "**Capacity**") from the Lessor and the Lessor desires to lease such Equipment and Capacity to CTH pursuant to the terms and conditions of this Lease Agreement.

C. CTH will provide software (but not ownership), secure warehousing, monitoring, maintenance, upgrading and updating of the Equipment to ensure proper and continuous operation of the Lessor's Equipment.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained in this Lease Agreement, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, CTH and Lessor agree as follows:

1. **LEASE**

    Lessor agrees to lease to CTH and CTH agrees to lease from the Lessor, 100% of the Equipment and the Capacity. The Lessor will be paid a fee (the "**Lease Fee**") for a total lease term of 5 years (the "**Lease Period**"). The Lease Fee will be paid in equal monthly installments (each such monthly payment, a "**Lease Fee**") by deposit to the Lessor's bank account (bank name and account number supplied by the Lessor). The Lease Fees are set forth in Schedule B hereto. The payments shall begin from the date that the Equipment and Capacity are available and ready for operation, (the "**Commencement Date**"). CTH will pay the Lessor the Lease Fees by the end of the third week of every month for the 5 year period that payments are required to be made under this Lease Agreement. The Lease Fee shall continue to be paid until all payments due have been paid; provided, however, if the Lease Agreement is terminated due to the actions or inactions or fault of Lessor, such payments shall cease immediately.

2. **END OF LEASE**

    At the end of the Lease Period, Lessor shall have the right to claim or not claim the Equipment. The Lessor must notify Lessee of its intention to claim or not claim the Equipment at least 30 days prior to the end of the Lease Period. Upon such notice, Lessee shall arrange to ship (at Lessee's expense) or return the Equipment to the Lessor or if the Lessor does not claim the Equipment, CTH will be obligated to purchase each Mining Farm bought by Lessor and leased by Lessee for the amount of $30,000.

3. **FORCE MAJEURE.**

6065665



Neither CTH nor Lessor shall be liable to the other for failure to perform its obligations under this Lease Agreement if prevented from doing so because of an Act of God, strike, fire, terrorism, flood, war, civil disturbance, interference by civil, government, or military authority, pandemic or other causes beyond the reasonable control of the party. Upon the occurrence of such an event the party seeking to rely on this provision shall promptly give written notice to the other party of the nature and consequences of the event.

4. **NOTICES.**

    All notices and other communications under this Lease Agreement must be in writing and must be given by facsimile, email, or first-class mail, certified with return receipt requested, and will be deemed to have been duly given 24 hours after transmission of a facsimile or email, or three (3) days after mailing, to the respective persons and entities named following this paragraph. Either party may change its address, telephone number, facsimile number, email address, or contact name by providing notice thereof to the other party in the manner specified above.

    *If to CryptoTech Holdings, LLC*:
    13809 Research Blvd.
    Suite 785
    Austin, TX 78729
    Fax: (512) 857-8176
    info@nfn8.com

    *If to Lessor*:
    At the address and telephone number set forth below Lessor's signature.

5. **LIMITATION OF LIABILITY.**

    THE PARTIES AGREE THAT IT IS IMPOSSIBLE TO DETERMINE WITH ANY REASONABLE ACCURACY THE AMOUNT OF DAMAGES TO LESSOR UPON THE BREACH BY CTH OF ITS OBLIGATIONS HEREUNDER AND THE PURCHASE AND SERVICES AGREEMENT. THE AMOUNT OF DAMAGES SHALL BE DEEMED TO BE LIQUIDATED DAMAGES, AT THE SOLE ELECTION OF CTH (a) IN THE AMOUNT OF $30,000 PER MINING FARM LEASED LESS ANY PAYMENT PAID UNDER THIS LEASE AGREEMENT OR THE PURCHASE AGREEMENT OR (b) THE RETURN OF THE EQUIPMENT TO LESSOR. THE OBLIGATIONS SET FORTH HEREIN UNDER THIS LEASE AGREEMENT AND THE PURCHASE AGREEMENT SHALL BE IN THE AGGREGATE AND NOT CUMULATIVE AND CAN ONLY BE COLLECTED ONCE AND NOT SEPARATELY UNDER BOTH AGREEMENTS. LESSOR HEREBY WAIVES ALL OTHER CLAIMS FOR DAMAGES OF ANY KIND AGAINST CTH, ITS MEMBERS, MANAGERS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS, AGENTS, REPRESENTATIVES OR AFFILIATES, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS FOR ANY LOSS OF USE, INTERRUPTION OF BUSINESS OR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING WITHOUT LIMITATION, LOST PROFITS), REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT, STRICT PRODUCT LIABILITY OR OTHERWISE. LESSOR AND CTH AGREE THAT THE LIQUIDATED DAMAGES SET FORTH ABOVE ARE REASONABLE AND NOT A PENALTY BASED ON THE FACTS AND



CIRCUMSTANCES OF THE PARTIES AT THE TIME OF ENTERING INTO THIS LEASE AGREEMENT WITH DUE REGARD TO FUTURE EXPECTATIONS. THESE LIQUIDATED DAMAGES AND THOSE UNDER THE PURCHASE AGREEMENT ARE NOT ADDITIVE; THEY SHALL ONLY BE PAID UNDER THIS AGREEMENT OR THE PURCHASE AGREEMENT, NOT UNDER BOTH AGREEMENTS.

6. **GOVERNING LAW.**

This Lease Agreement and any dispute arising from or in connection with this Lease Agreement shall be interpreted under and governed by Texas law, without regard to conflict of laws principles.

7. **BINDING ARBITRATION.**

CTH and the Lessor agree any dispute, claim or controversy arising out of or relating to this Lease Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Lease Agreement to arbitrate, shall be determined by arbitration in Dallas, Texas before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. Judgment on any award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

8. **WAIVER.**

The failure of either party to insist upon the performance of any obligation or term of this Lease Agreement or to exercise any right hereunder shall not constitute a waiver of that obligation or term. No waiver of any right or obligation under this Lease Agreement shall be effective unless in writing and signed by both parties.

9. **AKNOWLEDGEMENT**

(A) In accordance with the rules and regulations promulgated by the U.S. Securities and Exchange Commission (the "**SEC**"), the interest acquired through the execution of this Lease Agreement and the Purchase Agreement as described in an Executive Summary relating to this transaction which has been previously delivered to Lessor (the "**Executive Summary**") is deemed to be a "security" as such term is defined in the Act. As a result, such interest is subject to the SEC's rules and regulations governing securities.

(B) The Lessor is not entitled to any revenues, royalties or profits from Lessee or from any use or product generated by the Lessee or the Mining Farms.

(C) By leasing the Mining Farm(s), the Lessor is not mining or purchasing cryptocurrency.

(D) This Lease Agreement creates no employment, relationship of joint venture, partnership, limited partnership, fiduciary, or agency between the parties and the parties hereby acknowledge that no other facts or relations exist that would create any such relationship between them.

(E) Lessor acknowledges and agrees that all service obligations of Media under the Purchase Agreement will be assumed by CTH immediately upon execution of this Lease Agreement and the simultaneous execution of the Purchase Agreement. Lessor will no longer look to Media to perform or be liable for such service obligations.

3



(F) CTH, at its discretion, shall be able to replace any equipment on the terms and conditions set forth in the Purchase Agreement which right Media had. CTH will perform any and all service obligations on the replaced equipment as CTH was obligated to do on the original leased equipment

10. **SUCCESSORS AND ASSIGNS.**

This Lease Agreement shall inure to the benefit of and will be binding upon and enforceable by the parties and their respective heirs, representatives, successors and permitted assigns; provided that Lessor cannot assign its rights under this Lease Agreement without the prior written consent of Lessee, which consent may be withheld for any reason.

11. **ENTIRE UNDERSTANDING; AMENDMENT.**

This Lease Agreement and the schedules attached hereto, the Purchase Agreement and the Executive Summary constitute the entire understanding and agreement between the parties with respect to the subject matter set forth in this Lease Agreement and supersede any and all prior agreements, understandings, promises, conduct and representations made concerning the subject matter of this Lease Agreement. This Lease Agreement may only be amended in writing, signed by each party to this Lease Agreement.

12. **COUNTERPARTS; ELECTRONIC SIGNATURES.**

This Lease Agreement may be executed in counterparts, each of which taken together shall constitute an original, single, binding agreement between the parties. Any signature of a party required by this Lease Agreement may be transmitted to the other party via facsimile or other electronic transmission and such facsimile or electronically transmitted signature shall be deemed an original signature binding upon the signing party for all purposes.

13. **ATTORNEYS' FEES AND COSTS**.

In the event that either party must resort to legal action in order to enforce the provisions of this Lease Agreement or to defend such action pursuant to the arbitration provisions set forth in paragraph 8 above, the prevailing party will be entitled to receive reimbursement from the non-prevailing party for all reasonable attorneys' fees and all other costs incurred in commencing or defending such action, or in enforcing this Lease Agreement, including but not limited to post-judgment costs.

14. **SEVERABILITY**.

If any term, provision, covenant or condition of this Lease Agreement is found to be invalid, void, or unenforceable by any court of competent jurisdiction or arbitrator, the remaining provisions hereof will continue in full force and effect and will in no way be affected, impaired or invalidated.

15. **SURVIVAL.**

Sections 3, 5, 6, 7, 9, 10, 11, 13, 14, and 15 of this Lease Agreement will survive the expiration, termination or cancellation of this Lease Agreement.



**IN WITNESS WHEREOF**, the parties have caused this Lease Agreement to be executed on the date first written above.

**CryptoTech Holdings, LLC, a Texas limited liability Company**

Name: _____

Title: _____

Signature: _____

Date: _____


**LESSOR**

**Mobile-Med Work Health Solutions**

*Justin Lo*   3/20/2023

Signature: Justin Lo

Address: 2101 Forest Ave. #220 San Jose, CA 95128
Phone Number: (650) 280-0816
Social Security # / Tax ID: 82-0936379
Email: justin@justinlomd.com

5

6065665

DocuSign Envelope ID: 48CB6E75-4E26-4745-A7DB-72E4258AE789



SCHEDULE A
LEASED MINING FARM EQUIPMENT

YOUR LEASE CONSISTS OF THE FOLLOWING EQUIPMENT PACKAGE:

| EQUIPMENT | SERIAL NUMBER |
|---|---|
| THIRTY-FOUR (34) Infinite Miner(s) | Number issued upon lease |

EACH MINER INCORPORATES COMPONENTS BELOW AS DETAILED

IN THE PURCHASE AGREEMENT


## *HARDWARE*

CUSTOM MINING SERVER SETUP
HIGH-GRADE ALUMINUM CASING
CPU RACK WITH MULTIVARIATE OUTPUTS – MULTIPLE NODES
SHA 256 MICROPROCESSORS
FIELD-PROGRAMMABLE GATE ARRAY (FPGA)
500 MIN. APPLICATION SPECIFIC INTEGRATED CIRCUIT CHIPS
COMPUTER CONTROLLED FANS FOR COOLING AND HEAT DISSIPATION
PCI SLOTS
POWER ADAPTERS
REDUNDANT TRANSFER DEVICES
INCOMING POWER MANAGEMENT CONTROLLERS
VARIABLE INLINE CAPACITORS
CUSTOMIZED POWER MANAGED CONNECTING CABLES
PROPRIETARY MANAGED DASHBOARD SYNC
CONNECTORS FOR MONITORS

## *SOFTWARE AND FIRMWARE*

CUSTOM FIRMWARE FOR END USER INTERFACE, WALLET POOL MANAGEMENT
THERMAL LOAD MANAGEMENT SOFTWARE
PROPRIETARY COOLING SOLUTION SOFTWARE
METERING AND MONITORING CHIP EFFICIENCY SOLUTION SOFTWARE
PROPRIETARY THERMAL LOAD MANAGEMENT SOFTWARE
PROPRIETARY MINING FARM SOFTWARE LICENSE
PROPRIETARY MULTI-SOFTWARE SYNC LICENSE

6



## SCHEDULE B
## LEASE FEE DETAILS

CTH will pay the Lessor the Lease Fees by the end of the third week of every month for the 5 year period that payments are required to be made under this Lease Agreement. Lease Fees are paid on the following schedule beginning 30 days after the Commencement Date. These fees are paid directly into the Lessor's (supplied) bank account.

### LEASE FEES FOR ONE (1) MINING FARM

| YEAR | PAID EACH MONTH FOR 12 MONTHS | Total for Year |
|---|---|---|
| Year 1 | $600.00 | $7,200.00 |
| Year 2 | $600.00 | $7,200.00 |
| Year 3 | $600.00 | $7,200.00 |
| Year 4 | $600.00 | $7,200.00 |
| Year 5 | $600.00 | $7,200.00 |
| TOTAL LEASE FEES | | $36,000.00 |

To determine the total Lease Fees payable for any applicable period multiple the number of Mining Farms purchased times the amounts set forth on the above chart.



# PURCHASE AND SERVICES AGREEMENT

This Purchase and Services Agreement ("**Agreement**") is dated March 20, 2023 (the "**Effective Date**"), by and between NFN8 Media, LLC, a Texas limited liability company, ("**Media**"), and the other person or entity who has executed this Agreement ("**Clien**t").

## RECITALS

Client desires to purchase the computer equipment described in Schedule A attached hereto and the service obligation of Media with respect to such equipment (the "**Mining Farm(s)**") from Media.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained in this Agreement, and for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged by the parties, Media and Client agree as follows:

Media will provide the following under this Agreement:

1) **PURCHASING AND INSTALLATION; SERVICES**

   The Client is purchasing the equipment, and acquiring the services, described in Schedule A below.

2) **EQUIPMENT**

   It is understood that the Client is purchasing the Mining Farm(s) for the purpose of leasing the Mining Farm(s) to CryptoTech Holdings, LLC, an affiliate of Media ("**CTH**"). The Mining Farm(s) is (are) 100% owned by the Client. It is agreed that at the sole discretion of Media, any of the hardware set forth on Schedule A annexed hereto can be exchanged for other hardware of the same like, kind and quality of the previous hardware and shall be deemed owned by the Client and subject to this Agreement.

3) **OPERATION**

   Media is responsible for making sure that the Client's Mining Farm(s) is (are) installed and operating efficiently and effectively a manner that comports with usual and customary practices in the Blockchain and cryptocurrency mining industry.

4) **BILL OF SALE.**

   Media shall provide the Client with a Bill of Sale for the Mining Farm(s), which will specify product descriptions and serial numbers.

5) **FEES.**

   The purchase price for each Mining Farm is $30,000, payable on the date hereof. The Client is purchasing THIRTY-FOUR (34) Mining Farm(s) for a total fee of $1,020,000.00 (the "**Total Fee**"). Upon receipt of the Total Fee by certified check or wire transfer or other immediately available funds ("**good funds**"), Media will perform all items in Sections 1, 3 and 4 of this Agreement. No purchasing, installation, or services of any kind will be performed by Media until it receives (i) a copy of this Agreement executed by the Client, (ii) good funds and (iii) confirmation that the Client is an accredited investor as such term is defined in Rule 506(c) of Regulation D of the Securities Act of 1933, as amended (the "**Act**").

6) **TERM AND TERMINATION.**



The term of this Agreement shall commence on the Effective Date, Media's service obligations hereunder shall continue as long as a certain lease dated the same date as this Agreement between Client and CTH (the "**Lease Agreement**") remains in full force and effect.

7) **FORCE MAJEURE.**

    Media shall not be liable to the Client for the failure to perform its obligations under this Agreement if prevented from doing so because of an Act of God, strike, fire, terrorism, pestilence, flood, war, civil disturbance, interference by government, civil, or military authority, pandemic or other causes beyond the reasonable control of the party. Upon the occurrence of such an event the party seeking to rely on this provision shall promptly give written notice to the other party of the nature and consequences of the event.

8) **NOTICES.**

    All notices and other communications under this Agreement must be in writing and must be given by facsimile, email or first-class mail, certified with return receipt requested, and will be deemed to have been duly given 24 hours after transmission of a facsimile or email with proof of receipt, or three days after mailing, to the respective persons and entities named following this paragraph. Either party may change its address, telephone number, facsimile number, email address, or contact name by providing notice thereof to the other party in the manner specified above.

    *If to NFN8 Media*:
    13809 Research Blvd.
    Suite 785
    Austin, TX 78729
    Fax: (512) 857-8176
    info@nfn8.com

    *If to Client:*
    At the address and telephone number set forth below Client's signature.

9) **LIMITATION OF LIABILITY.**

    THE PARTIES AGREE THAT IT IS IMPOSSIBLE TO DETERMINE WITH ANY REASONABLE ACCURACY THE AMOUNT OF DAMAGES TO CLIENT UPON THE BREACH BY MEDIA OF ITS OBLIGATIONS HEREUNDER. THEREFORE, THE PARTIES AGREE THAT CLIENT'S SOLE REMEDY FOR MATERIAL BREACH BY MEDIA OF ITS OBLIGATIONS HEREUNDER AND THE LEASE AGREEMENT WILL BE LIQUIDATED DAMAGES, AT THE SOLE ELECTION OF MEDIA, (a) IN THE AMOUNT OF $30,000 PER MINING FARM PURCHASED LESS ANY AMOUNTS PAID UNDER THIS AGREEMENT OR THE LEASE AGREEMENT OR (b) THE RETURN OF THE EQUIPMENT TO CLIENT. THE OBLIGATIONS SET FORTH HEREIN UNDER THIS AGREEMENT AND THE LEASE AGREEMENT SHALL BE IN THE AGGREGATE AND NOT CUMULATIVE AND ONLY BE COLLECTED ONCE AND NOT SEPARATELY UNDER BOTH AGREEMENTS. CLIENT HEREBY WAIVES ALL OTHER CLAIMS FOR DAMAGES OF ANY KIND AGAINST MEDIA, ITS MEMBERS, MANAGERS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS, AGENTS, REPRESENTATIVES OR AFFILIATES, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS FOR ANY LOSS OF USE, INTERRUPTION OF

BUSINESS OR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING, WITHOUT LIMITATION LOST PROFITS), REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT, STRICT PRODUCT LIABILITY OR OTHERWISE (EXCEPT AS OTHERWISE SPECIFIED IN THIS SECTION OF THE AGREEMENT). CLIENT AND MEDIA AGREE THAT THE LIQUIDATED DAMAGES SET FORTH ABOVE ARE REASONABLE AND NOT A PENALTY BASED ON THE FACTS AND CIRCUMSTANCES OF THE PARTIES AT THE TIME OF ENTERING INTO THIS AGREEMENT WITH DUE REGARD TO FUTURE EXPECTATIONS. THESE LIQUIDATED DAMAGES AND THOSE UNDER THE LEASE AGREEMENT ARE NOT ADDITIVE; THEY SHALL ONLY BE PAID UNDER THIS AGREEMENT OR THE LEASE AGREEMENT, NOT UNDER BOTH AGREEMENTS.

10) **GOVERNING LAW.**

This Agreement and any dispute arising from or in connection with this Agreement shall be interpreted under and governed by Texas law, without regard to conflict of laws principles.

11) **BINDING ARBITRATION.**

Media and the Client agree any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Dallas, Texas before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. Judgment on any award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

12) **WAIVER.**

The failure of either party to insist upon the performance of any obligation or term of this Agreement or to exercise any right hereunder shall not constitute a waiver of that obligation or term. No waiver of any right or obligation under this Agreement shall be effective unless in writing and signed by both parties.

13) **ACKNOWLEDGMENT**

(A) In accordance with the rules and regulations promulgated by the U.S. Securities and Exchange Commission (the "**SEC**"), the interest acquired through the execution of this Agreement and the Lease Agreement as described in an Executive Summary relating to this transaction which has previously been delivered to Client (the "**Executive Summary**") is deemed to be a "security" as such term is defined in the Act. As a result, such interest is subject to the SEC's rules and regulations governing securities.

(B) By executing this Agreement, the Client is not purchasing cryptocurrency. The Client is purchasing 100% of the Mining Farm(s). The Client is acquiring no interests in the products generated by the Mining Farms by CTH, the lessee of the Mining Farms.

(C) This Agreement creates no relationship of employment, joint venture, partnership, limited partnership, fiduciary or agency between the parties and the parties hereby acknowledge that no other facts or relations exist that would create any such relationship between them.

3

DocuSign Envelope ID: AC31AB70-8C68-4E03-9469-E0D33C4B58F5



> The parties are engaging in this Agreement as independent parties with respect to each other.
>
> (D) Client acknowledges and agrees that all service obligations of Media under this Agreement will be assigned to CTH and upon such assignment Media will have no further obligations to Client pursuant to this Agreement.

14) **SUCCESSORS AND ASSIGNS.**

    This Agreement shall inure to the benefit of and will be binding upon and enforceable by the parties and their respective heirs, representatives, successors and permitted assigns; provided that Client cannot assign its rights under this Agreement without the prior written consent of Media, which consent may be withheld for any reason.

15) **ENTIRE UNDERSTANDING; AMENDMENT**

    This Agreement and the schedules attached hereto, the Lease Agreement and the Executive Summary constitute the entire understanding and agreement between the parties with respect to the subject matter set forth in this Agreement and supersedes any and all prior agreements, understandings, promises, conduct and representations made concerning the subject matter of this Agreement. This Agreement may only be amended in writing, signed by each party to this Agreement.

16) **COUNTERPARTS; ELECTRONIC SIGNATURES.**

    This Agreement may be executed in counterparts, each of which taken together shall constitute an original, single, binding agreement between the parties. Any signature of a party required by this Agreement may be transmitted to the other party via facsimile or other electronic transmission and such facsimile or electronically transmitted signature shall be deemed an original signature binding upon the signing party for all purposes.

17) **ATTORNEYS' FEES AND COSTS.**

    If either party resorts to legal action in order to enforce the provisions of this Agreement or to defend such action pursuant to the arbitration provisions set forth in paragraph 12 above, the prevailing party will be entitled to receive reimbursement from the non-prevailing party for all reasonable attorneys' fees and all other costs incurred in commencing or defending such action, or in enforcing this Agreement, including but not limited to post-judgment costs.

18) **SEVERABILITY.**

    If any term, provision, covenant or condition of this Agreement is found to be invalid, void, or unenforceable by any court of competent jurisdiction or arbitrator, the remaining provisions hereof will continue in full force and effect and will in no way be affected, impaired or invalidated.

19) **SURVIVAL.**

    Sections 7, 9, 10, 11, 13, 14, 15, 17, 18 and 19 of this Agreement will survive the expiration, termination, or cancellation of this Agreement.



**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed on the date first written above.

**NFN8 Media, LLC,** a Texas limited liability company

Name: _____

Title: _____

Signature: _____

Date: _____

**CLIENT**

**JLL Ventures**

Signature: *Justin Lo*    3/21/2023

Address: 2101 Forest Ave. #220 San Jose, CA 95128
Phone Number: (650) 280-0816
Social Security # / Tax ID:
Email: justin@justinlomd.com

5

6065209



## SCHEDULE A
### (Purchased Mining Farm Equipment and Services)

### YOUR PURCHASE CONSISTS OF THE FOLLOWING EQUIPMENT PACKAGE

| **EQUIPMENT** | **SERIAL NUMBER** |
|---|---|
| THIRTY-FOUR (34) Infinite Blockchain Miner(s) | ISSUED UPON PURCHASE |

### EACH MINING FARM INCORPORATES THE FOLLOWING

**HARDWARE**

CUSTOM MINING SERVER SETUP
HIGH-GRADE ALUMINUM CASING
CPU RACK WITH MULTIVARIATE OUTPUTS – MULTIPLE NODES
SHA 256 MICROPROCESSORS
FIELD-PROGRAMMABLE GATE ARRAY (FPGA)
500 MIN. APPLICATION SPECIFIC INTEGRATED CIRCUIT CHIPS
COMPUTER CONTROLLED FANS FOR COOLING AND HEAT DISSIPATION
PCI SLOTS
POWER ADAPTERS
REDUNDANT TRANSFER DEVICES
INCOMING POWER MANAGEMENT CONTROLLERS
VARIABLE INLINE CAPACITORS
CUSTOMIZED POWER MANAGED CONNECTING CABLES
PROPRIETARY MANAGED DASHBOARD SYNC
CONNECTORS FOR MONITORS

**SOFTWARE AND FIRMWARE**

CUSTOM FIRMWARE FOR END USER INTERFACE, WALLET POOL MANAGEMENT
THERMAL LOAD MANAGEMENT SOFTWARE
PROPRIETARY COOLING SOLUTION SOFTWARE
METERING AND MONITORING CHIP EFFICIENCY SOLUTION SOFTWARE
PROPRIETARY THERMAL LOAD MANAGEMENT SOFTWARE
PROPRIETARY MINING FARM SOFTWARE LICENSE
PROPRIETARY MULTI-SOFTWARE SYNC LICENSE

**SERVICES**

(1) The purchased assets are procured, assembled, and tested by Media. (2) Mining Software is installed, tested, managed and updated. (3) The purchased assets are transported, installed, and warehoused at a designated data center where power, cooling, and venting are carefully controlled. (4) The data center is protected, alarmed, and insured. (5) The equipment may be modified, updated or both or exchanged for like, kind, or more advanced equipment at any time at the discretion of Media. (6) The software referenced above is part of the services provided in this agreement. It is not owned by the client. Client does not obtain any rights to the software. The equipment purchaser pays no additional fees for (1) through (6). The exact location and address of the data center is not disclosed herein for security and safety reasons.

# PURCHASE AND SERVICES AGREEMENT

This Purchase and Services Agreement ("**Agreement**") is dated March 20, 2023 (the "**Effective Date**"), by and between NFN8 Media, LLC, a Texas limited liability company, ("**Media**"), and the other person or entity who has executed this Agreement ("**Clien**t").

## RECITALS

Client desires to purchase the computer equipment described in Schedule A attached hereto and the service obligation of Media with respect to such equipment (the "**Mining Farm(s)**") from Media.

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained in this Agreement, and for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged by the parties, Media and Client agree as follows:

Media will provide the following under this Agreement:

1) **PURCHASING AND INSTALLATION; SERVICES**

   The Client is purchasing the equipment, and acquiring the services, described in Schedule A below.

2) **EQUIPMENT**

   It is understood that the Client is purchasing the Mining Farm(s) for the purpose of leasing the Mining Farm(s) to CryptoTech Holdings, LLC, an affiliate of Media ("**CTH**"). The Mining Farm(s) is (are) 100% owned by the Client. It is agreed that at the sole discretion of Media, any of the hardware set forth on Schedule A annexed hereto can be exchanged for other hardware of the same like, kind and quality of the previous hardware and shall be deemed owned by the Client and subject to this Agreement.

3) **OPERATION**

   Media is responsible for making sure that the Client's Mining Farm(s) is (are) installed and operating efficiently and effectively a manner that comports with usual and customary practices in the Blockchain and cryptocurrency mining industry.

4) **BILL OF SALE.**

   Media shall provide the Client with a Bill of Sale for the Mining Farm(s), which will specify product descriptions and serial numbers.

5) **FEES.**

   The purchase price for each Mining Farm is $30,000, payable on the date hereof. The Client is purchasing THIRTY-FOUR (34) Mining Farm(s) for a total fee of $1,020,000.00 (the "**Total Fee**"). Upon receipt of the Total Fee by certified check or wire transfer or other immediately available funds ("**good funds**"), Media will perform all items in Sections 1, 3 and 4 of this Agreement. No purchasing, installation, or services of any kind will be performed by Media until it receives (i) a copy of this Agreement executed by the Client, (ii) good funds and (iii) confirmation that the Client is an accredited investor as such term is defined in Rule 506(c) of Regulation D of the Securities Act of 1933, as amended (the "**Act**").

6) **TERM AND TERMINATION.**

The term of this Agreement shall commence on the Effective Date, Media's service obligations hereunder shall continue as long as a certain lease dated the same date as this Agreement between Client and CTH (the "**Lease Agreement**") remains in full force and effect.

7) **FORCE MAJEURE.**

   Media shall not be liable to the Client for the failure to perform its obligations under this Agreement if prevented from doing so because of an Act of God, strike, fire, terrorism, pestilence, flood, war, civil disturbance, interference by government, civil, or military authority, pandemic or other causes beyond the reasonable control of the party. Upon the occurrence of such an event the party seeking to rely on this provision shall promptly give written notice to the other party of the nature and consequences of the event.

8) **NOTICES.**

   All notices and other communications under this Agreement must be in writing and must be given by facsimile, email or first-class mail, certified with return receipt requested, and will be deemed to have been duly given 24 hours after transmission of a facsimile or email with proof of receipt, or three days after mailing, to the respective persons and entities named following this paragraph. Either party may change its address, telephone number, facsimile number, email address, or contact name by providing notice thereof to the other party in the manner specified above.

   *If to NFN8 Media*:
   13809 Research Blvd.
   Suite 785
   Austin, TX 78729
   Fax: (512) 857-8176
   info@nfn8.com

   *If to Client:*
   At the address and telephone number set forth below Client's signature.

9) **LIMITATION OF LIABILITY.**

   THE PARTIES AGREE THAT IT IS IMPOSSIBLE TO DETERMINE WITH ANY REASONABLE ACCURACY THE AMOUNT OF DAMAGES TO CLIENT UPON THE BREACH BY MEDIA OF ITS OBLIGATIONS HEREUNDER. THEREFORE, THE PARTIES AGREE THAT CLIENT'S SOLE REMEDY FOR MATERIAL BREACH BY MEDIA OF ITS OBLIGATIONS HEREUNDER AND THE LEASE AGREEMENT WILL BE LIQUIDATED DAMAGES, AT THE SOLE ELECTION OF MEDIA, (a) IN THE AMOUNT OF $30,000 PER MINING FARM PURCHASED LESS ANY AMOUNTS PAID UNDER THIS AGREEMENT OR THE LEASE AGREEMENT OR (b) THE RETURN OF THE EQUIPMENT TO CLIENT. THE OBLIGATIONS SET FORTH HEREIN UNDER THIS AGREEMENT AND THE LEASE AGREEMENT SHALL BE IN THE AGGREGATE AND NOT CUMULATIVE AND ONLY BE COLLECTED ONCE AND NOT SEPARATELY UNDER BOTH AGREEMENTS. CLIENT HEREBY WAIVES ALL OTHER CLAIMS FOR DAMAGES OF ANY KIND AGAINST MEDIA, ITS MEMBERS, MANAGERS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS, AGENTS, REPRESENTATIVES OR AFFILIATES, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS FOR ANY LOSS OF USE, INTERRUPTION OF

2