UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| MOBILE MED WORK HEALTH SOLUTIONS, INC.; JLL VENTURES, INC.; and M-M WHS LLC,<br><br>*Plaintiffs*<br><br>v.<br><br>JOSHUA MOORE; CORY RODRIGUEZ; NFN8 GROUP, INC.; NFN8 HOLDINGS, LLC; NFN8 CAPITAL, LLC; NFN8 MEDIA, LLC; NFN8 FOUNDATION; and CRYPTOTECH HOLDINGS, LLC,<br><br>*Defendants* | CASE NO. AU:24-CV-01219-RP |

### PLAINTIFFS' OPPOSED MOTION FOR EXPEDITED DISCOVERY AND REQUEST FOR A HEARING

Plaintiffs Mobile Med Work Health Solutions, Inc. ("Mobile Med"), JLL Ventures, Inc. ("JLL"), and M-M WHS LLC ("M-M WHS") ("Plaintiffs") respectfully request expedited discovery in their lawsuit filed against Defendants Joshua Moore, Cory Rodriguez, NFN8 Group, Inc., NFN8 Holdings, LLC, NFNA8 Capital, LLC, NFN8 Media, LLC, NFN8 Foundation, and Cryptotech Holdings, LLC ("Defendants").

I.   **INTRODUCTION**

Plaintiffs' counsel continue to research the publicly available information on NFN8 and its principals, and the results of that research make it ever more apparent that Defendants are running a Ponzi scheme. Plaintiffs now have legitimate reason to believe that Defendants have serially defrauded not only them, but also hundreds of other investors who collectively invested over $50 million in Defendants' sale-leaseback securities. At the October 21 conference, the Court was sufficiently troubled by the allegations in Plaintiffs' Complaint and preliminary injunction

application to make clear that it would order pre-hearing discovery. Despite the Court's admonition, however, Defendants have refused to provide even the most basic historical financial information—information any Ponzi scheme plaintiff would need to be able to trace cash flows and help to carry their preliminary injunction burden. Plaintiffs thus request that this Court schedule a hearing on this Motion as soon as possible and order Defendants to produce discrete, easy-to-compile, yet meaningful documents and categories of information that will allow Plaintiffs to get to the bottom of what appears to be an egregious fraud on Plaintiffs and the investing public.

## II.   SUMMARY OF REQUEST

Plaintiffs allege that Defendants are engaged in a large-scale, multi-year Ponzi scheme with the purpose and effect of defrauding Plaintiffs and almost 400 other investors out of tens of millions of dollars by promising them secure and reliable annualized returns of 21% or more through the sale, long-term leaseback, and ultimate repurchase of cryptocurrency mining machines. Dkt 1. Plaintiffs seek a preliminary injunction requesting, among other things, that the Court freeze Defendants' assets while litigation is ongoing. Dkt. 2. In support of their application for preliminary injunction, Plaintiffs asked the Court to order expedited limited discovery that would allow Plaintiffs to prepare for an expedited preliminary injunction hearing. *Id*.

At the October 21 conference, the Court indicated that it would be ordering pre-hearing discovery and directed the parties to negotiate over the scope of that discovery. Plaintiffs had provided Defendants with an informal discovery proposal four days before the October 21 conference, and conferred with Defendants about discovery twice in advance of that meeting with the Court without making any headway. *See e.g.,* Ex. A. Several hours after the October 21 conference, Plaintiffs provided Defendants with a revised written proposal including several expanded requests based on the results of Plaintiffs' continuing investigation. Ex. B.

Plaintiffs have consistently explained to Defendants—both orally and in writing—that the limited expedited discovery they seek is necessary to assess both Defendants' current financial status and the cash flows over time that will confirm the true nature of Defendants' underlying business. They have also repeatedly explained that they seek only information and documents that can be collected and produced quickly and easily. See, e.g., Ex. A, B. In response, Defendants have offered only partial, recent financial and asset information—proposals that would allow Defendants to avoid providing the information that would allow Plaintiffs to confirm (or potentially disprove) the existence of a Ponzi scheme.[1]

Plaintiffs need discovery sufficient to demonstrate and verify:

- The full extent of Defendants' financial obligations to their sale-leaseback investors over time, including the amounts and timing of both lease and repurchase payments, the rates of return Defendants have promised to those investors, and Defendants' payment histories with respect to those obligations.

- Defendants' revenues over time from sale-leaseback investors as opposed to revenues from mining and trading activities.

- Defendants' income over time from both their cryptocurrency mining activities and their cryptocurrency trading activities, since Defendants have claimed repeatedly that the so-called "secret sauce" they have discovered for making enough money in cryptocurrency to pay 20%+ returns to investors consists of both mining for Bitcoin themselves and "[h]igh frequency trad[ing] what we mine to leverage up the value of our mining computers [sic] output." Ex. D.

- Defendants' underlying mining economics over time, including information about their mining fleet and operations as well as their miner hosting arrangements and costs, electricity costs, and capital expenditures on miners and related equipment. Such data would allow Plaintiffs to determine whether Defendants' claims whether they pay their massive promised returns to investors through mining profits, or by using new investor money for that purpose.

---

[1] As directed by the Court, the parties' counsel met again on October 22 to discuss discovery. During that meeting, Defendants' counsel orally presented a counterproposal limited to providing Plaintiffs with information relating only to Defendants' current operations and purported financial condition. Defendants followed up with a written version of that proposal early in the morning on October 23 (Ex. C.), and the parties met once more shortly thereafter but were unable to resolve their differences.

- Defendants' current and historical assets and finances, which will enable Plaintiffs to assess Defendants' cash flows and to verify the full extent to which Defendants have used and are using new investor funds to compensate earlier investors.[2]
- The current status of the miners under Defendants' control.

For purposes of the preliminary injunction hearing, Plaintiffs are requesting only materials and information that should be readily available and close at hand. Plaintiffs are not currently requesting any discovery requiring Defendants to perform a traditional document collection or responsiveness and privilege review. Plaintiffs do not yet seek Defendants' emails, text messages, or other correspondence, nor are any of Plaintiffs' requests of the "all documents related to" variety. Rather, Plaintiffs seek only discrete documents and information that Defendants should be able to assemble and produce in short order, with little burden relative to the gravity of Plaintiffs' allegations.

Defendants' counterproposal would provide Plaintiffs with no historical information of any type.[3] Their proposal also would give Plaintiffs no information regarding the cryptocurrency trading operations Defendants identify as a key component of their "secret sauce," no information from which Plaintiffs can assess Defendants' financial obligations to investors over time or whether and how they have satisfied them, no sale-leaseback documents, no information regarding their historical fleet of mining machines, no information regarding either individual Defendant's

---

[2] As discussed below, Plaintiffs also seek depositions of both of Defendants' principals and of an accountant. Although Plaintiffs initially requested two-hour depositions of each principal, their investigations since that initial request indicate that a four-hour deposition of each would be more appropriate.

[3] During the parties' final meet-and-confer, counsel for Defendants tentatively suggested that Defendants might be able to produce information from January of 2024 to date; on October 24 Defendants emailed Plaintiffs a revised proposal expanding certain proposed disclosures to cover the full year 2024. Ex. E. But information for 2024 by itself is of limited or no value in assessing the true character of Defendants' business; proper evaluation requires that Plaintiffs obtain both additional historical information and meaningful information regarding the nuts and bolts of Defendants' business and their sale-leaseback obligations. Defendants' revised proposal offers neither.

4

finances, and only current information regarding Defendants' mining activities and hosting arrangements.

The provision of only recent information is never sufficient to analyze Ponzi schemes, which are inherently built around the continual solicitation of additional investment funds to pay off prior investors. *See, e.g., Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (defining Ponzi scheme). Moreover, Defendants' SEC filings indicate that they raised over $16 million in new sale-leaseback investments—almost 1/3 of their total reported investments from November 2020 forward—from August 2023 to January 2024. *See* Ex. F, G, H. Those same filings state that Defendants raised an additional $3.2 million—including Plaintiff M-M WHS LLC's $1 million May 2024 investment—from May to August of 2024. *See* Ex. G. Coupled with Defendants' ongoing default on their obligations to Plaintiffs, that fundraising history sends seriously mixed signals and raises even greater concerns that a snapshot purporting to show some baseline of financial viability may instead reflect only that Defendants have partially restocked their coffers with cash from new victims sufficient to keep their scam going a bit longer.

Plaintiffs therefore respectfully request that the Court order Defendants to provide the following categories of written discovery, which Plaintiffs have more fully detailed in the attached Proposed Order, within ten days from the entry of the Court's order:

- A spreadsheet or other document identifying all cryptocurrency mining machines Defendants have owned or controlled from January 1, 2020 to present;
- Identification of all cryptocurrency wallets Defendants have owned or controlled for the past from January 1, 2020 to present;[4]

---

[4] The nature of blockchain is such that all cryptocurrency wallets are publicly available; moreover, all cryptocurrency wallets contain a complete record of all transactions associated with that wallet. However, the identities of wallet holders are not publicly disclosed; accordingly, Plaintiffs request that the Court order Defendants to disclose the identifying information (public keys) that would allow Plaintiffs to locate and examine Defendants' cryptocurrency wallets. Because Plaintiffs will not have access to the private keys that allow wallet holders to conduct transactions, access to Defendants' public keys will simply allow Plaintiffs to analyze Defendants' mining and trading activities over time, and will not put Defendants' assets

- A spreadsheet or other document detailing Defendants' cryptocurrency trading activities;
- Records of all cryptocurrency mined by Defendants;
- All purchase agreements, lease agreements, and bills of sale relating to all sale-leaseback transactions from 2018 to present;
- Other summary information regarding Defendants' sale-leaseback business;
- A spreadsheet or other document identifying all miners sold or otherwise disposed of, whether through BlockOverstock.com or otherwise.
- Documents detailing Defendants' current and past financial performance including:
  - Financial statements
  - Bank statements
  - Records of all Defendants' assets and indebtedness
  - Corporate tax returns
- A document identifying Defendants' accountant(s).

Plaintiffs also request that the Court order:

- A four-hour deposition of Joshua Moore;
- A four-hour deposition of Cory Rodriguez;
- A deposition of an accountant of Plaintiffs' choice from those identified by Defendants; and
- Inspection of the miners and mining facilities Defendants own, control, or use.

Plaintiffs request an order requiring that both the depositions and the inspections take place within 10 days after Defendants complete production of the written discovery.

## III. PRE-HEARING DISCOVERY IS NECESSARY TO SUPPORT PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION

The Court has already indicated that pre-hearing discovery is necessary in this case. Moreover, the particularized discovery Plaintiffs seek here is appropriate, because Plaintiffs have satisfied the good cause standard for expedited pre-Rule 26-conference discovery adopted by this

---

at risk. If Defendants provide Plaintiffs with information regarding *all* of their wallets, Plaintiffs' separate requests for Defendants' cryptocurrency mining and trading records largely become moot.

Court. *See Legacy of Life, Inc. v. Am. Donor Services, Inc.,* No. SA-06-CA-0802-XR, 2006 WL8435983, at *1 (W.D. Tex. Oct. 10, 2006) (adopting good cause standard and granting expedited discovery to allow plaintiff to prepare for preliminary injunction hearing.); *Universal Prot. Serv., LP v. Prosegur Sec. USA,* No. SA-23-CV-00802-FB, 2023 WL 4980942 (W.D. Tex. Aug. 2, 2023) (granting Plaintiff's motion for expedited discovery and setting case for preliminary injunction hearing); *see also Wachovia Sec., L.L.C. v. Stanton*, 571 F.Supp.2d 1014, 1050 (N.D. Iowa 2008) (finding good cause where plaintiff's need for discovery outweighs prejudice to defendant). Plaintiffs have shown good cause; their Complaint (Dkt. 1), Application (Dkt. 2), and the further investigation described below points to a Ponzi scheme.

"[A] Ponzi scheme is, as a matter of law, insolvent from its inception." *Janvey v. Alguire*, 647 F.3d at 597 (internal citations omitted). Ponzi schemes dissipate assets by their very nature. As one article describes the phenomenon, in Ponzi schemes "[s]omehow, the money dissipates for a variety of reasons, like bad investments, payments to the old investors with the new investments, personal expenditures for frivolous purposes, and so on." David A. Gradwohl and Karin Corbett, *Equity Receiverships for Ponzi Schemes*, 34 Seton Hall J. of Legis. & Pub. Policy 181, 205 (2010). If Defendants are engaged in a Ponzi scheme, therefore, Plaintiffs and other investors will suffer immediate irreparable harm as the pool available to redress their injuries continues to dissipate.

As set forth in the Complaint and Application and summarized and amplified below, Plaintiffs have made a sufficient showing that Defendants are engaged in a Ponzi scheme to entitle them to expedited discovery regarding both the underlying nature of Defendants' business and the business's finances.[5]

---

[5] The automatic stay imposed by 15 U.S.C. §78u-4(b)(3)(B) does not apply. The statute expressly creates an exception when the Court finds that "particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." *Id. See generally*, *In re Cassava Scis., Inc. Sec. Litig.*, No. 1:21-CV-00751-DAE, 2023 WL 28436 at *2 (W.D.Tex. 2023) (undue prejudice is "improper or unfair treatment amounting to something less than irreparable harm"). As noted above, the Fifth Circuit has found that "a

7

Based on the publicly available information that Plaintiffs' counsel have gathered, Defendants began offering their sale-leaseback program to investors no later than 2018 (*see, e.g.*, "Blockchain Data Center's Unique Sale/Leaseback Strategy Gains Traction in Mainstream Business Media," November 14, 2018, *available at* https://nfn8.com/wp-content/uploads/MarketWatch-11_18_2018.pdf). Because Defendants did not make their first SEC filing in connection with their sale-leaseback business until December 11, 2020—a Form D Notice of Exempt Offering of Securities recording an initial investment date of November 27, 2020—Plaintiffs lack even the aggregated information collected in Form D filings in connection with Defendants' pre-November 27, 2020 lease and repurchase obligations. *See* Ex. F.

The investments Defendants *have* reported in their Form D filings are troubling enough. From December 11, 2020 to present, Defendants NFN8 Media, Inc., and NFN8 Group, Inc. and their affiliate company NFN8 International LLC have sponsored three separate offerings of private placement securities that they disclosed to the SEC under Rule 506(c). Ex. F, G, H. As of Defendants' most recent filing on August 13, 2024, they had raised a total of $52,320,000.00 from 396 separate investors in their sale-leaseback securities.[6] Ex. F ($12,640,000 in investments by

---

Ponzi scheme is, as a matter of law, insolvent from its inception." *Janvey v. Alguire,* 647 F.3d at 597. Ordering discovery will allow Plaintiffs to determine the true nature of Defendants' business. This in turn will permit the Court both to protect the public from further misconduct and protect Defendants' assets if Plaintiffs' concerns prove justified. Undue prejudice justifying pre-motion-to-dismiss discovery thus exists. *See also Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99 Civ. 342, 1999 WL 223158, at *2 (S.D.N.Y. Apr. 16, 1999) (ordering discovery on undue prejudice grounds because in its absence, plaintiffs might have been prevented from seeking redress for alleged securities violations.) Without such discovery and a resulting preliminary injunction freezing Defendants' assets, Plaintiffs and the other investors will suffer prejudice as assets continue to dissipate.

[6] Defendants' SEC filings do not identify individual investors or investments, but rather identify only the aggregate number of investors and amount of investment in the specific offering in question.

100 separate investors reported by NFN8 Media, Inc./NFN8 Group, Inc.), Ex. G ($38,930,000 in investments by 293 separate investments reported by NFN8 Group, Inc.), Ex. H ($750,000 in investments by three separate investors reported by NFN8 International LLC). Plaintiffs invested a total of $10,180,000.00 in Defendants' Sale Leaseback Securities, or just under 20% of the investment total Defendants have disclosed to the SEC to date.[7]  *See* Dkt. 2-2, Decl. of Justin Lo, Ex. A, C, F.

Although Defendants appear to have purchased *some* miners and engaged in *some* mining activities,[8] their business and conduct nonetheless have all the hallmarks of a classic Ponzi scheme:

- During negotiations in advance of this Court's ruling on Plaintiffs' Application for TRO, Defendants indicated that Defendants Moore and Rodriguez would agree not to make any transfers from their personal funds in excess of $250,000 without Plaintiffs' permission. Even if Defendants were proposing an *aggregate* personal transfer limit rather than a *per-transaction* limit,[9] $250,000 is an amount far in excess of any legitimate need for personal funds given the short-term nature of a TRO.

- Defendants promise sale-leaseback customers essentially guaranteed rates of return in excess of 20% per year (*see, e.g.,* http://get21now.com) in which investors are to receive monthly lease payments for three to five years plus complete repayment of their principal investment at lease expiration.

- In fact, Defendants promised Plaintiffs a guaranteed return of 22% on their first three-year sale-leaseback investment in 2021, 24% for each of the next seven investments, and 36% when NFN8 persuaded Plaintiffs to make their final investment in 2024.  Even today, Defendants' get21now.com website still promises that investors can "Collect Fixed Returns of 21% Annualized, Paid Monthly."  *See* http://get21now.com.

- With these promised rates of return, adding additional investors actually makes things *worse* for Defendants, not better, even with relatively long lease terms.  That is because

---

[7] Plaintiffs' first investment was made in the spring of 2021, after Defendants began reporting sales of their Sale Leaseback Securities to the SEC.  Plaintiffs have no information regarding any of the pre-November 2020 investments Defendants have not disclosed to the SEC, and thus have no way of evaluating the cash flows associated with those sale-leaseback transactions.

[8] Ponzi schemes in the sale-leaseback context routinely involve at least a smattering of legitimate business activity.  *See, e.g. SEC v. Lotito et al.*, No. 3:24-cv-09348 -ZNQ-TJB (D.N.J.) (Complaint filed 9/20/24; sale-leaseback scam involving cryptomining "Apex Packs."  Defendants purchased some "Apex Packs" for investors but continued to solicit investment after significant shipping issues made it impossible to obtain additional units.) (Complaint attached as Ex. I)); *SEC v. Nationwide Automated Systems*, 14-CV-07249, (C.D. Cal. 2014) (ATM sale-leaseback fraud in which Defendants owned far fewer ATMs than they represented to investors) (Complaint attached as Ex. J).

[9] The aggregate/per-transaction distinction was unclear during the oral discussion, and Defendants did not provide Plaintiffs with a written proposal during the parties' initial negotiations.

36327794.v1-10/25/24

Defendants—were they operating legitimately—would need to make even more income through cryptomining and trading to cover the astronomical rates of return embodied in their lease payments in addition to paying for salaries, facilities expenses, electricity (the largest expense for any miner), and all other business expenses. And if Defendants simultaneously have other leases expiring like Plaintiffs' first lease did in July, the picture likely gets even worse as NFN8 accrues additional obligations to repay the investors' principal.

- It is thus no wonder that Defendants' scheme collapsed under its own weight with Defendants unable to make Plaintiffs' July 2024 and subsequent lease payments or their July 2024 buyback payment, even with Plaintiffs' May 2024 $1 million investment.

- Plaintiffs currently lack the information necessary to perform a thorough analysis of the viability of Defendants' business model and are seeking discovery to fill in the holes. However, the tentative preliminary analyses Plaintiffs have been able to perform strongly suggest that—even without considering Defendants' lump-sum buyback obligations—Defendants cannot satisfy their ongoing lease obligations without robbing Peter to pay Paul; that is, without using more recent investment funds to cover older lease payments.

- Defendants promise investors extraordinary investment security, featuring claims in their marketing materials that:

    o Their method is successful in strong or weak markets. *See, e.g.,* NFN8 Group 2024 Brochure, available at NFN8 Group 2023 Brochure at 6, available at https://nfn8.com/wp-content/uploads/NFN8Group_Brochure-2024-web.pdf ("The Company's proprietary hedging system is designed to hold short term and thrive in bear markets with intense volatility, as well as profit in an upward trending market;" "NFN8 Group has been cash flowing [sic] when Bitcoin was $6,700.00 --- $14,000.00 ---$30,000 --- $55,000.00;" "NFN8 Group has grown during every period of volatility;"); *see also* Steven Greene, "You Can Harness the Blockchain: The Algorithmic Recipe that Works," Futures Truth, #4-2018 Issue, available at https://nfn8.com/articles/you-can-harness-the-blockchain/ ("Therefore, we are not concerned if bitcoin or any other token is at $20,000 or $1.00. The cost of any token for us – no matter what the market price is fixed – because we manufacture tokens, we don't buy them. Our opportunities are myriad. We can manufacture, hold, or sell 1 token worth $20,000 or 20,000 tokens worth $1.00 and everything in between. And we can do it one time every few days or many times every few minutes. Additionally, the fact that we operate in a decentralized market that is not loaded with middlemen – banks-traders-brokers – all who take substantial commissions enables us to make a huge volume of trades and not be burdened with punishing fees.")

    o They have never missed a lease payment. *See, e.g,* https://www.linkedin.com/posts/juddkitzmiller_nfn8-group-inc-is-rated-excellent-with-activity-7021191010802180096-zLMZ?utm_source=share&utm_medium=member_desktop (January 2023 LinkedIn post by NFN8 "Enterprise Account Executive" and Josh Moore brother-in-law stating that "NFN8 GROUP has a perfect 5 year track record of making its payments to accredited investors – on-time" and noting that their "sale/leaseback concept" allows investors to "earn the bigger rates of return possible in the world

10

of #bitcoin and #blockchain, without having to become an expert in the field itself and dealing with the volatility.")[10]

- The "Press" tab of Defendants' website is nothing more than a collection of "pay-for-play" or other Astroturf links.  For example, none of the 75 entries under the heading "In the News – Featured in Publications Nationally" link to legitimate news articles; rather, every single live link takes visitors to company press releases dressed up as news articles and distributed by pay-for-play companies like BusinessWire, GlobeNewsWire, AccessWire, PR Newswire, Authority Press WireNews, NewMediaWire.  *See* https://nfn8.com/press/.

- Defendants provide little detail regarding the true nature of their business.  Among other things:

    - Defendants refuse to identify the mining equipment they purportedly purchase and sell to their investors by brand or model number, instead referring to the equipment as "Infinite Miners" or "Infinite Blockchain Miners" and providing nonsensical and internally inconsistent "equipment lists" for each Bill of Sale and/or Lease Agreement.[11]  *See, e.g.*, Dkt. 2-2, Decl. of Justin Lo, Ex. E, F.

    - Defendants provided Plaintiffs with Bills of Sale for eight separate investments over a period of two years from April 2021 through March 2023, reporting miner serial numbers that seemingly:

        - Correspond to the manufacturer serial number protocol for a particular off-the-shelf Bitcoin miner produced by Bitminer—the Antminer S19 Pro—rather than the customized "Infinite miners" or "Infinite blockchain miners" described in the relevant Lease Agreements and NFN8 promotional materials.  *See* Dkt. 2-2, Decl. of Justin Lo Ex. E, F; *see also* Ex. L.; and,

        - Correspond *only* to the Antminer S19 Pro that debuted in 2020 rather than to the serial numbers associated with the faster and more advanced Antminer S19 XP that Defendants' press releases indicate they purchased and began receiving in mid-2022. *See, e.g.,* "NFN8 Group Welcomes the Future of Digital Currency Mining to the U.S.," August 4, 2022, available at https://www.businesswire.com/news/home/20220804005301/en/NFN8-GROUP-Welcomes-the-Future-of-Digital-Currency-Mining-to-the-U.S. This conflicts with NFN8's repeated claims that an NFN8 investor "buys and owns the same specified computer equipment that the Company owns and uses."  *See* https://nfn8.com/about/, insofar as Defendants continued to

---

[10] Defendants no longer link directly to this claim in the current version of their website, but the first five results returned by a Google Search for "NFN8 never missed a payment" all feature the claim.  *See* Ex.K (Google search results page for "NFN8 never missed a payment," search performed on October 24, 2024). And all results displayed in Exhibit K besides the 2023 LinkedIn post making the same claim are links to materials either directly or indirectly available on NFN8's website today, including pay-for-play "articles," previous versions of the NFN8 Brochure, and other portions of the website.  *See id.*

[11] As explained in the Complaint, Defendants operate a business selling their "new and seasoned" miners, all of which are off-the-shelf branded equipment. Dkt. 1, 2.

11

assign to Plaintiffs machines that were increasingly out-of-date.[12] *Compare, e.g.,* Decl. of Justin Lo Ex. E, F Purchase Orders serial numbers with Ex. L (internet photographs of Bitmain Antminer S19 Pro and S19 XP model serial numbers showing different numbering conventions).

- Instead of providing legitimate details of their business model, Defendants publish what they call their "NFN8 Secret White Paper" on their website, which reads in its entirety as follows:

    **The Secret Sauce**

    The financial press has called NFN8 Group the Digital Asset Backbone Company that developed "the secret sauce." That is a fun catchy name that has stuck with NFN8 Group as it has experienced skyrocketing growth evidenced by exploding revenue and profits over the past few years. However, the "secret sauce" is much more than a fun name. It is an actual recipe for success that NFN8 Group uses every day. We lay it out for you to review below.

    **Equipment**
    - Power Control
    - Neutralize Climate Influences
    - Acquire And Efficiently Manage Next Generation Equipment
    - Upgrade, Refurbish And Trade Equipment For Optimal Performance

    **Software**
    - Management Software Platform
    - Mining Pool Association and Management
    - Equipment Alert Systems
    - Digital Asset Hedging Platform

    **Balancing**
    - Calculate Weighted Diversification/Hedging Options As Well As New Purchases And Ongoing Expenses
    - Managing Hardware Acquisition And Futures Contracts
    - Manage Last Gen Equipment Runtimes Against Profitability

---

[12] Although Defendants' sale-leaseback obligations were not tied to the purchase of any specific miner, each lease grants Plaintiffs the right to demand return of the designated equipment rather than having NFN8 repurchase the miners at the end of the lease term. In the unlikely event that Plaintiffs or another investor demanded return of the equipment rather than repurchase, Defendants' apparent continued provision of S19 Pro serial numbers to investors would allow Defendants to "return" less valuable S19 Pros to their investors rather than any more advanced and more valuable machines Defendants purchased later.

*See* https://nfn8.com/our-operations/#secret-sauce. This information is insufficient to establish the means by which Defendants can earn sufficient profits to cover the high lease payments, let alone repay investors' principal.

- Based on the information Plaintiffs have developed, Defendants also overcharged Plaintiffs significantly for the miners they purportedly purchased on Plaintiffs' behalf. This is true even if Defendants were buying a top-of-the-line new miner for every $30,000 their sale-leaseback program attracted. *See* Dkt. 1 at ¶¶ 20, 36-38, 77-79.[13] The massive disparity between the price Defendants paid to purchase the miners assigned to their sale-leaseback scheme and the prices they charged for those would also constitute a significant cushion Defendants can use to make lease payments back to the same investors or to earlier investors in the scheme.

Defendants' unwillingness to produce any information that would allow Plaintiffs to trace Defendants' cash flows over time is another significant red flag, as is their unwillingness to provide meaningful information regarding the supposed successes of the cryptocurrency trading portion of their "secret sauce" recipe. On October 7, hoping to head off this lawsuit, Defendants' counsel emailed Plaintiffs' counsel that they needed two weeks "to analyze even more closely both cash flows and additional assurances [to Plaintiff] that will be satisfactory." investment. Ex. N. It has been over two weeks now, and Defendants have not provided a plan. Defendants' conduct in discovery negotiations has been similarly telling. Defendants are now proposing to provide limited financial information for 2024 only. Ex. E. By limiting their proposal to 2024, Defendants would

---

[13] Although prices for any specific cryptocurrency miner will decline in the long term as newer, faster machines come to market, prices also vary significantly over time based on the price of the coin they are mining and the difficulty of mining that coin. NFN8 repeatedly claims to buy their miners at very low prices—*see, e.g.,* https://blockoverstock.com/#difference (We bulk order top-in-class miners every month and receive lucrative deals through tenured relationships we've built over the years and pass along those savings to you."). While Plaintiffs have no indication of the prices NFN8 actually paid for any miners it purchased, the most expensive miner they publicly claim to have purchased is the Bitmain Antminer S19 XP, which industry giant Marathon Digital purchased in bulk in mid-2022. *See* https://hashrateindex.com/blog/bitmain-repriced-s19-xp-order-heres-how-much-bitcoin-miners-are-saving/. Marathon originally paid between $78 and $83 per terahash, or between $10,920 and $11,620 per unit for its bulk order. *See id.* However, the manufacturer ultimately rebated those prices down to between $50.50 and $54.90 per terahash, or between $7,070 and $6,260 per machine, based on market conditions. Even at the high end, the standard $30,000 per miner price Defendants usually use constitutes an almost $24,000 overcharge. *See also* Dkt. 1 at ¶¶ 77-79 (explaining that maximum average price Defendants could have paid per miner based on information they provided to Plaintiffs was $5,225).

13

cut off the inquiry just after they received a $16 million influx of cash from knew investors, some of which Plaintiffs suspect was used to repay older investors.  Plaintiffs need historical information so they can trace Defendants use of their funds and others.'

There are other indicia of fraud as well, many of which Plaintiffs set forth in their Complaint and Application. *See* Dkt. 1, 2.  In addition, the Trustpilot reviews of NFN8's business contain multiple indications that Defendant Moore is mixing NFN8's business with his self-directed IRA advisory business, New Standard IRA ("New Standard"), and those reviews in turn led Plaintiffs to scrutinize Moore's IRA business more closely.  For example, one NFN8 reviewer notes that "[t]he folks at NFN8 helped me set up a business to invest in my Roth IRA," and another states, "Josh Moore guided me in the set up [sic] of my self directed [sic] IRA."  Ex. M.  When Plaintiffs in turn reviewed The New Standard IRA website, they found that it contains its own "Testimonials" section featuring what are purportedly reviews from real customers—including customer photographs.  *See* https://www.newstandardira.com/testimonials/.  However, Google Lens reveals that the photograph of a customer New Standard identifies as "Robert" from South Carolina is actually a photo of English superstar actor Idris Elba, and a photo of "Hollis" from Texas is instead a red-carpet photo of English actor Martin Freeman, of *Sherlock* and *The Hobbit* fame.  *See id.*  In addition, most of the remaining thumbnail photos associated with New Standard IRA testimonials seem to be either stock photos or photos lifted from other websites (for example, Google Lens reveals that the photo labeled "Jeff, Tennessee" is actually Twitter/X user Kenold Beauplan's profile photo, and the photograph of "Mace, New Jersey" shows up on multiple websites under different names).[14]  *See id.*

---

[14] Defendant Rodriguez has apparently used this same tactic to bolster the credibility of one of his other businesses.  Other than the photos of Rodriguez and now-deceased NFN8 co-founder Steven Greene, the majority of the "Our Team" photos on his ClickFirst Media website (https://clickfirstmedia.com/#our-team) are stock photos or photos from other websites.  For example, the photographs of the individuals ClickFirst Media identifies as "Jim Miller, VP of Client Advertising and Messaging" and "Linda Klein,

14

IV.   **CONCLUSION**

At the preliminary injunction hearing, Plaintiffs must satisfy all four elements of the traditional preliminary injunction test to obtain relief. That is, they must show:

(1) A substantial likelihood that they will prevail on the merits;

(2) A substantial threat that they will suffer irreparable injury if the injunction is not granted;

(3) Their substantial injury outweighs the threatened harm to the party whom they seek to enjoin; and

(4) Granting the preliminary injunction will not disserve the public interest.

*City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018).

The discovery Plaintiffs seek is narrowly tailored to ensure that Plaintiffs have a fair opportunity to satisfy that burden without overwhelming Defendants. It asks for no discovery requiring ESI collection or traditional document review; instead, everything Plaintiffs seek should be easy for Defendants to access and produce.

Moreover, each of Plaintiffs' requests are directly relevant to one or more of the four elements of the preliminary injunction test. For example, to prove likelihood of success justifying the requested relief—freezing of Defendants' accounts—Plaintiffs likely must demonstrate that Defendants' misconduct rises above the level of garden-variety fraud and into Ponzi scheme territory. Accordingly, Plaintiffs need discovery regarding Defendants' actual mining and trading activities *over time* and regarding their sale-leaseback obligations as well. Similarly, Plaintiffs need discovery into Defendants' current and historical miner fleet, miner hosting arrangements and electricity prices to determine the plausibility of Defendants' claims that they are especially skilled at mining cryptocurrency profitably. Plaintiffs also need meaningful discovery into

---

CFO" also appear on UK surveying firm Owen & Owen's website as "Steven Johnson" and "Inna Cruz," respectively (https://www.owenandowen.co.uk/all-team/), and on other U.S. and international websites as well. Moreover, Plaintiffs have been unable to find evidence suggesting that the individuals for whom ClickFirst used stock photos even exist.

36327794.v1-10/25/24

Defendants' finances over that same time period to determine whether and to what extent they have misappropriated invested funds either for their principals' individual benefit or to pay earlier investors.

The same is true for the other elements. If Defendants are indeed running a Ponzi scheme, Plaintiffs will almost certainly be able to satisfy the irreparable injury, balance of harms, and public interest components of the preliminary injunction test as well. But Plaintiffs will likely need the discovery they have requested to meet that burden—including not only the document and information requests Plaintiffs propose, but also four-hour depositions of both Josh Miller and Cory Rodriguez, a separate deposition of Defendants' accountant, and in-person inspection of the miners and mining facilities Defendants own, control, or use.[15]

Accordingly, Plaintiffs respectfully request that the Court order Defendants to provide the discovery set forth in the attached Proposed Order.

---

[15] Plaintiffs originally requested two-hour depositions of each individual Defendant, but in light of the expanded scope of their concerns, now request four hours with each witness.

Date:  October 25, 2024                    Respectfully submitted,

**STEPTOE LLP**

*/s/ David Isaak*
Hector R. Chavez
Texas State Bar No. 24078335
David Isaak
Texas State Bar No. 24012887
*Admitted Pro Hac Vice*
Paul Stancil
Texas State Bar No. 00797488
*Admitted Pro Hac Vice*
717 Texas Avenue, Suite 2800
Houston, Texas 77002
Telephone (713) 221-2300
hchavez@steptoe.com
disaak@steptoe.com
pstancil@steptoe.com

Ashwin Ram
*Admitted Pro Hac Vice*
California State Bar No. 277513
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
aram@steptoe.com

**THE DURRANT LAW FIRM, APC**
John S. Durrant
*Admitted Pro Hac Vice*
California State Bar No. 217345
john@durrantlawfirm.com
2337 Roscomare Rd., Suite 2-180
Los Angeles, CA 90077
Telephone: (424) 273-1962

**COUNSEL FOR PLAINTIFFS MOBILE MED WORK HEALTH SOLUTIONS, INC.; JLL VENTURES, INC.; AND M-M WHS LLC**

## CERTIFICATE OF CONFERENCE

Pursuant to Western District of Texas Local Rule CV-7.G., I certify that the parties have conferred regarding Plaintiffs' requests for discovery multiple times and were unable to reach agreement.

    */s/ David Isaak*
    David Isaak

## CERTIFICATE OF SERVICE

I certify that on October 25, 2024, a true and correct copy of the foregoing document has been served on all counsel of record via the Court's CM/ECF system.

    */s/ David Isaak*
    David Isaak