# EXHIBIT J

1  GARY Y. LEUNG, *L.R. 83-2.4.1* leave to practice granted
   Email: leungg@sec.gov
2  PETER F. DEL GRECO (Cal. Bar No. 164925)
   Email: delgrecop@sec.gov
3
   Attorneys for Plaintiff
4  Securities and Exchange Commission
   Michele Wein Layne, Regional Director
5  Lorraine Echavarria, Associate Regional Director
   John W. Berry, Regional Trial Counsel
6  5670 Wilshire Boulevard, 11th Floor
   Los Angeles, California 90036
7  Telephone: (323) 965-3998
   Facsimile: (323) 965-3908
8
9              **UNITED STATES DISTRICT COURT**
10             **CENTRAL DISTRICT OF CALIFORNIA**
11                   **Western Division**

12             CV14    07249- SJO (FFMx)

13 SECURITIES AND EXCHANGE          Case No.
   COMMISSION,
14                                  **COMPLAINT**
                Plaintiff,
15
        vs.
16
17 NATIONWIDE AUTOMATED
   SYSTEMS, INC., JOEL GILLIS, and
18 EDWARD WISHNER,

19              Defendants,

20              and

21 OASIS STUDIO RENTALS, LLC,
   OASIS STUDIO RENTALS #2, LLC,
22 and OASIS STUDIO RENTALS #3,
   LLC,
23
24              Relief Defendants.

25
26
27
28

COMPLAINT                    1

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

3.    This matter concerns a large ongoing Ponzi scheme.  Defendants' scheme was to sell—in an unregistered securities offering—investment opportunities in automated teller machines ("ATMs") through purported "sale and leaseback" transactions.

4.    Since 2013 alone, Defendants raised at least $123 million in investor funds through its ATM sale and leaseback transactions with investors.  Defendant Nationwide Automated Systems, Inc. ("NASI") told investors that it is in the business of placing, operating and maintaining ATMs, and that investors could purchase ATMs from NASI, and then lease them back to NASI in return for "rent" of 50 cents per ATM transaction, with a guaranteed investment return of at least 20% per year.

5.    But none of that was true.  Legitimate ATM transaction revenue represented only a tiny fraction—less than 2%—of NASI's actual revenue.  The vast majority of NASI's revenue was comprised of new investor funds.  To an overwhelming degree, therefore, investor funds were not being used to acquire, place, operate, and maintain the thousands of ATMs that NASI said it had sold to them, but were instead being used to pay guaranteed returns NASI already owed to earlier

investors.  Defendants also did not actually own many of the ATMs they had ostensibly bought and allegedly sold to investors.  In fact, Defendants required investors to contractually promise that they would never contact the locations where their ATMs were supposedly located, all to ensure that no one could discover Defendants' fraud.

6.     Defendant Gillis is involved in all aspects of the fraud.  He is the president of NASI, he personally executed thousands of sale and leaseback agreements with investors on NASI's behalf, he is the signatory on the bank accounts from which NASI made Ponzi-like investor payments, and he was directly involved in the marketing of NASI's ATM investment opportunities to investors.

7.     Defendant Wishner is also a key actor in Defendants' fraudulent scheme. He is the treasurer, vice president, and secretary of NASI, he was responsible for preparing NASI's tax returns, and he is a signatory on the bank accounts from which NASI made Ponzi-like investor payments.  Wishner is also the registered agent of and is affiliated with Relief Defendants Oasis Studio Rentals, LLC, Oasis Studio Rentals #2, LLC and Oasis Studio Rentals #3, LLC.

8.     As a result of the conduct alleged herein, Defendants have violated the antifraud provisions of the Securities Act and the Exchange Act, and Defendants NASI and Gillis have violated the registration provisions of Section 5 of the Securities Act.  Defendant Gillis is liable for these violations directly, and as a control person under Section 20(a) of the Exchange Act.

9.     The SEC brings this emergency action and seeks a temporary restraining order and preliminary injunction, among other relief, to halt Defendants' unlawful conduct and preserve the status quo.  The SEC also seeks entry of permanent injunctions against Defendants; disgorgement of ill-gotten gains and prejudgment interest thereon from Defendants and Relief Defendants; and civil penalties from Defendants.

**THE DEFENDANTS**

10.    Nationwide Automated Systems, Inc. is a California corporation headquartered in Calabasas, California.  NASI is not registered with the SEC, and has not registered any offering or class of its securities with the SEC.

11.    Joel Barry Gillis is a resident of Woodland Hills, California.  Gillis is the president of Defendant NASI and a signatory on its bank accounts.  According to a press release issued by NASI, Gillis "runs" NASI.  He was formerly a registered investment representative, but he has not been registered since 1986.

12.    Edward Wishner is a resident of Woodland Hills, California.  Wishner is the treasurer, vice president, and secretary of Defendant NASI and a signatory on its bank accounts.  Wishner prepared NASI's tax returns.  Wishner is affiliated with Relief Defendants Oasis Studio Rentals, LLC, Oasis Studio Rentals #2, LLC and Oasis Studio Rentals #3, LLC (collectively, "Oasis Studio Rentals").

**RELIEF DEFENDANTS**

13.    Oasis Studio Rentals, LLC is a California limited liability company headquartered in Houston, Texas which was formed in 2008.  Wishner is its registered agent.

14.    Oasis Studio Rentals #2, LLC is a California limited liability company headquartered in Woodland Hills, California which was formed in 2012.  Wishner is its registered agent.

15.    Oasis Studio Rentals #3, LLC is a California limited liability company headquartered at the same Woodland Hills address as Oasis Studio Rentals #2, and was also formed in 2012.  Wishner is its registered agent and one of its principals.

**FACTUAL ALLEGATIONS**

A.    **Background on NASI**

16.    NASI was incorporated in 1996 and is controlled by Gillis.  To the public, NASI describes itself as "an ATM machine provider" which "works with high-traffic retail locations, hotels, casinos, convenience stores and movie theatres

located throughout the United States." NASI claims that it "has been consistently recognized for its exceptional customer service, sturdy machines and aggressive revenue-sharing model." NASI touts the fact that it operates "over 80 branches" with "1,000 certified technicians on standby," and further claims that NASI services more than $1 billion in ATM transactions per month. Stated succinctly, NASI tells investors that it is in the business of placing, operating and maintaining automated teller machines.

**B.    The Unregistered NASI Offering**

**1.    Defendants' solicitation of investors**

17.    Since at least 1999 and continuing to the present, Defendants NASI and Gillis have offered securities—in the form of ATM sale and leaseback agreements—to the public. From just January 2013 to today, Defendants have raised approximately $123 million in investor money through the NASI ATM sale and leaseback offering.[1]

18.    Defendants NASI and Gillis, directly and indirectly, solicited investors through various salespeople, including Gillis himself, electronic mail, and by word-of-mouth. Defendants NASI and Gillis offered and sold NASI's ATM sale and leaseback agreements to investors across the United States.

**2.    The terms of the NASI offering**

19.    Defendants sold investors ATMs through a standard package of agreements, comprised of: (i) an ATM Equipment Purchase Agreement ("Purchase Agreement"); (ii) an ATM Equipment Lease Agreement ("Lease Agreement"); and (iii) an Addendum To Owner Lease Agreement ("Addendum"). The three documents were executed at or around the same time by investors, with Gillis signing on behalf

---

[1] The NASI bank records with transaction-level detail that the SEC obtained during its pre-filing investigation are limited to this 20-month time period; NASI, however, has been engaged in the offer and sale of ATM sale and leaseback agreements since at least 1999.

of NASI.

20.     Under the terms of the Purchase Agreement, investors paid a flat amount—typically $12,000, but in some cases $19,800 per ATM—to buy one or more ATMs, all of which were identified in an exhibit to the contract by both "serial number" and the name of the location to which the ATMs were to be delivered.  In exchange for this payment, NASI, as "Seller", agreed to deliver the investor-purchased ATMs to the location indicated by the agreement within 60 days.  Last, NASI warranted that "the ATM(s) purchased by BUYER shall, at the time of delivery, be free and clear of all liens, claims, debts, encumbrances, security interests, or other charges."

21.     Under the terms of the Lease Agreement, investors then leased their ATMs back to NASI for an initial 10-year term.  The lease provides that "NASI, at its sole cost and expense, shall operate and maintain the ATMs and provide all services relating thereto," including but not limited to "processing and accounting for all ATM transactions, obtaining, the delivering and loading of cash for the ATMs, and repairing, maintaining and servicing the ATMs."  Moreover, the lease states that NASI, "at its sole cost and expense," shall "maintain insurance coverage on the ATMs in an amount not less than the full replacement value of the ATMs," as well as "liability insurance (both public liability and property damage) covering the operation of the ATMs."

22.     The Lease Agreement further provides that "NASI shall pay to [the investor] as rent an amount equal to $0.50 for each 'approved transaction' … produced by the ATMs for each calendar month during the term of this Agreement."

23.     Following the initial 10-year lease term, the Lease Agreement automatically renewed for additional 3-year periods thereafter, unless investors provided written notice at least 60 days in advance of expiration of their intent to terminate.  If terminated, NASI would either deliver an investor's ATMs to a designated place, or alternatively, return the full amount of their initial investment,

1    *i.e.*, the purchase payment provided for in the Purchase Agreement.

2        24.   The Lease Agreement also includes the following "non-interference"

3    clause:

4            11.   Non-Interference.  During the term of this Agreement,

5            including any extensions thereof, and provided that NASI is not in

6            default under the terms hereof, Lessor agrees not to interfere with

7            the operation of the ATMs by NASI in any manner including, but

8            not limited to, contacting the locations where the ATMs is/are

9            installed and/or any service providers under contract with NASI

10           relating to the operation of such ATMs.

11       25.   Last, the Addendum modified the rent obligation set forth in the Lease

12   Agreement by guaranteeing a minimum investment return of 20% per year.  In the

13   Addendum, NASI promised that "[i]f at anytime [*sic*] the owner's ATM machine

14   fails to make enough transactions [t]o pay the owner a monthly check equivalent to

15   twenty (20%) percent [a]nnual return on the owner's investment … [NASI]

16   guarantees to pay owner the difference between what the Owner has received and [a

17   20% annual return.]"   The Addendum also modified the ten-year lease term provided

18   for in the Lease Agreement by granting investors the right, after only two years, to

19   sell their ATMs back to NASI at their original sales price at any time.

20       26.   When marketing NASI's ATM sale and leaseback agreements,

21   Defendants NASI and Gillis touted NASI's purported 19-year track record of

22   profitable returns for investors.  They also claimed that the locations acquired by

23   NASI were strong performers, and that many ATMs installed in those areas yielded

24   transaction revenue in excess of the 20% already guaranteed by NASI.  Defendants

25   NASI and Gillis encouraged investors to invest in NASI's ATM sale and leaseback

26   agreements by periodically representing that NASI had "secured" a new "round" of

27   convenience store locations at which ATMs would be installed, but that because these

28   opportunities were limited, interested investors should quickly invest while they were

still available.  Defendants NASI and Gillis urged, in addition, that investors should roll their IRA savings into NASI's ATM sale and leaseback agreements because these investments would outperform most traditional retirement investments.

27.     NASI's ATM sale and leaseback agreements are securities in the form of investment contracts.  They represent an investment of money, in a common enterprise, with the expectation of profits to be derived from the efforts of a third party.  Investors provided money to NASI for investment purposes.  Because the terms of the NASI Purchase Agreement, Lease Agreement and Addendum made investors entirely dependent on NASI to operate and maintain their purported ATMs, investors were investing in a common enterprise.  And for that same reason, along with investors' contractual promise not to "interfere" with the operation of their ATMs, NASI's efforts were essential to the failure or success of the common enterprise.

### 3.    The NASI offering is not registered

28.     Defendants have not registered with the SEC any offering of any kind by NASI.

29.     Defendants NASI and Gillis have offered and sold NASI's ATM sale and leaseback agreements through interstate commerce to investors residing in multiple states.

## C.    Defendants' Misrepresentations and Fraudulent Scheme

30.     In its ATM sale and leaseback agreements and other written communications, NASI made the following representations to investors regarding their investment with NASI.  All of these statements were false and deceptive, and made by Defendants in furtherance of a fraudulent scheme:

(a)     Investors were buying from NASI an actual ATM, identified by serial number, "free and clear of all liens, claims, debts, encumbrances, security interests, or other charges."

(b)     The ATMs bought by investors would then be installed by NASI

at a designated place—typically, hotels, convenience stores, and gas stations located across the United States.

(c)     Following the sales transaction, investors' ATMs would remain, at all times, their "sole and exclusive personal property."

(d)     During the lease term, NASI would "operate and maintain the ATMs … includ[ing] … processing and accounting for all ATM transactions, obtaining, the [sic] delivering and loading of cash for the ATMs, and repairing, maintaining and servicing the ATMs," "maintain insurance coverage on the ATMs," and "pay, prior to delinquency, all personal property taxes assessed against and levied upon the ATMs."

(e)     During the lease term, NASI would pay to investors 50 cents per transaction occurring in their ATMs, with NASI agreeing that in the event of a shortfall, it would guarantee a 20% annual return on investment; NASI said that it was able to make this guarantee because with ATM transaction fees typically being in the range of $2.50-$3.00—well above the 50 cents per transaction in rent owed by NASI under the lease—NASI could guarantee a 20% return by shifting part of its share of the ATM transaction revenue back to investors.

(f)     Each month, NASI would send investors monthly transaction reports that purportedly detailed the performance of the ATMs that they owned; these transaction figures would then form the basis for NASI's monthly payments to investors.

31.     NASI is also a Ponzi scheme.  NASI does not own or operate the tens of thousands of ATMs it claims to have sold and leased back from its investors.  The legitimate ATM transaction revenue on ATMs that NASI, in fact, operates is only a miniscule part of its total revenue.  By a wide margin, NASI's incoming revenue is comprised of new investor funds.  And so each month, the payments NASI made to investors under their NASI Lease Agreements were not paid from real ATM transaction revenue, but were instead funded by money received from new investors

in Defendants' Ponzi scheme.

> 1.    **Misrepresentations about NASI's operation and ownership of ATMs sold to and leased back from investors**

32.    According to NASI's records, NASI had sold and was leasing back more than 31,000 ATMs to investors as of June 2014.  These ATMs were purportedly located in hotels, gas stations and convenience stores across the United States, and in particular, NASI claimed that many of these ATMs were located in less densely-populated areas—towns such as Ottumwa, Iowa; Bicknell, Indiana; Viola, Illinois; Plattsmount, Nebraska; Higgensville, Missouri; and Medicine Lodge, Kansas, to name only a few.

33.    Because of the "Non-Interference" provision in their NASI Lease Agreements, investors were contractually barred from contacting these locations to learn anything at all about NASI's operation of their putative ATM investments.

34.    Each month, NASI sent investors monthly transaction reports for the ATMs that they "owned."  When one interested investor asked NASI, "How can I audit the ATM's monthly revenue?," a NASI sales representative tersely responded, "Your statement with each check is your audit."  In fact, in their monthly reports to investors, Defendants fabricated false transaction figures for, in many cases, either non-existent ATMs or ATMs that neither NASI nor its investors actually owned.

35.    NASI's claim of 31,000 ATMs under operation is not true.  To operate its ATMs, NASI subcontracted with two ATM service providers.  In exchange for certain fees, these third-party ATM servicers provided ATM processing, settlement, clearing, installation, and maintenance services to NASI for all of the ATMs owned or allegedly leased by NASI.  Each month, the ATM servicers issued settlement reports to NASI, detailing the revenue generated by NASI's ATMs, less fees owed to the ATM servicers, with the balance to be paid to NASI by monthly check.  These settlement reports listed each NASI ATM by location and by Terminal ID.

36.    NASI's records of its ATMs under operation list more than 31,000

COMPLAINT                                  10

purported ATM holdings.  The settlement reports from NASI's third-party ATM servicers, however, identify only about 235 ATMs serviced for NASI.  In short, Defendants have "sold" and "leased back" tens of thousands of ATMs to NASI investors that they never owned, that they never operated, and that may have never existed.

37.    As just one example, NASI's internal records claim ownership or operation of about 673 ATMs located at various "Casey's Convenience Mart" businesses in Nebraska, Iowa, Minnesota, Kansas and Illinois.  These same Casey's Convenience Mart locations are listed in dozens of NASI investor agreements as the business locations at which NASI installed the ATMs that these investors had supposedly paid for.  Neither NASI nor its investors own any of the ATMs being operated in Casey's Convenience Mart stores across the Midwest United States.  Rather, each and every Casey's Convenience Mart ATM is in fact owned by a company called MobileMoney, Inc., a San Clemente-based company which has no affiliation with NASI.

38.    What's more, in many instances NASI sold the same sham Casey's Convenience Mart ATM to more than one investor.  For instance, in 2013, NASI sold an ATM at a single Casey's store in Norfolk, Nebraska, to five different NASI investors, with two of those sales occurring only 16 days apart.  Defendants not only sold investors ATMs that NASI had never owned, but ATMs which Defendants had already fraudulently "sold" to other investors.

**2.    The Ponzi scheme**

39.    Defendants did not pay investors transaction revenue from the operation of the ATMs that NASI claimed to have sold investors.  Defendants instead made Ponzi-like payments funded by cash from new investors.

40.    In April, May and June 2014, a total of about $23,783,827.29 was deposited to NASI's bank accounts.  Of that amount, only approximately $390,805.46—or 1.64%—represented legitimate ATM transaction revenue from

NASI's third-party ATM servicers. By contrast, about $18,420,608.25 in investor funds were deposited to NASI's bank accounts. But NASI paid to investors at least $23,492,097 in amounts owed under NASI's ATM sale and leaseback agreements. Accordingly, NASI's April, May and June investor payments were not funded by legitimate ATM transaction revenue, but instead by cash raised from new investors.

### 3. The misappropriation and misuse of investor proceeds

41.    In addition to making Ponzi payments to investors as alleged above, Defendants wrongly transferred investor proceeds to Relief Defendants Oasis Studio Rentals, three entities affiliated with Wishner.

42.    NASI's April 2013 balance sheet reflects a $1,477,192 receivable due from Oasis Studio Rentals. These entities were formed in 2008 and 2012, and Wishner serves as the registered agent for each entity. Within eight months, NASI's balance sheet indicated that this $1.477 million receivable from Oasis Studio Rentals had been reduced to only $75,000. NASI's bank records, however, reflect only $28,250 in payments made by Oasis Studio Rentals to NASI during that period of time, in the form of two checks signed by Wishner. During this time period, the source of virtually all of NASI's incoming cash was new investor funds.

43.    Accordingly, Defendants misappropriated and misused investor proceeds by loaning and later forgiving or writing off large amounts of money to unrelated entities affiliated with Wishner.

### D.    The Ongoing Nature of the Fraud

44.    In August 2014, NASI bounced approximately $3 million in checks to NASI investors. By the end of the month, NASI had drained its bank account, drawing it down to a balance of less than $200,000.

45.    Following hundreds of calls from concerned investors, NASI told investors in an August 28, 2014 letter from Defendant Gillis that: "We cannot control the U.S. mail, and there will always be a small percentage of checks that for some reason or another never make it to their intended location."

46.     NASI also stated in Gillis's letter:  "In 19 years we have never, never been late.  We have never had to deal with such a challenge of this type or magnitude. We have always posted and mailed checks on the 1st of each month or the Monday following, if the 1st fell on a weekend or holiday."

47.     Gillis's August 28th letter further stated:  "I will not go into every detail, but we came to the uncomfortable realization that the current infrastructure of Nationwide cannot support over 4000 phone calls that were fielded in the first 2-1/2 weeks of August.  Some of those calls were the same people calling two or three times."

48.     The August 28th letter further stated:  "The September 1st check will be going out late as well due to the inordinate amount of time spent on complaints, cleaning up the general accounting and system upgrades.  We hope to be back on track by October 1st."

49.     Finally, Gillis's August 28th letter stated:  "Please do not call us with check mailing inquiries for September.  We estimate that they will go out anywhere from the 8th to the 10th.  If checks are not received within the standard 10 day period please e-mail us at:  accounting@nationwideautomatedsystems.com as we do not wish to spend the next few weeks on the telephone and revisit the same unpleasant experience."

50.     Defendants NASI and Gillis separately attempted to lull investors by also telling them that their bounced checks had been caused by a mere "glitch" in connection with NASI's decision to contract with a new outside firm to manage investor payments.  NASI claimed this "system conversion" had not gone "smoothly."

51.     On August 20, Defendants opened a new NASI account at a different bank.  From that new account, NASI continued raising investor money and making Ponzi-like payments to existing investors.

52.     From August 20 to September 8, 2014, a total of about $3,871,430 was deposited to NASI's new bank account.  Of that amount, only $52,463—or 1.36%—represented legitimate ATM transaction revenue from NASI's third-party ATM servicers.  By contrast, $3.36 million in deposits during that period came from new NASI investors.  But in that timeframe, NASI paid to existing investors at least $2,044,050 in amounts owed under NASI's ATM sale and leaseback agreements.  Accordingly, NASI's August and September investor payments from its new bank account were not funded by legitimate ATM transaction revenue, but instead by cash raised from new investors.

**E.     Defendants' Roles in the Fraud**

53.     At all relevant times, Defendant Gillis controlled NASI.  Gillis formed and controls NASI.  He has been identified in NASI written communications and a press release as NASI's president, and the man responsible for "running" NASI's operations.

54.     Gillis is also a signatory to the Sales Agreements, Lease Agreements, and Addendums that NASI entered into with its investors.  He is also a signatory on NASI's bank accounts; significantly, Defendant Gillis signed thousands of the investor checks since 2013 which constitute Ponzi scheme payments.

55.     As a principal of NASI, Gillis's mental state is imputed to his company, Defendant NASI.

56.     Gillis made direct misrepresentations to investors regarding NASI's ATM sale and leaseback investment opportunities, including meeting in-person with investors to solicit their investment.

57.     Gillis knew, or was reckless in not knowing, that the false and misleading representations and omissions alleged herein were being made to investors about NASI's ATM sale and leaseback business.  Gillis knew, or was reckless in not knowing, that NASI does not own or operate the tens of thousands of ATMs it claims to have sold and leased back from its investors, that NASI's real

ATM transaction revenue was only a minute part of the cash coming into the company, that instead, NASI's revenue was almost all comprised of new investor funds, and that NASI's payments to investors were Ponzi payments made with other investors' money.

58.    On information and belief, in one case, a former NASI investor called the rural California hotel that Defendants said her ATM was located at.  She learned that the hotel did not have an ATM on the premises and never had.  She then contacted Gillis, and left a message to the effect of, "I know what you're doing.  And I want my money back."  The very next day, Gillis provided that investor with a cashier's check for the full amount of her investment.  He asked her no questions.

59.    At all relevant times, Defendant Wishner was NASI's vice president, treasurer and secretary.  Wishner prepared NASI's tax returns.  He is a signatory on NASI's bank accounts and typically signed the bulk of the checks written out of NASI's general account.  He also signed dozens of investor checks written since August 2014 which constitute Ponzi scheme payments.

60.    As a signatory to all of NASI's bank accounts and the NASI executive responsible for preparing its tax returns, Wishner knew, or was reckless in not knowing, that NASI's real ATM transaction revenue was only a minute part of the cash coming into the company, that instead, NASI's revenue was almost all comprised of new investor funds, and that NASI's payments to investors were Ponzi payments made with other investors' money.

61.    Wishner also signed, on NASI's behalf, one of NASI's ATM management agreements with its third-party ATM service providers.  These management agreements provided the only source of NASI's legitimate ATM transaction revenue.

62.    As a principal of NASI, Wishner's mental state is imputed to his company.  His mental state is also imputed to his affiliated entities, Relief Defendants Oasis Studio Rentals.

1

2

3

4

5

6

## FIRST CLAIM FOR RELIEF

**Fraud in Connection With the Sale of Securities**

**Violations of Section 10(b) of the Exchange Act**

**and Rule 10b-5(b) Thereunder**

**(against Defendants NASI and Gillis as primary violators, and, alternatively,**

**against Gillis as a control person under Section 20(a) of the Exchange Act)**

7

8          63.    The SEC realleges and incorporates by reference paragraphs 1 through 62 above.

9

10

11

12

13

14

15          64.    Defendants NASI and Gillis, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading

16

17

18

19          65.    By engaging in the conduct described above, Defendants NASI and Gillis, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

20

21

22

23

24

25          66.    Defendant Gillis was a control person of Defendant NASI because he possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of each of these entities.  Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), Defendant Gillis is liable to the SEC to the same extent as Defendant NASI for its violations of Section 10(b) and Rule 10b-5(b) thereunder.

26

27

28

COMPLAINT                                    16

1

## SECOND CLAIM FOR RELIEF

2

### Fraud in the Offer and Sale of Securities

3

### Violations of Section 17(a)(2) of the Securities Act

4

### (against Defendants NASI and Gillis)

5        67.    The SEC realleges and incorporates by reference paragraphs 1 through

6    62 above.

7        68.    Defendants NASI and Gillis, by engaging in the conduct described

8    above, in the offer or sale of securities by the use of means or instruments of

9    transportation or communication in interstate commerce or by use of the mails,

10   directly or indirectly, with scienter, obtained money or property by means of untrue

11   statements of a material fact or by omitting to state a material fact necessary in order

12   to make the statements made, in light of the circumstances under which they were

13   made, not misleading.

14       69.    By engaging in the conduct described above, Defendants NASI and

15   Gillis, violated, and unless restrained and enjoined will continue to violate, Section

16   17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

17

## THIRD CLAIM FOR RELIEF

18

### Fraud in Connection With the Sale of Securities

19

### Violations of Section 10(b) of the Exchange Act

20

### and Rules 10b-5(a) and (c) Thereunder

21

### (against all Defendants as primary violators, and, alternatively, against Gillis as

22

### a control person under Section 20(a) of the Exchange Act)

23       70.    The SEC realleges and incorporates by reference paragraphs 1 through

24   62 above.

25       71.    Defendants, by engaging in the conduct described above, directly or

26   indirectly, in connection with the purchase or sale of a security, by the use of means

27   or instrumentalities of interstate commerce, of the mails, or of the facilities of a

28   national securities exchange, with scienter:

COMPLAINT                                17

1     a.     employed devices, schemes, or artifices to defraud; or

2     b.     engaged in acts, practices, or courses of business which operated

3            or would operate as a fraud or deceit upon other persons.

4     72.    By engaging in the conduct described above, Defendants violated, and

5 unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange

6 Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§

7 240.10b-5(a) & 240.10b-5(c).

8     73.    Defendant Gillis was a control person of Defendant NASI because he

9 possessed, directly or indirectly, the power to direct or cause the direction of the

10 management and policies of each of these entities.  Accordingly, pursuant to Section

11 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), Defendant Gillis is liable to the SEC

12 to the same extent as Defendant NASI for its violations of Section 10(b) and Rule

13 10b-5(a) and (c) thereunder.

14               **<u>FOURTH CLAIM FOR RELIEF</u>**

15               **Fraud in the Offer and Sale of Securities**

16     **Violations of Sections 17(a)(1) and (3) of the Securities Act\**

17                    **(against all Defendants)**

18     74.    The SEC realleges and incorporates by reference paragraphs 1 through

19 62 above.

20     75.    Defendants, by engaging in the conduct described above, in the offer or

21 sale of securities by the use of means or instruments of transportation or

22 communication in interstate commerce or by use of the mails, directly or indirectly

23     a.     with scienter, employed devices, schemes, or artifices to defraud;

24            or

25     b.     engaged in transactions, practices, or courses of business which

26            operated or would operate as a fraud or deceit upon the purchaser.

27     76.    By engaging in the conduct described above, Defendants violated, and

28 unless restrained and enjoined will continue to violate, Sections 17(a)(1) and (3) of

COMPLAINT                                    18

the Securities Act, 15 U.S.C. § 77q(a)(1) and (3).

## FIFTH CLAIM FOR RELIEF

### Sale of Unregistered Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (against Defendants NASI and Gillis)

77.     The SEC realleges and incorporates by reference paragraphs 1 through 62 above.

78.     Defendants NASI and Gillis, by engaging in the conduct described above, directly or indirectly, made use of means or instruments or transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

79.     No registration statement has been filed with the SEC or has been in effect with respect to any of the offerings alleged herein, and no exemption from registration applies.

80.     By engaging in the conduct described above, Defendants NASI and Gillis have violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Fed. R. Civ. P. 65(d), temporarily, preliminarily and permanently enjoining Defendants, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or

otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## III.

Issue, in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order and a preliminary injunction against all Defendants, freezing the assets of Defendants Gillis, Wishner, NASI, and their respective affiliates, and freezing the assets of Relief Defendants Oasis Studio Rentals, LLC, traceable to the fraud; prohibiting all Defendants from destroying documents; granting expedited discovery; requiring accountings from Defendants; and appointing a Receiver over NASI and its respective affiliates.

## IV.

Order Defendants and Relief Defendants to disgorge all ill-gotten gains they received, together with prejudgment interest thereon.

## V.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

COMPLAINT

1

## VII.

2      Grant such other and further relief as this Court may determine to be just and

3   necessary.

4

5   Dated:  September 17, 2014

6

7                                               Gary Y. Leung

8                                               Peter F. Del Greco
                                                Attorneys for Plaintiff
9                                               Securities and Exchange Commission

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                              21