# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| MOBILE MED WORK HEALTH SOLUTIONS, INC., *et al.*, | |
| *Plaintiffs*, | CIVIL ACTION NO. 1:24-CV-01219-RP |
| v. | **OPPOSED MOTION TO COMPEL ARBITRATION** |
| JOSHUA MOORE, *et al.*, | |
| *Defendants*. | |

## Introduction

Plaintiffs[1] have filed an eleven-claim shotgun pleading against NFN8 Group, Inc. ("Group"), its owners, and its affiliates. Each claim, however, has a common core: Plaintiffs entered into nine sets of lease agreements and service and purchase agreements with Group affiliates to effectuate sales and leasebacks of cryptocurrency mining systems. According to Plaintiffs, these agreements are investment contracts, and thus securities, and Defendants made false statements in connection with the sale of these securities in violation of federal and Texas law.[2] Plaintiffs also claim that (a) the last set of agreements, entered in 2024, amount to a fraudulent transfer, (b) Defendants lied, or failed to disclose material information, in connection with the agreements and Defendants' performance of the agreements, (c) Defendants operated a RICO enterprise in connection with their sale-leaseback arrangements, and (d) Defendants obtaining money from Plaintiffs under their sale-leaseback arrangements constituted conversion and unjust enrichment.

This Court never needs to address the flaws in Plaintiffs' allegations or the merits of Plaintiffs' claims for a simple reason: All eighteen agreements at issue here contain broad arbitration clauses covering all of Plaintiffs' claims. The arbitration clauses are clearly set forth in the agreements, and not a single allegation in Plaintiffs' 226-paragraph Complaint questions the enforceability of those clauses. As a result, this Court should compel Plaintiffs to arbitrate all their claims against all Defendants. Moreover, even if the Court were to conclude (which it should not)

---

[1] Plaintiffs are Mobile Med Work Health Solutions, Inc. ("Mobile Med"), JLL Ventures, Inc. ("JLL") and M-M WHS LLC ("M-M").

[2] Defendants are (1) Group, (2) NFN8 Holdings, LLC ("Holdings"), (3) CryptoTech Holdings, LLC ("CryptoTech"), which has been merged into Holdings, (4) NFN8 Capital, LLC ("Capital"), (5) NFN8 Media, LLC ("Media"), which has been merged into Capital, (6) NFN8 Foundation ("Foundation"), and two owners of Group, Joshua Moore and Cory Rodriguez. Compl. ¶¶ 63–70.

that some claims against some Defendants are not subject to the broad arbitration clauses, it should nevertheless stay this litigation until an arbitration is completed. In short, Plaintiffs voluntarily agreed that if they have any disputes, they will resolve them through arbitration. Federal law strongly favors arbitration, and this Court should compel Plaintiffs to honor their obligation to arbitrate.

## Background

The core of Plaintiffs' Complaint is stated in its initial paragraphs. Plaintiffs begin by alleging that:

> Moore, Rodriguez, and each NFN8 Defendant induced Plaintiffs to enter into a series of fraudulent cryptocurrency mining sale-leaseback investments (the 'Sale Leaseback Securities'), marketing these securities through a litany of intentional misrepresentations and calculated fraudulent omissions. [] Then, when the time came for Defendants to make good on their first obligation to repurchase Plaintiffs' machines, they defaulted.

Compl. ¶¶ 2-3.

From that starting point, Plaintiffs assert eleven related causes of action. Plaintiffs allege that the agreements memorializing the sale-leaseback arrangements (service and purchase agreements and corresponding lease agreements) are securities forming the basis for their federal and Texas securities fraud claims (Counts II to V). Plaintiffs also allege that these sale-leaseback agreements and Defendants' related communications did not disclose that the agreements' terms reflected an "approximately 500-600%" markup on the cost of mining computers and misled or concealed from Plaintiffs information about "NFN8's creditworthiness, cash reserves, liquidity, market risks, debt-to-equity ratio, the underlying strength of NFN8's business, [and] the technical capabilities of NFN8." *See* Compl. ¶¶ 145, 150–51, 163, 167, 177, 205, 214. From this, Plaintiffs assert claims against Defendants for fraud, negligent misrepresentation, and violating RICO (Counts VI to IX). Relatedly, Plaintiffs contend that Defendants taking Plaintiffs' funds under the

sale-leaseback agreements qualifies as conversion and unjust enrichment (Counts X to XI). Finally, Plaintiffs contend that the last set of sale-leaseback agreements they entered in May 2024 constitute fraudulent transfers (Count I).[3]

All told, one of Plaintiffs and one of Defendants signed eighteen agreements covering nine sale-leaseback transactions (each transaction involving both a services and purchase agreement and a lease agreement). Every single one of those agreements contains a provision requiring disputes to be resolved through binding arbitration. In fact, the arbitration clauses are consistent across the agreements in one of two forms. The first form states:

> [A Defendant] and [a Plaintiff] agree that any disputes, claims, suits, actions, causes of action, demands or proceedings (collectively, "Disputes") arising from or related to the terms of the Agreement shall not be resolved in a court, and (ii) hereby waive [a Plaintiff's] and [a Defendant's] respective rights to a jury trial. Instead, [a Plaintiff] and [a Defendant] will arbitrate Disputes through binding arbitration (which is the referral of a Dispute to one or more persons charged with reviewing the Dispute and making a final and binding determination to resolve it instead of having the Dispute decided by a judge or jury in court).
> …
> **Process.** Any arbitration will occur in Dallas, Texas. Arbitration will be conducted confidentially by a single arbitrator in accordance with the rules of the Judicial Arbitration and Mediation Services ("JAMS"), which are hereby incorporated by reference. The state and federal courts located in Texas will have exclusive jurisdiction over any appeals and the enforcement of an arbitration award.
>
> **Authority of Arbitrator.** As limited by the FAA, the Agreement and the applicable JAMS rules, the arbitrator will have (i) the exclusive authority and jurisdiction to make all procedural and substantive decisions regarding a Dispute, including the determination of whether a Dispute is arbitrable, and (ii) the authority to grant any remedy that would otherwise be available in court; provided, however, that the arbitrator does not have the authority to conduct a class arbitration or a representative action, which is prohibited by the Agreement. The arbitrator may only conduct an individual arbitration and may not consolidate more than one individual's claims, preside over any type of class or representative proceeding, or preside over any proceeding involving more than one individual.

---

[3]  Each of Plaintiffs' claims incorporates by reference the first 132 paragraphs of the Complaint. Not surprisingly, 48 of those 132 incorporated paragraphs (more than a third) contain at least one reference, if not multiple, references to the agreements—whether referred to as agreements, contracts, securities, or some variation thereof. *See* Compl. ¶¶ 1–132.

Declaration of Joshua Moore ("Moore Decl.") ¶¶ 44-47 & Exs. 4 to 15.  The second, more succinct form states:

> [A Defendant] and [a Plaintiff] agree any dispute, claim or controversy arising out of or relating to this [] Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Dallas, Texas before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. Judgment on any award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

Moore Decl. ¶¶ 48-51 & Exs. 16 to 21.

Plaintiffs' Complaint is loaded with meritless (and, in many cases, contradictory or conflicting) allegations. Plaintiffs' goal appears to be to disparage, and gain leverage over, Defendants by recasting a simple breach of contract case as a massive securities fraud scheme and by labeling each Defendant as a racketeer. None of this is justified. More importantly for purposes of this Motion, however, none of Plaintiffs' allegations should ever have been aired in Court, but instead resolved through the efficient arbitration process so clearly favored under federal law.

## Argument

The Federal Arbitration Act ("FAA") "establishes a liberal federal policy favoring arbitration agreements." *Epic Sys. Corp. v. Lewis*, 549 U.S. 497, 505 (2018) (quotation omitted).  The FAA provides, in relevant part:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]

9 U.S.C. § 2.[4]  Because arbitration is a highly favored means of settling disputes, the Supreme Court has consistently instructed that "courts must 'rigorously enforce' arbitration agreements according to their terms." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]").

Typically, "[e]nforcement of an arbitration agreement involves two analytical steps. The first is contract formation—whether the parties entered into any arbitration agreement at all. The second involves contract interpretation to determine whether this claim is covered by the arbitration agreement." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016), quoted in *Engebretson v. Randolph-Brooks Fed. Credit Union*, 2024 WL 2871317, at *1 (W.D. Tex. May 21, 2024) (Pitman, J.).  This analysis, however, changes "where the arbitration agreement contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim." *Id.* When presented with a delegation clause:

> [A] court "performs the first step—an analysis of contract formation—as it always does. But the only question, after finding that there is in fact a valid agreement, is whether the purported delegation clause is in fact a delegation clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated." *Id.* at 202. "If there is a delegation clause, the motion to compel arbitration should be granted in almost all cases." *Id.*

*Engebretson*, 2024 WL 2871317, at *1 (quoting *Kubala*, 830 F.3d at 201–02).

1. *The Court need only address whether Plaintiffs are bound by an arbitration agreement.*

The Court here need only be concerned with the first step of the arbitration inquiry because the parties have delegated to an arbitrator the decision of whether a given claim must be arbitrated. The first form of arbitration agreement quoted above provides that "the arbitrator will have [] the exclusive authority and jurisdiction to make all procedural and substantive decisions regarding a

---

[4]  Plaintiffs' Complaint recognizes that the agreements here evidence transactions involving interstate commerce. *See* Compl. ¶¶ 23, 59, 145, 190.

Dispute, including the determination of whether a Dispute is arbitrable." Similarly, the second form of arbitration agreement requires that "the determination of the scope or applicability of this [] Agreement to arbitrate[] shall be determined by arbitration." These provisions expressly "constitute[ ] valid delegation clause[s] delegating all questions regarding the arbitrability of the specific claims at issue to the arbitrator." *Roberson v. Experian Info. Solutions, Inc.*, 2022 WL 62270, at *4 (W.D. Tex. Jan. 5, 2022). The parties also showed that they intended to submit substantive arbitrability issues to the arbitrator by agreeing to broad arbitration provisions covering *any* dispute "arising out of or related to" and "arising from or related to" the agreements. *See Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins.,* 921 F.3d 522, 538 (5th Cir. 2019) (identifying a more limited provision covering "[a]ny controversy between the Parties . . . related to" the agreement as one of two provisions showing the parties intent to delegate this question).

The foregoing provisions are enough to establish that Plaintiffs agreed to delegate to an arbitrator any issue over whether a particular claim is arbitrable. But here, there is even more: The parties' arbitration agreements also expressly adopt the JAMS arbitration rules to govern any arbitration. Adoption of those rules, the Fifth Circuit has held, is "clear and unmistakable evidence" that the parties have agreed to delegate questions of arbitrability to an arbitrator. *Work v. Intertek Res. Solutions, Inc.*, 102 F.4th 769, 772 (5th Cir. 2024) (quoting *Petrofac, Inc. v. DynMcDermott Petro. Op. Co.*, 687 F.3d 671, 675 (5th Cir. 2012)); *Cooper v. WestEnd Cap. Mgmt., LLC*, 832 F.3d 534, 546 (5th Cir. 2016) . This is made clear by JAMS Rule 11(b), which provides that "[j]urisdictional and arbitrability disputes, including disputes over the … interpretation or scope of the agreement under which the Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator." JAMS Comprehensive Arbitration Rules & Procedures 11(b).

6

### 2. *There is no doubt Plaintiffs are bound by arbitration agreements.*

There is no dispute that each Plaintiff entered and executed at least two agreements containing arbitration clauses. JLL and M-M each entered two agreements containing arbitration clauses. Moore Decl. ¶¶ 22, 23, 39-42 & Exs. 18 to 21. Mobile Med entered the remaining fourteen agreements containing arbitration clauses. Moore Decl. ¶¶ 25-38 & Exs. 4 to 17.[5]

Plaintiffs do not deny entering these agreements; quite the contrary, as explained above, the agreements and the transactions they reflect are central to all of Plaintiffs' claims in this lawsuit. The arbitration clauses appear prominently in each of the agreements and, as reflected in the quoted language above (*see* pages 3–4, *supra*), the clauses are written in clear language binding Plaintiffs to resolve any disputes by arbitration. Finally, nothing in Plaintiffs' 226-paragraph Complaint calls into question the enforceability of the arbitration clauses. Plaintiffs do not claim they were deceived into believing the agreements did not contain arbitration clauses, which would be impossible given how prominently the arbitration clauses are presented in the agreements. Plaintiffs also do not offer any allegations to suggest that the arbitration clauses are procedurally *or* substantively unconscionable (let alone both), which likewise would be impossible given the commercial nature of the agreements and the evenhanded structure of the arbitration clauses.

All Plaintiffs can allege as to the arbitration clauses to which they agreed is that "there is language in the fraudulently obtained contracts committing certain related matters to JAMS arbitration, [but] Plaintiffs contend that its [sic] claims are not subject to these clauses." Compl. ¶ 23 n.4. While the agreements were not fraudulently obtained, the law is clear in any event that an arbitration clause is fully enforceable even in a fraudulently obtained agreement unless a party can prove that the arbitration clause itself was fraudulently obtained (which Plaintiffs do not

---

[5]   Per the Complaint, Mobile Med assigned twelve of these agreements to M-M, but it retained the initial set of one lease agreement and one services and purchase agreement. *See* Compl. ¶¶ 23, 39–40. Each of those agreements contains an arbitration clause. Moore Decl. ¶¶ 44-45 & Exs. 6 to 15.

7

allege, and could never prove). *See, e.g.*, *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70–71 (2010). Similarly, the broad scope of the arbitration clauses—covering any claim arising out of or from the agreements, or even merely relating to the agreements—cover Plaintiffs' claims, but in any event the law is also clear that any questions about the scope of the clauses is for an arbitrator to decide in light of the delegation language in each arbitration clause (*see* pages 3–6, *supra*).

   3. *Each Defendant is entitled to enforce the arbitration agreements against Plaintiffs.*

As demonstrated above, each Plaintiff is bound by an arbitration agreement, and any question about whether those arbitration agreements encompass Plaintiffs' claims (as they do) is a question the Court must leave to an arbitrator to decide. As a consequence, the only remaining question is whether each Defendant can enforce Plaintiffs' commitments to arbitrate. This final question must be answered in the affirmative.

Each Defendant is entitled to enforce arbitration agreements against Plaintiffs on at least one ground. Signatories can, of course, enforce arbitration provisions in their agreements. Such agreements may expressly extend that enforcement power to non-signatories as well. *See In re Rubiola*, 334 S.W.3d 220, 224–25 (Tex. 2011). And both the Fifth Circuit and Texas courts have recognized that arbitration may also be required with non-signatories under contract law and agency principles, including incorporation by reference, assumption, agency, veil piercing/alter ego, estoppel, and third-party beneficiary theories. *See, e.g.*, *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 738–39 (Tex. 2005); *Halliburton Energy Servs., Inc.*, 921 F.3d at 531.

8

As summarized below, most of the entity Defendants are either original or successor parties to each agreement comprising the nine sale-leaseback transactions underlying Plaintiffs' claims:

| Trans. No. | Purchase Agreements | | Lease Agreements | |
|---|---|---|---|---|
| | Defendant Party | Party Successor | Defendant Party | Party Successor |
| 1 to 8 | Media | Capital | CryptoTech | Holdings |
| 9 | Capital | N/A | Holdings | N/A |

Each of these Defendants can enforce arbitration obligations against Plaintiffs, either as signatories or as successors to signatories.  *See* Decl. ¶¶ 53-58 & Exs. 4 to 21 (providing in "Successors and Assigns" provisions that each agreement "shall inure to the benefit of and will be binding upon and enforceable by the parties and their respective … successors, and permitted assigns.").

Under these agreements' express terms, Moore and Rodriguez also can enforce the arbitration provisions in each agreement as "representatives" of the signatory entity. *See* Decl. ¶¶ 53-58 and Exs. 4 to 21 (providing in "Successors and Assigns" provisions that each agreement "shall inure to the benefit of and will be binding upon and enforceable by the parties and their respective … representatives …..").  Moore and Rodriguez have at all relevant times managed the Defendant entities, and they have acted on behalf of those entities when human action is needed (e.g., Moore signed agreements on behalf of various Defendant entities). *See* Moore Decl. ¶ 17; *see, e.g.*, Ex. 4 at 6; *see also* Compl. ¶¶ 68–69. The Supreme Court of Texas has recognized individual defendants' right to enforce arbitration provisions in agreements entered by entities for which they served as representatives where the agreements' terms broadened the definition of "parties" to include the "officers" and "representatives" thereof. *See Rubiola*, 334 S.W.3d at 224–25. Subsequent Texas decisions have further recognized that the right to enforce arbitration provisions can be extended to non-signatories without making them formal "parties" to the broader contract in which an arbitration agreement is embedded. *See, e.g.*, *Amazon.com Servs., LLC v. De La Victoria*, No. 14-23-00493-CV, 2024 WL 3941376, at *9–11 (Tex. App. Aug. 27, 2024) (reaching this conclusion based on the express terms of the agreement without relying on any of the "Six Bases" identified in *Kellog Brown*

*& Root*). And in any event, contracting parties' agreements to arbitrate all disputes under or relating to contracts are generally understood to include disputes about actions by their agents. *See In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 762 (Tex. 2006) (explain why limiting arbitration clauses to contractual signatories would "not place such clauses on equal footing with" all other provisions).

Likewise, under the agreements' express terms, Capital and Holdings can enforce arbitration under agreements entered by Media and CryptoTech, respectively, as the "successors" to those entities. The term "successor" is a term of art in contract law. *See Tyco Valves & Controls, L.P. v. Colorado*, 365 S.W.3d 750, 773 (Tex. App. 2012), *aff'd,* 432 S.W.3d 885 (Tex. 2014). As to business entities, "successor" generally relates to the transfer of rights and obligations "by merger, consolidation, or other legal succession." *See Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 342 (Tex. 2023), *reh'g denied* (Sept. 1, 2023). Capital is Media's successor because Media was merged into Capital, and Holdings is CryptoTech's successor because CryptoTech was merged into Holdings. *See* Moore Decl. ¶¶ 12, 16. *Cf. Roberson*, 2022 WL 62270, at *3 (allowing affiliate of signatory ECS to compel arbitration because agreement stated that "ECS and you agree to arbitrate all dispute[s]" and defined "ECS" to include its affiliates).

Finally, all Defendants can enforce Plaintiffs' agreements to arbitrate disputes under estoppel theories. The "intertwined claims" doctrine permits a non-signatory to enforce an arbitration clause when: (1) "a nonsignatory has a 'close relationship' with one of the signatories," and (2) "the claims are 'intimately founded in and intertwined with the underlying contract obligations.'" *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 404 (5th Cir. 2022). Separately, under the direct benefits doctrine, a non-signatory can enforce arbitration where a signatory's claims against the non-signatory reference or presume the existence of the written agreement containing the arbitration clause. *See Meyer v. WMCO–GP, L.L.C.*, 211 S.W.3d 302, 305–06 (Tex. 2006) (quoting *MS Dealer Serv. Corp. v. Franklin*, 210 F.3d 524, 527 (5th Cir. 2000)) (describing the Fifth Circuit's use of this language as "a substantially correct statement of Texas law"). All the above conditions are satisfied here.

10

First, Defendants at least share a close relationship with a signatory based on their status as owners, representatives, or affiliates thereof. *See In re Merrill Lynch*, 235 S.W.3d 185, 194 & n.40 (Tex. 2007) (noting that these relationships typically include a non-signatory owner, agent, or parent of a signatory company). The entity Defendants all share "formal corporate affiliation[s]" generally understood to show a "close relationship" under Texas law. *See Newman*, 23 F.4th at 405; *cf. Santos v. Wincor Nixdorf, Inc.*, No. 1:16-CV-440 RP, 2016 WL 4435271, at *6 (W.D. Tex. Aug. 19, 2016) (Pitman, J.) (contrasting the movant with non-signatory defendants who were "'affiliates' – meaning they were related entities under common control" and "[t]hus . . . had the close relationship" required). [6]

Further, Plaintiffs' failure to differentiate between Defendants in their allegations makes "[i]t undeniable that [Plaintiffs'] regarded the parties as closely related." *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 613 (5th Cir. 2016); *see also Santos*, 2016 WL 4435271, at *6 ("[T]he close relationship between the signatories and nonsignatory defendants in *Hays* was demonstrated by the pleadings, which treated the entities as a single unit or as interchangeable."). Like the signatory-plaintiff in *Hays*, Plaintiffs' complaint is replete with generic references to "Defendants" and "NFN8" as well as to "NFN8 Defendants." *See* Compl. at 1 (defining "NFN8 Defendants" to include all entity Defendants). Indeed, Plaintiffs maintain that no "individuality and separateness between or among [Defendants]" existed any time relevant to Plaintiffs' claims. *See* Compl. ¶ 71 (alleging further that every Defendant "was and is the alter ego of each of the other Defendants" and that "each of the Defendants was and is acting in the course of such agency"). Even if this Court deems Plaintiffs' categorical position insufficient to enforce Plaintiffs' obligations to arbitrate under agency and alter ego doctrines, "[Plaintiffs'] own contentions about the relationship among" Defendants "establishes

---

[6] Foundation, admittedly, is a nonprofit corporation that does not have owners, but it is managed by Moore and Rodriguez as its directors. Moore Decl. ¶ 18. The Complaint's only Foundation-specific allegation is that it "is an entity formed under Texas law with its principal place of business in Austin, Texas." Compl. ¶ 67. Plaintiffs' only apparent basis for suing Foundation is their unadorned contention that it is the agent and alter ego of the other Defendants. *Id.* ¶ 71.

11

the 'tight relatedness of the parties'" sufficient to compel arbitration under estoppel doctrines. *Psara Energy, Ltd. v. Space Shipping, Ltd.*, 427 F. Supp. 3d 858, 868 (E.D. Tex. 2019).

Second, equitable estoppel applies under both direct benefits and intertwined claims theories because Plaintiffs' claims rely on, presume the existence of, and are intertwined with the agreements comprising the sale-leaseback transactions. As explained in the background above, Plaintiffs assert claims based on Defendants' contractual obligations under the agreements, based on purchases and leases Plaintiffs made under the terms set by these agreements, and based on Plaintiffs' position that the agreements, themselves, constitute securities. *See* Compl. ¶ 49 ("Sale Leaseback Securities are considered securities under the law, because they are investment contracts that include evidence of indebtedness."); *id*. ¶ 73 (describing "[t]he Lease Agreements and [Services and] Purchase Agreements" as the "contracts governing [Plaintiffs'] investments"). Texas courts facing similar allegations referencing and presuming the existence of written agreements have applied direct benefits estoppel to allow enforcement by non-signatories, even when plaintiffs also relied in their complaints on other oral and written communications from the counterparty's officers. *See, e.g.*, *Smith v. Kenda Cap., LLC,* 451 S.W.3d 453, 459–60 (Tex. App. 2014) (enforcing forum selection clause under equitable estoppel over arguments that a fraudulent inducement claim depended on other communications rather than "specific contract language").

Similarly, all four judicial districts in Texas have recently applied intertwined claims estoppel to compel arbitration of statutory and common law claims against a non-signatory defendant related to allegedly fraudulent sales-leaseback transactions. *See Prangner v. EK Real Est. Servs. of NY, LLC*, No. CV H-21-3406, 2023 WL 2143605, at *2–3 (S.D. Tex. Feb. 21, 2023) (compiling cases involving the same defendants and noting that they presented essentially the same set of circumstances and issues). Like Plaintiffs here, the participants in these sales-leaseback transactions alleged that they had been defrauded into entering and continuing agreements by statements and promotional materials that allegedly misrepresented the nature of the transactions and omitted information that allegedly should have been disclosed. *See, e.g.*,

*Chlarson v. EK Real Est. Servs. of NY, LLC*, No. 5-21-CV-01046-XR, 2022 WL 2392648, at *1–3 (W.D. Tex. July 1, 2022). For example, the plaintiff in *Chlarson* brought a raft of claims including statutory and common-law fraud, conspiracy to commit the same, and other violations of state and federal law. *See id.* at *4. Still, the Western District court held that the plaintiff's statutory and common law claims were all "intertwined with [the plaintiffs'] execution of the Lease and Sales Agreement as well as the parties' obligations thereunder." *Id.* at *4–5 (compelling arbitration with a non-signatory defendant who was the sole member of the signatory LLC under intertwined claims estoppel). Courts in the Southern, Eastern, and Northern Districts have all reached the same conclusion. *See Sparrow v. EK Real Est. Servs., NY, LLC*, No. 422CV00046SDJCAN, 2023 WL 3035359, at *9 (E.D. Tex. Feb. 9, 2023) ("concur[ring]" with *Chlarson*'s application of intertwined claims estoppel); *Prangner v. EK Real Est. Servs. of NY, LLC*, No. CV H-21-3406, 2023 WL 2143605, at *4 (S.D. Tex. Feb. 21, 2023) (same, crediting this "excellent analysis" in *Chlarson* and *Sparrow*); *Sitzman v. EK Real Est. Servs. of NY LLC*, No. 3:21-CV-2666-E, 2022 WL 17853214, at *6 (N.D. Tex. Dec. 21, 2022) (reaching the same conclusion). Indeed, *no* court considering these circumstances has denied a motion to compel arbitration by a non-signatory defendant that was the affiliate of the signatory defendant in favor of proceeding to the merits in court. *See Pranger*, 2023 WL 2143605, at *2.

In summary, there are multiple grounds upon which Defendants are entitled to hold Plaintiffs to their agreements to arbitrate claims of the very type pled in the Complaint. The Court, therefore, should promptly compel Plaintiffs to arbitrate their dispute with all Defendants

   4. *This lawsuit should be stayed pending arbitration.*

A stay under FAA Section 3 is mandatory upon a showing that the opposing party has commenced suit upon *any* issue referable to arbitration under an agreement in writing for such arbitration. *See Smith v. Spizzirri*, 601 U.S. 472, 476–8 (2024). Because all of Plaintiffs' claims against all Defendants are arbitrable, FAA § 3 mandates a stay of this litigation.

13

But even if the Court determines that one or more Defendants cannot compel arbitration of one or more claims, the entire case needs to be stayed because Plaintiffs' claims arise from the same facts and cannot be separated such that litigating some claims would not impact the arbitration of others. Courts addressing requests by non-signatories to stay litigation of inarbitrable claims against them under FAA § 3 consider the following factors: whether (1) the arbitrated and litigated disputes involve the same operative facts; (2) the claims asserted in the arbitration and litigation are "inherently inseparable;" and (3) whether the litigation has as "critical impact" on the arbitration. *See Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A. de C.V.,* 372 F.3d 339, 343 & n.6 (5th Cir. 2004).[7]

As discussed above, Plaintiffs treated Defendants as a single unit throughout their factual allegations and based all their claims on the same set of facts surrounding the sales-leaseback transactions. Indeed, aside from their claim for control person liability brought only against Moore and Rodriguez, Plaintiffs have pleaded all the same claims against all Defendants. Moreover, permitting Plaintiffs to litigate some of these claims and issues related to the sales-leaseback transactions could potentially influence the parallel arbitration, thereby "undermin[ing] the arbitration proceedings" against those other Defendants and "thwart[ing] the federal policy in favor of federal arbitration." *See Sitzman*, 2022 WL 17853214, at *9 (staying claims against all defendants, including those against an unrelated non-signatory who could not compel arbitration). The Court should thus stay this litigation under FAA § 3.

## Conclusion

This Court should compel Plaintiffs to honor their agreement to arbitrate all disputes arising out of, from, or even relating to the agreements constituting the sales-leaseback transactions at issue here. This Court need not address the arbitrability of any of Plaintiffs'

---

[7] Aside from FAA § 3, this Court also may stay cases between non-arbitrating parties involving claims related to issues subject to arbitration to manage its docket and preserve the purpose of arbitration. *See, e.g.*, *U.S. ex rel. Tindall Corp. v. Satterfield & Pontikes Const., Inc.,* 2014 WL 819478, at *3 (W.D. Tex. March 3, 2014) ("[I]t is within this Court's discretion to stay the case among non-arbitrating parties.").

14

claims as to any Defendants because the parties' agreements make clear in multiple ways that all such determinations should be left to the arbitrator. And all Defendants are entitled to enforce Plaintiffs' obligations to arbitrate these disputes on at least one ground. Under these circumstances, the Court should compel arbitration of all claims against all Defendants and stay this litigation under FAA § 3.

Dated: October 29, 2024

Respectfully submitted,

<u>*/s/ Christopher R.J. Pace*</u>
Christopher R.J. Pace
crjpace@winston.com
Texas State Bar No. 789534
Winston & Strawn LLP
2121 North Pearl Street, Suite 900
Dallas, TX 75201
Telephone: 214.453.6500
Facsimile:  214.453.6400

*Attorneys for Defendants*

**CERTIFICATE OF CONFERENCE**

    I hereby certify that on the 29th day of October, 2024, Defendants conferred with Plaintiffs regarding this motion. Plaintiffs have agreed to the following statement of their position: "Plaintiffs oppose the arbitration of their request for preliminary injunctive relief. As to whether the merits of Plaintiffs' claims should be arbitrated, Plaintiffs' position is that at least some claims, as against at least some Defendants, are not arbitrable because they are outside the scope of the relevant arbitration clauses. Plaintiffs, therefore, oppose Defendants' motion."

                                                        */s/ Christopher R.J. Pace*
                                                        Christopher R.J. Pace

**CERTIFICATE OF SERVICE**

    I hereby certify that on the 29th day of October, 2024, I caused the foregoing document to be electronically filed using the CM/ECF system, which automatically sends notification of such filing to all counsel of record.


                                                                                      */s/ Christopher R.J. Pace*
                                                                                   Christopher R.J. Pace