# EXHIBIT 4

DocuSign Envelope ID: FD0E94E4-01AE-4C9F-A88A-A6524AA5C3B2

Purchase-Rev4-Sec-3yr -22-100-sg-4-28-2021

**THIS INSTRUMENT AND ANY SECURITIES ISSUABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("THE ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGE, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR UPON RECEIPT BY NFN8 MEDIA OF AN OPINION OF COUNSEL SATISFACTORY TO NFN8 MEDIA THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT.**

This Services and Purchase Agreement ("Agreement") is effective as of the last date executed by the parties hereto (the "Effective Date"), by and between NFN8 Media, LLC, a Texas limited liability company, ("**NFN8 Media**"), and the other person or entity who has executed this Agreement ("**Client**"). If this Agreement is not fully executed by both NFN8 Media and the Client, and funded, within ten business days after June 16, 2021, it is null and void.

## RECITALS

Client desires to purchase Computer Equipment called a Mining Farm described in number 2 below and in Schedule A attached which is a part of this agreement. *Client desires to purchase THIRTY-FOUR (34) Mining Farm(s).*

A. NFN8 Media is selling the Mining Farm(s) and Client is purchasing the Mining Farm(s).

B. The Client is purchasing the Mining Farm(s) (defined in number 2 below and in Schedule A).

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained in this Agreement, and for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged by the parties, NFN8 Media and Client agree as follows:

## PURCHASE AND SERVICES AGREEMENT

NFN8 Media will provide the following under this Agreement:

1) **PURCHASING AND INSTALLATION**

   The Client is purchasing the equipment described in Schedule A below. NFN8 will choose, assemble, and install the equipment at its designated Mining Farm Equipment Facility

2) **EQUIPMENT**

   It is understood, the Client is purchasing the Mining Farm(s) (defined in number 2 below and in Schedule A) for the purpose of leasing the Mining Farm Equipment to CryptoTech Holdings. The Mining Farm(s) is (are) 100% owned by the Client.

3) **OPERATION**

1

DocuSign Envelope ID: FD0E94E4-01AE-4C9F-A88A-A6524AA5C3B2

Purchase-Rev4-Sec-3yr -22-100-sg-4-28-2021

NFN8 Media is responsible for making sure that the Client's Mining Farm(s) is (are) installed and operating efficiently and effectively a manner that comports with usual and customary practices in the Blockchain and cryptocurrency mining industry.

4) **BILL OF SALE.**

NFN8 Media shall provide the Client with a Bill of Sale for the Mining Farm(s). The Bill of Sale will specify product descriptions, serial numbers, and MAC Identification Numbers.

5) **FEES.**

In consideration for each Mining Farm, and the other services discussed above, Client shall pay NFN8 Media, upon execution of this Agreement, a one-time all-inclusive fee (the "Fee") of $30,000.00 for each Mining Farm, payable upon the execution of this Agreement by Client. The Client is purchasing THIRTY-FOUR (34) Mining Farm(s) for a Total Fee of $1,020,000.00. Upon receipt of the Total Fee by certified check or wire transfer or other immediately available funds ("good funds"), NFN8 Media will perform all items in 1-4 above of this Agreement. The undersigned Client has read this Agreement and acknowledges that the execution of the Signature Page below shall constitute the undersigned's agreement. No Purchasing, Installation, or Services of any kind will be performed by NFN8 Media until it receives a copy of this Agreement executed by the Client along with good funds.

6) **TERM AND TERMINATION.**

The term of this Agreement shall commence on the Effective Date and shall continue until terminated. Termination occurs when NFN8 Media completes its obligations under this agreement.

7) **CLIENT COOPERATION.**

Client agrees to from time to time and as requested by NFN8 Media timely provide to NFN8 Media complete and accurate contact and other specific information to ensure that NFN8 Media can contact the Client, complete its obligations under this agreement, and comply with any Federal, State, and Local Laws and rules regarding the Mining Farms.

8) **ACKNOWLEDGEMENT OF BUSINESS RISKS – NO GUARANTY & RELIANCE ON REPRESENTATIONS.**

The Client acknowledges that the acquisition of the Mining Farm(s) outlined in Schedule A and purchase of the related Computer Equipment, software, warehousing, maintenance and other items, as well as any lease agreement with NFN8 Media and/or a lessee, or sub-lessee, poses significant risks and challenges.

The equipment may not be able to produce the anticipated output due to changes in the process or the marketplace. NFN8 Media may experience other business delays and disruptions in obtaining the Mining Farm(s) and appropriate Warehousing. Changes in civil or government regulations may impair the intended use of the Mining Farm(s). There is no assurance that the Client will earn revenue or profit from his/her ownership of the Mining Farm(s). The Mining Farm(s) could lose some or all of its (their) value.

CLIENT ACKNOWLEDGES THAT ONLY INFORMATION OR REPRESENTATIONS CONTAINED HEREIN OR IN ANOTHER DOCUMENT EXECUTED BY NFN8 MEDIA MAY BE RELIED UPON AS HAVING BEEN AUTHORIZED BY NFN8 MEDIA. CLIENT ACKNOWLEDGES THAT ORAL

DocuSign Envelope ID: FD0E94E4-01AE-4C9F-A88A-A6524AA5C3B2

Purchase-Rev4-Sec-3yr -22-100-sg-4-28-2021

REPRESENTATIONS MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY NFN8 MEDIA. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS AGREEMENT AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY NFN8 MEDIA.

## 9) FORCE MAJEURE.

Neither NFN8 Media nor Client shall be liable to the other for failure to perform its obligations under this Agreement if prevented from doing so because of an Act of God, strike, fire, terrorism, pestilence, flood, war, civil disturbance, interference by government, civil, or military authority or other causes beyond the reasonable control of the party. Upon the occurrence of such an event the party seeking to rely on this provision shall promptly give written notice to the other party of the nature and consequences of the event.

## 10) NOTICES.

All notices and other communications under this Agreement must be in writing and must be given by facsimile, email or first class mail, certified with return receipt requested, and will be deemed to have been duly given 24 hours after transmission of a facsimile or email, or three days after mailing, to the respective persons and entities named following this paragraph. Either party may change its address, telephone number, facsimile number, email address, or contact name by providing notice thereof to the other party in the manner specified above.

*If to NFN8 Media*:
13809 Research Blvd.
Suite 745
Austin, TX 78729
Fax: (512) 857-8176
info@nfn8.com

*If to Client:*
At the address and telephone number set forth below Client's signature.

## 11) LIMITATION OF LIABILITY.

THE PARTIES AGREE THAT IT IS IMPOSSIBLE TO DETERMINE WITH ANY REASONABLE ACCURACY THE AMOUNT OF DAMAGES TO CLIENT UPON THE BREACH OF NFN8 MEDIA OBLIGATIONS UNDER THIS AGREEMENT. THEREFORE, THE PARTIES AGREE THAT CLIENT'S SOLE REMEDY FOR MATERIAL BREACH OF NFN8 MEDIA OBLIGATIONS UNDER THIS AGREEMENT AND THE ACCOMPANYING LEASE AGREEMENT WILL BE LIQUIDATED DAMAGES IN THE AMOUNT OF THE EQUIPMENT PURCHASE FEE PAID BY CLIENT TO NFN8 MEDIA PLUS TEN DOLLARS ($10.00) LESS ANY LEASE PAYMENTS REMEDIES, AND DAMAGES PAID UNDER THE ACCOMPANYING LEASE AGREEMENT TO THE CLIENT FROM LEASING THE HASHING ABILITY OF THE MINING FARM(s). CLIENT HEREBY WAIVES ALL OTHER CLAIMS FOR DAMAGES OF ANY KIND AGAINST NFN8 MEDIA, ITS MEMBERS, MANAGERS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS, AGENTS, REPRESENTATIVES OR AFFILIATES, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS FOR ANY LOSS OF USE, INTERRUPTION OF BUSINESS OR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING, WITHOUT LIMITATION LOST PROFITS), REGARDLESS OF THE FORM OF ACTION

3

DocuSign Envelope ID: FD0E94E4-01AE-4C9F-A88A-A6524AA5C3B2

Purchase-Rev4-Sec-3yr -22-100-sg-4-28-2021

WHETHER IN CONTRACT, TORT, STRICT PRODUCT LIABILITY OR OTHERWISE (EXCEPT AS OTHERWISE SPECIFIED IN THIS SECTION OF THE AGREEMENT). CLIENT AND NFN8 MEDIA AGREE THAT THE LIQUIDATED DAMAGES SET FORTH ABOVE ARE REASONABLE AND NOT A PENALTY BASED ON THE FACTS AND CIRCUMSTANCES OF THE PARTIES AT THE TIME OF ENTERING INTO THIS AGREEMENT WITH DUE REGARD TO FUTURE EXPECTATIONS.

## 12) GOVERNING LAW.

This Agreement and any dispute arising from or in connection with this Agreement shall be interpreted under and governed by Texas law, without regard to conflict of laws principles.

## 13) <u>BINDING ARBITRATION</u>.

NFN8 and the Client agree that any disputes, claims, suits, actions, causes of action, demands or proceedings (collectively, "Disputes") arising from or related to the terms of the Agreement shall not be resolved in a court, and (ii) hereby waive the Client's and NFN8's respective rights to a jury trial. Instead, the Client and NFN8 will arbitrate Disputes through binding arbitration (which is the referral of a Dispute to one or more persons charged with reviewing the Dispute and making a final and binding determination to resolve it instead of having the Dispute decided by a judge or jury in court).

a) *No Class Arbitrations, Class Actions, or Representative Actions*. Any Dispute arising out of or related to the Agreement is personal to the Client and NFN8 and will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding. There will be no class arbitration or arbitration in which an individual attempts to resolve a Dispute as a representative of another individual or group of individuals. Further, a Dispute cannot be brought as a class or other type of representative action, whether within or outside of arbitration, or on behalf of any other individual or group of individuals.

b) *Federal Arbitration Act*. The Agreement affects interstate commerce and the enforceability of this section 14 will be both substantively and procedurally governed by and construed and enforced in accordance with the federal arbitration act, 9 U.S.C. § 1 et seq. (the "FAA"), to the maximum extent permitted by applicable law.

c) *Notice*. Each party will notify the other party in writing of any Dispute within thirty (30) days of the date it arises, so that the parties can attempt in good faith to resolve the Dispute informally. Notice shall be sent pursuant to the notice provisions of this Agreement. The Client's notice must include (i) the Client's name, postal address, email address, and telephone number, (ii) a description in reasonable detail of the nature or basis of the Dispute, and (iii) the specific relief that the Client is seeking. If the Client and NFN8 cannot agree how to resolve the Dispute within thirty (30) days after the date notice is received by the applicable party, then either the Client or the NFN8 may, as appropriate and in accordance with this Section 14, commence an arbitration proceeding.

d) *Process*. Any arbitration will occur in Dallas, Texas. Arbitration will be conducted confidentially by a single arbitrator in accordance with the rules of the Judicial Arbitration and Mediation Services ("JAMS"), which are hereby incorporated by reference. The state and federal courts located in Texas will have exclusive jurisdiction over any appeals and the enforcement of an arbitration award.

4

DocuSign Envelope ID: FD0E94E4-01AE-4C9F-A88A-A6524AA5C3B2

Purchase-Rev4-Sec-3yr -22-100-sg-4-28-2021

e) ***Authority of Arbitrator***. **As limited by the FAA, the Agreement and the applicable JAMS rules, the arbitrator will have (i) the exclusive authority and jurisdiction to make all procedural and substantive decisions regarding a Dispute, including the determination of whether a Dispute is arbitrable, and (ii) the authority to grant any remedy that would otherwise be available in court; provided, however, that the arbitrator does not have the authority to conduct a class arbitration or a representative action, which is prohibited by the Agreement. The arbitrator may only conduct an individual arbitration and may not consolidate more than one individual's claims, preside over any type of class or representative proceeding or preside over any proceeding involving more than one individual.**

f) ***Rules of JAMS***. **The rules of JAMS and additional information about JAMS are available on the JAMS (https://www.jamsadr.com/). By agreeing to be bound by the Agreement, the Client either (i) acknowledges and agrees that the Client has read and understands the rules of JAMS, or (ii) waives its opportunity to read the rules of JAMS and any claim that the rules of JAMS are unfair or should not apply for any reason.**

g) ***Severability of Dispute Resolution and Arbitration Provisions***. **If any term, clause or provision of Section 14 is held invalid or unenforceable, it will be so held to the minimum extent required by law, and all other terms, clauses and provisions of Section 14 will remain valid and enforceable. Further, the waivers set forth in Section 14.A are severable from the other provisions of the Agreement and will remain valid and enforceable, except as prohibited by applicable law.**

14) **WAIVER.**

The failure of either party to insist upon the performance of any obligation or term of this Agreement or to exercise any right hereunder shall not constitute a waiver of that obligation or term. No waiver of any right or obligation under this Agreement shall be effective unless in writing and signed by both parties.

15) **ASSET PURCHASE ONLY – NO OTHER RELATIONSHIP**

The Client is not investing in any company or entity. The Client is not purchasing shares or part of any company or entity. By executing this agreement, the Client is not purchasing cryptocurrency. The Client is purchasing 100% of the Computer Equipment described herein. This Agreement creates no relationship of employment, joint venture, partnership, limited partnership, fiduciary, or agency between the parties and the parties hereby acknowledge that no other facts or relations exist that would create any such relationship between them. The parties are engaging in this Agreement as independent parties with respect to each other.

16) **SUCCESSORS AND ASSIGNS.**

This Agreement shall inure to the benefit of and will be binding upon and enforceable by the parties and their respective heirs, representatives, successors and permitted assigns.

17) **ENTIRE AGREEMENT; AMENDMENT.**

This Agreement and the schedules attached hereto constitute the entire understanding and agreement between the parties with respect to the subject matter set forth in this Agreement and supersedes any and all prior agreements, understandings, promises, conduct and representations made concerning the subject matter of this Agreement. This Agreement may only be amended in writing, signed by each party to this Agreement.

DocuSign Envelope ID: FD0E94E4-01AE-4C9F-A88A-A6524AA5C3B2

Purchase-Rev4-Sec-3yr -22-100-sg-4-28-2021

## 18) COUNTERPARTS; ELECTRONIC SIGNATURES.

This Agreement may be executed in counterparts, each of which taken together shall constitute an original, single, binding agreement between the parties. Any signature of a party required by this Agreement may be transmitted to the other party via facsimile or other electronic transmission and such facsimile or electronically transmitted signature shall be deemed an original signature binding upon the signing party for all purposes.

## 19) ATTORNEYS' FEES AND COSTS.

If either party resorts to legal action in order to enforce the provisions of this Agreement or to defend such action, the prevailing party will be entitled to receive reimbursement from the non-prevailing party for all reasonable attorneys' fees and all other costs incurred in commencing or defending such action, or in enforcing this Agreement, including but not limited to post judgment costs.

## 20) SEVERABILITY.

If any term, provision, covenant or condition of this Agreement is found to be invalid, void, or unenforceable by any court of competent jurisdiction, the remaining provisions hereof will continue in full force and effect and will in no way be affected, impaired or invalidated.

## 21) SURVIVAL.

Sections 11 through 22 of this Agreement will survive the expiration, termination, and cancellation of this Agreement.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the date first written above.

**NFN8 Media, LLC**, a Texas limited liability company

Name: Josh Moore

Title: CEO

Signature: _____

Date: 6-28-21

**CLIENT**

Mobile-Med Work Health Solutions

Signature: Justin Lo

2101 Forest Ave #220 A
San Jose, CA 95128
650-280-0816
Social Security # / Tax ID: 820936379
justin@justinlomd.com

6

DocuSign Envelope ID: FD0E94E4-01AE-4C9F-A88A-A6524AA5C3B2

Purchase-Rev4-Sec-3yr -22-100-sg-4-28-2021

## SCHEDULE A
### *(Purchased Mining Farm Equipment)*

### YOUR PURCHASE CONSISTS OF THE FOLLOWING EQUIPMENT PACKAGE

| EQUIPMENT | SERIAL NUMBER |
|---|---|
| THIRTY-FOUR (34) Infinite Blockchain Miner(s) | ISSUED UPON PURCHASE |

### EACH BLOCKCHAIN MINER INCORPORATES COMPONENTS BELOW

## *HARDWARE*

**CUSTOM MINING SERVER SETUP**
**HIGH-GRADE ALUMINUM CASING**
**CPU RACK WITH MULTIVARIATE OUTPUTS – MULTIPLE NODES**
**SHA 256 MICROPROCESSORS**
**FIELD-PROGRAMMABLE GATE ARRAY (FPGA)**
**500 MIN. APPLICATION SPECIFIC INTEGRATED CIRCUIT CHIPS**
**COMPUTER CONTROLLED FANS FOR COOLING AND HEAT DISSIPATION**
**PCI SLOTS**
**POWER ADAPTERS**
**REDUNDANT TRANSFER DEVICES**
**INCOMING POWER MANAGEMENT CONTROLLERS**
**VARIABLE INLINE CAPACITORS**
**CUSTOMIZED POWER MANAGED CONNECTING CABLES**
**PROPRIETARY MANAGED DASHBOARD SYNC**
**CONNECTORS FOR MONITORS**

## *SOFTWARE AND FIRMWARE*

**CUSTOM FIRMWARE FOR END USER INTERFACE, WALLET POOL MANAGEMENT**
**THERMAL LOAD MANAGEMENT SOFTWARE**
**PROPRIETARY COOLING SOLUTION SOFTWARE**
**METERING AND MONITORING CHIP EFFICIENCY SOLUTION SOFTWARE**
**PROPRIETARY THERMAL LOAD MANAGEMENT SOFTWARE**
**PROPRIETARY MINING FARM SOFTWARE LICENSE**
**PROPRIETARY MULTI-SOFTWARE SYNC LICENSE**

DocuSign Envelope ID: FD0E94E4-01AE-4C9F-A88A-A6524AA5C3B2

Purchase-Rev4-Sec-3yr -22-100-sg-4-28-2021

(1) The purchased assets are procured, assembled, and tested by the Company. (2) Mining Software is installed, tested, managed and updated. (3) The purchased assets are transported, installed, and warehoused at a data center where power, cooling, and venting are carefully controlled. (4) The data center is protected, alarmed, and insured. (5) The equipment components may be modified, updated or both at any time at the discretion of NFN8 Media. (6) The software referenced above is part of the services provided in this agreement. It is not owned by the client. (7) The company employs a proprietary trading platform. The equipment purchaser pays no additional fees for (1) through (7). The exact location and address of the data center is not disclosed herein for security and safety reasons.

# GENERAL INFORMATION

THE INFORMATION CONTAINED HEREIN (THE "INFORMATION") HAS BEEN PREPARED BY NFN8 MEDIA FOR THE PRIVATE AND CONFIDENTIAL USE OF PROSPECTIVE CLIENTS CONSIDERING THE PURCHASE OF THE COMPUTER EQUIPMENT HEREIN AND IS NOT TO BE REPRODUCED OR DISTRIBUTED BY SUCH PROSPECTIVE CLIENTS, OTHER THAN IN CONNECTION WITH CONFIDENTIALLY SHARING SUCH INFORMATION WITH SUCH PROSPECTIVE CLIENTS' FINANCIAL ADVISORS OR CONSULTANTS.

BY ACCEPTING THIS CONFIDENTIAL AGREEMENT, THE RECIPIENT AGREES: (I) NOT TO DISTRIBUTE OR REPRODUCE THIS AGREEMENT, IN WHOLE OR IN PART, AT ANY TIME, WITHOUT THE PRIOR WRITTEN CONSENT OF NFN8 MEDIA; AND (II) TO KEEP CONFIDENTIAL THE EXISTENCE OF THIS DOCUMENT AND THE INFORMATION CONTAINED HEREIN OR MADE AVAILABLE IN CONNECTION WITH ANY FURTHER INVESTIGATION OF NFN8 MEDIA.

THE INFORMATION CONTAINS CERTAIN "FORWARD-LOOKING" STATEMENTS. YOU CAN IDENTIFY FORWARD-LOOKING STATEMENTS BY TERMINOLOGY SUCH AS "MAY," "WILL," "WOULD," "COULD," "SHOULD," "EXPECTS," "INTENDS," "PLANS," "ANTICIPATES," "BELIEVES," "ESTIMATES," "PREDICTS," "POTENTIAL," "CONTINUES" OR THE NEGATIVE OF THESE TERMS OR OTHER COMPARABLE TERMINOLOGY. FORWARD-LOOKING" STATEMENTS ARE BASED ON VARIOUS ASSUMPTIONS MADE BY NFN8 MEDIA; WHICH ASSUMPTIONS MAY PROVE TO BE INCORRECT. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT SUCH FORWARD-LOOKING STATEMENTS WILL ACCURATELY PREDICT FUTURE EVENTS OR NFN8 MEDIA'S ACTUAL PERFORMANCE. IN ADDITION, ANY PROJECTIONS AND REPRESENTATIONS, WRITTEN OR ORAL, WHICH DO NOT CONFORM TO THOSE CONTAINED IN THIS AGREEMENT, MUST BE DISREGARDED, AND THEIR USE IS A VIOLATION OF LAW. NO REPRESENTATION OR WARRANTY CAN BE GIVEN THAT THE ESTIMATES, OPINIONS OR ASSUMPTIONS MADE HEREIN WILL PROVE TO BE ACCURATE. WE ASSUME NO OBLIGATION TO UPDATE SUCH FORWARD-LOOKING STATEMENTS OR TO UPDATE THE REASONS ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN SUCH FORWARD-LOOKING STATEMENTS. BECAUSE MANY FACTORS ARE UNFORESEEABLE, THE FOREGOING SHOULD NOT BE CONSIDERED AN EXHAUSTIVE LIST AND READERS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON FORWARD-LOOKING STATEMENTS.

BY READING THE INFORMATION CONTAINED WITHIN THIS DOCUMENT, THE RECIPIENT AGREES WITH NFN8 MEDIA TO MAINTAIN IN CONFIDENCE SUCH INFORMATION, TOGETHER WITH ANY OTHER NON-PUBLIC INFORMATION REGARDING NFN8 MEDIA OBTAINED FROM NFN8 MEDIA OR ITS AGENTS DURING THE COURSE OF THE PROPOSED FINANCING. NFN8 MEDIA HAS CAUSED THESE MATERIALS TO BE DELIVERED TO YOU IN RELIANCE UPON SUCH AGREEMENT AND UPON RULES

DocuSign Envelope ID: FD0E94E4-01AE-4C9F-A88A-A6524AA5C3B2

Purchase-Rev4-Sec-3yr -22-100-sg-4-28-2021

PROMULGATED UNDER REGULATION FD BY THE SECURITIES AND EXCHANGE COMMISSION.

## ADDITIONAL INFORMATION FOR ALL CLIENTS

As used in this Agreement and unless otherwise expressly stated or the context otherwise indicates, all references to "we", "our", "us", or the "Company" refer to NFN8 Media, LLC , a Texas limited liability company.

WE HAVE THE SOLE AUTHORITY TO NEGOTIATE THE TERMS OF THIS PURCHASE OF COMPUTER EQUIPMNT WITH ANY RECIPIENT OF THIS AGREEMENT, OR ANY OTHER PERSON AT ANY TIME AND TO ENTER INTO A DEFINITIVE AGREEMENT, OR TERMINATE ALL NEGOTIATIONS, WITHOUT PRIOR NOTICE TO ANY PROSPECTIVE CLIENT OR ANY OTHER PERSON. WE RESERVE THE RIGHT, IN OUR SOLE DISCRETION AND FOR ANY REASON WHATSOEVER, TO MODIFY, AMEND AND/OR WITHDRAW ALL OR A PORTION OF THE PURCHASE AND/OR TO ACCEPT OR REJECT IN WHOLE OR IN PART ANY PROSPECTIVE PURCHASE OF THE COMPUTER EQUIPMENT OR TO ALLOT TO YOU LESS THAN THE QUANTITY OF EQUIPMENT THAT YOU MAY WISH TO PURCHASE.

BEFORE PURCHASING THE COMPUTER EQUIPMENT, NFN8 MEDIA: (1) WILL GRANT EACH PROSPECTIVE CLIENT THE OPPORTUNITY TO REVIEW ADDITIONAL DOCUMENTS AND TO ASK QUESTIONS OF, AND TO RECEIVE ANSWERS FROM, THE OFFICERS OF NFN8 MEDIA CONCERNING NFN8 MEDIA AND THE TERMS AND THE CONDITIONS OF THIS PURCHASE OR ANY OTHER MATTER SET FORTH HEREIN; AND (2) SUPPLY ANY ADDITIONAL INFORMATION, TO THE EXTENT NFN8 MEDIA POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN.

## WHERE YOU CAN FIND MORE INFORMATION

We are not subject to the informational and reporting requirements under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

For additional information you may also contact us at: (514) 928-7368, press 3

## THE SALE OF COMPUTER EQUIPMENT (MINING FARM COMPUTERS)

NFN8 Media is offering to sell up to a total of $ 15,000,000 of computer equipment called Mining Farm Computers to be used in cryptocurrency mining operations (the "Computer Equipment"). **The above Services and Purchase Agreement is for a purchase of  34 Mining Farm Computer(s) for a Total Fee of $1,020,000.00.**  Since the purchase of the Mining Farm Computers offered in each **Services and Purchase Agreement** along with an opportunity to immediately lease back the Mining Farm Computers to an NFN8 Media affiliated company could potentially be construed as a sale of a "security" by Federal and State regulators, we are only allowing "accredited investors", as defined below, to participate in this purchase and lease-back transaction (The **Services and Purchase Agreement and the Lease Agreement**). NFN8 Media reserves the right to increase the amount of the sale of computer equipment in its sole discretion.

9

DocuSign Envelope ID: FD0E94E4-01AE-4C9F-A88A-A6524AA5C3B2

Purchase-Rev4-Sec-3yr -22-100-sg-4-28-2021

The initial closing of each **Services and Purchase Agreement** (the "Initial Closing") will occur as soon as practicable after NFN8 Media has accepted the initial **Services and Purchase Agreement**. It is currently contemplated that the proceeds each **Services and Purchase Agreement** will be delivered to NFN8 Media at one or more closings. Following the Initial Closing, NFN8 Media may conduct one or more subsequent closings (consummation of each individual **Services and Purchase Agreement**) until the earlier of (i) July 31, 2021, subject to the right of NFN8 Media to extend the sale of computer equipment or (ii) the date on which the maximum sale of computer equipment equals $15,000,000. If the sale of all computer equipment is successful, NFN8 Media may sell additional MINING FARM Computer Equipment, for an additional aggregate price of up to $15,000,000. NFN8 Media may employ commissioned selling agents in connection with the offer. to sell Mining Farm computers to Clients, who will purchase them and lease them back.

Although NFN8 Media is attempting to sell up to $ 15,000,000 of Computer Equipment pursuant to the terms of each individual **Services and Purchase Agreement** (the aggregated total of all **Services and Purchase Agreements** which equals the total computer equipment sales described in (ii) above), it is not obligated to sell or lease-back the maximum amount of computer equipment described in (ii) above, and it cannot make any assurances that such amount will be sold or leased or both. All proceeds from the regular business account of NFN8 Media, and no escrow account will be established. NFN8 Media will forthwith prepare and deliver the Mining Farm Computers to the designated data center that NFN8 chooses on behalf of the client.

Upon closing any **Services and Purchase Agreement**, NFN8 Media will immediately begin to utilize the proceeds received therefrom, notwithstanding the fact that NFN8 Media has not received purchases for all or even substantially all of the Mining Farm Computer Equipment. NFN8 Media is not obligated to sell all of the Computer Equipment pursuant to this Agreement,

### Use of Proceeds

Total amount to be Purchased:                                $ 15,000,000

PLEASE SEE SCHEDULE A FOR DETAILED INFORMTION
CONCERNING THE USE OF PROCEEDS

Hardware, Software, Services                                $15,000,000

_____

### Additional Information

**The address of the principal executive offices of NFN8 Media is:**

13809 Research Blvd.
Suite 745
Austin, TX 78729

**For additional information concerning this Purchase, contact Josh Moore, President, at 512 914-2611 or josh@nfn8.com.**

10

DocuSign Envelope ID: FD0E94E4-01AE-4C9F-A88A-A6524AA5C3B2

Purchase-Rev4-Sec-3yr -22-100-sg-4-28-2021

## Purchase only for Accredited Investors

This Purchase is being extended to "Accredited Investors" only pursuant to Rule 504 of Regulation D of the Securities Act of 1933. Under the Act, and for purposes of this Agreement, an "Accredited Investor" is defined as follows:

(1) Any bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $15,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $15,000,000, or, if a self-directed plan, with investment decisions made solely by persons that are Accredited Investors;

(2) Any private business development company as defined in Section 202(a) (22) of the Investment Advisers Act of 1940;

(3) Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, or similar business trust, or partnership, not formed for the specific purpose or acquiring the securities offered, with total assets in excess of $15,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7) Any trust with total assets in excess of $15,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are Accredited Investors.

## Securities Act and Exchange Act Compliance

Rule 504 and Rule 502 under the Securities Act of 1933 require no written disclosure to an offeree or purchaser when an offering is made exclusively to "Accredited Investors"; as such term is

11

DocuSign Envelope ID: FD0E94E4-01AE-4C9F-A88A-A6524AA5C3B2

Purchase-Rev4-Sec-3yr -22-100-sg-4-28-2021

defined in Rule 501(a) under the Securities Act. NFN8 Media is mindful that the prohibitions of Rule 10b-5 and Section 10(b) of the Securities Exchange Act of 1934, as amended, are applicable to the purchase and sale of securities in interstate commerce.

This Purchase is intended to qualify for an exemption under Rule 504 under the Securities Act of 1933, as amended, for limited offerings and sales of securities not exceeding $15,000,000. The aggregate offering price for an offering of securities under Rule 504, as defined in Rule 501(c), shall not exceed $15,000,000, less the aggregate offering price for all securities sold within the twelve months before the start of and during the offering of securities under this Rule 504, in reliance on any exemption under Section 3(b), or in violation of section of Section 5(a) of the Securities Act.

The provisions of Section 502(c) and (d) shall not apply to offers and sales of securities under Rule 504 that are made, among other things, exclusively according to state law exemptions from registration that permit general solicitation and general advertising so long as sales are made only to "Accredited Investors" as defined in Rule 501(a). Accordingly, the limitations on the manner of offering contained in Rule 502(c) may not apply to this Purchase. In addition, the limitations on resale contained in Rule 502(d) may not apply to this Purchase, with the result that securities acquired in a transaction under Regulation D do not have the status of securities acquired in a transaction under Section 4(2) of the Securities Act and can be resold without registration under the Securities Act or the existence of an exemption therefrom.