# EXHIBIT 9



Lease-506(c)-5yr-24-sg-05-19-2022

**THIS INSTRUMENT AND ANY SECURITIES ISSUABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("THE ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGE, HYPOTHECATED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR UPON RECEIPT BY NFN8 MEDIA OF AN OPINION OF COUNSEL SATISFACTORY TO NFN8 MEDIA THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT.**

## LEASE AGREEMENT

This Lease Agreement ("Lease Agreement") is effective as of the last dated executed by the parties hereto (the "Effective Date"), by and between CryptoTech Holdings, LLC, a Texas limited liability company, ("**CryptoTech Holdings**") and the other person or entity who has executed this Lease Agreement ("**Lessor**"). If this Lease Agreement is not fully executed by both CryptoTech Holdings and the Lessor within ten business days after May 19, 2022 it is null and void.

### RECITALS

A. Lessor owns computer Equipment called (a) Mining Farm(s). The equipment is further described on Schedule A which is part of this agreement.

B. CryptoTech Holdings desires to lease 100% of the equipment and the equipment processing output capacity of the Mining Farm computer equipment (the "Equipment") from the Lessor and the Lessor desires to lease such capacity to CryptoTech Holdings pursuant to the terms and conditions of this Lease Agreement.

C. CryptoTech Holdings will provide, software, secure warehousing, monitoring, maintenance, upgrading, and updating of the Equipment to ensure proper and continuous operation of the Lessor's Mining Farm(s).

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained in this Lease Agreement, and for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged by the parties, CryptoTech Holdings and Lessor agree as follows:



Lease-506(c)-5yr-24-sg-05-19-2022

1. **LEASE**

   The Identified Mining Farm Equipment is specified in Schedule A which is attached and is a part of this agreement. Lessor agrees to lease to CryptoTech Holdings and CryptoTech Holdings hereby leases from the Lessor, 100% of the Equipment and the Equipment's processing output. The Lessor will be paid a fee (the "Lease Fee") for a total lease term of 60 months (the "Lease Period") which is equal to Five (5) years. The Lease Fee will accrue each month and be paid monthly by deposit to the Lessor's Bank Account (bank name and account number supplied by the Lessor). The monthly Lease Fees are detailed in Schedule B which is part of this Lease Agreement. Lease Payments start accruing 60 days from the date of this agreement.

2. **END OF LEASE**

   At the end of the Lease Period, Lessor shall have the right to claim the Equipment. The Lessor must notify Lessee of their intention to claim the Equipment within 30 days prior to the lease end date. Lessee will then arrange to ship (at Lessee's expense) or hand over the Equipment to the Lessor. If the Lessor does not claim the equipment, Lessee will be obligated to repurchase the leased equipment for 100% of the original price paid by the Lessor to purchase the equipment.

3. **FORCE MAJEURE**.

   Neither CryptoTech Holdings nor Lessor shall be liable to the other for failure to perform its obligations under this Lease Agreement if prevented from doing so because of an Act of God, strike, fire, terrorism, flood, pestilence, war, civil disturbance, interference by civil, government, or military authority or other causes beyond the reasonable control of the party. Upon the occurrence of such an event the party seeking to rely on this provision shall promptly give written notice to the other party of the nature and consequences of the event.

4. **NOTICES**.

   All notices and other communications under this Lease Agreement must be in writing and must be given by facsimile, email, or first-class mail, certified with return receipt requested, and will be deemed to have been duly given 24 hours after transmission of a facsimile or email, or three (3) days after mailing, to the respective persons and entities named following this paragraph. Either party may change its address, telephone number, facsimile number, email address, or contact name by providing notice thereof to the other party in the manner specified above.



Lease-506(c)-5yr-24-sg-05-19-2022

**If to CryptoTech Holdings**:
13809 Research Blvd.
Suite 785
Austin, TX 78729
Fax: (512) 857-8176
info@nfn8.com

**If to Lessor**:
At the address and telephone number set forth below Lessor's signature.

5. **LIMITATION OF LIABILITY**.

   THE PARTIES AGREE THAT IT IS IMPOSSIBLE TO DETERMINE WITH ANY REASONABLE ACCURACY THE AMOUNT OF DAMAGES TO LESSOR UPON THE BREACH OF CRYPTOTECH HOLDINGS OBLIGATIONS UNDER THIS LEASE AGREEMENT AND THE ACCOMPANYING PURCHASE AGREEMENT WILL BE EITHER: (1) LIQUIDATED DAMAGES IN THE AMOUNT OF THE EQUIPMENT PURCHASE FEE PAID BY CLIENT TO ACQUIRE THE EQUIPMENT PLUS TEN DOLLARS ($10.00) LESS ANY LEASE FEES PAID TO THE CLIENT FROM LEASING THE HASHING ABILITY OF THE MINING FARM OR (2) SURRENDER OF ALL THE EQUIPMENT OWNED BY THE LESSOR PER THE PURCHASE AGREEMENT BETWEEN THE LESSOR AND NFN8 MEDIA. THE EQUIPMENT IS SPECIFIED IN SCHEDULE A OF THIS LEASE AGREEMENT. LESSOR HEREBY WAIVES ALL OTHER CLAIMS FOR DAMAGES OF ANY KIND AGAINST CRYPTOTECH HOLDINGS, ITS MEMBERS, MANAGERS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS, AGENTS, REPRESENTATIVES OR AFFILIATES, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS FOR ANY LOSS OF USE, INTERRUPTION OF BUSINESS OR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING, WITHOUT LIMITATION LOST PROFITS), REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT, STRICT PRODUCT LIABILITY OR OTHERWISE. LESSOR AND CRYPTOTECH HOLDINGS AGREE THAT THE LIQUIDATED DAMAGES SET FORTH ABOVE ARE REASONABLE AND NOT A PENALTY BASED ON THE FACTS AND CIRCUMSTANCES OF THE PARTIES AT THE TIME OF ENTERING INTO THIS AGREEMENT WITH DUE REGARD TO FUTURE EXPECTATIONS.

6. **GOVERNING LAW**.

   This Lease Agreement and any dispute arising from or in connection with this Lease Agreement shall be interpreted under and governed by Texas law, without regard to conflict of laws principles.



Lease-506(c)-5yr-24-sg-05-19-2022

7. **BINDING ARBITRATION**

CryptoTech Holdings and the Lessor agree that any disputes, claims, suits, actions, causes of action, demands or proceedings (collectively, "Disputes") arising from or related to the terms of the Agreement shall not be resolved in a court, and (ii) hereby waive the Lessor's and CryptoTech Holdings's respective rights to a jury trial. Instead, the Lessor and CryptoTech Holdings will arbitrate Disputes through binding arbitration (which is the referral of a Dispute to one or more persons charged with reviewing the Dispute and making a final and binding determination to resolve it instead of having the Dispute decided by a judge or jury in court).

  a. **No Class Arbitrations, Class Actions, or Representative Actions.** Any Dispute arising out of or related to the Agreement is personal to the Lessor and CryptoTech Holdings and will be resolved solely through individual arbitration and will not be brought as a class arbitration, class action or any other type of representative proceeding. There will be no class arbitration or arbitration in which an individual attempts to resolve a Dispute as a representative of another individual or group of individuals. Further, a Dispute cannot be brought as a class or other type of representative action, whether within or outside of arbitration, or **on behalf of any other individual or group of individuals.**

  b. **Federal Arbitration Act.** The Agreement affects interstate commerce and the enforceability of this section 6 will be both substantively and procedurally governed by and construed and enforced in accordance with the federal arbitration act, 9 U.S.C. § 1 et seq. (the "FAA"), to the maximum extent permitted by applicable law.

  c. **Notice.** Each party will notify the other party in writing of any Dispute within thirty (30) days of the date it arises, so that the parties can attempt in good faith to resolve the Dispute informally. Notice shall be sent pursuant to the notice provisions of this Agreement. The Lessor's notice must include (i) the Lessor's name, postal address, email address, and telephone number, (ii) a description in reasonable detail of the nature or basis of the Dispute, and (iii) the specific relief that the Lessor is seeking. If the Lessor and CryptoTech Holdings cannot agree how to resolve the Dispute within thirty (30) days after the date notice is received by the applicable party, then either the Lessor or the CryptoTech Holdings may, as appropriate and in accordance with this Section 6, commence an arbitration proceeding.

  d. **Process.** Any arbitration will occur in Dallas, Texas. Arbitration will be conducted confidentially by a single arbitrator in accordance with the rules of the Judicial Arbitration and Mediation Services ("JAMS"), which are hereby incorporated by reference. The state and federal courts located in Texas will have exclusive jurisdiction over any appeals and the enforcement of an arbitration award.



Lease-506(c)-5yr-24-sg-05-19-2022

    e. **Authority of Arbitrator.** As limited by the FAA, the Agreement and the applicable JAMS rules, the arbitrator will have (i) the exclusive authority and jurisdiction to make all procedural and substantive decisions regarding a Dispute, including the determination of whether a Dispute is arbitrable, and (ii) the authority to grant any remedy that would otherwise be available in court; provided, however, that the arbitrator does not have the authority to conduct a class arbitration or a representative action, which is prohibited by the Agreement. The arbitrator may only conduct an individual arbitration and may not consolidate more than one individual's claims, preside over any type of class or representative proceeding, or preside over any proceeding involving more than one individual.

    f. **Rules of JAMS.** The rules of JAMS and additional information about JAMS are available on the JAMS (https://www.jamsadr.com/). By agreeing to be bound by the Agreement, the Lessor either (i) acknowledges and agrees that the Lessor has read and understands the rules of JAMS, or (ii) waives its opportunity to read the rules of JAMS and any claim that the rules of JAMS are unfair or should not apply for any reason.

    g. **Severability of Dispute Resolution and Arbitration Provisions.** If any term, clause, or provision of Section 6 is held invalid or unenforceable, it will be so held to the minimum extent required by law, and all other terms, clauses and provisions of Section 6 will remain valid and enforceable. Further, the waivers set forth in Section 6.A are severable from the other provisions of the Agreement and will remain valid and enforceable, except as prohibited by applicable law.

8. **WAIVER**.

The failure of either party to insist upon the performance of any obligation or term of this Agreement or to exercise any right hereunder shall not constitute a waiver of that obligation or term. No waiver of any right or obligation under this Lease Agreement shall be effective unless in writing and signed by both parties.

9. **LEASE AGREEMENT ONLY - NO OTHER RELATIONSHIP**

The Equipment is an asset wholly owned by the Lessor. It is not part of any other equipment. The Lessor has not invested in any company or entity by purchasing or leasing the Equipment. By purchasing the Equipment, the Lessor has not purchased shares or part of any company or entity. The Lessor is not entitled to any revenues, royalties, profits, percentages from any company other than as described herein in 1. above. The Lessor has not purchased cryptocurrency by executing this Lease Agreement. This Lease Agreement creates no employment, relationship of joint venture, partnership, limited partnership, fiduciary, or agency between the parties and the parties hereby acknowledge that no other facts or



Lease-506(c)-5yr-24-sg-05-19-2022

relations exist that would create any such relationship between them. The parties are engaging in this Lease Agreement as independent parties with respect to each other.

10. **SUCCESSORS AND ASSIGNS**.

    This Lease Agreement shall inure to the benefit of and will be binding upon and enforceable by the parties and their respective heirs, representatives, successors and permitted assigns.

11. **ENTIRE AGREEMENT; AMENDMENT**.

    This Lease Agreement and the schedules attached hereto constitute the entire understanding and agreement between the parties with respect to the subject matter set forth in this Lease Agreement and supersedes any and all prior agreements, understandings, promises, conduct and representations made concerning the subject matter of this Lease Agreement. This Lease Agreement may only be amended in writing, signed by each party to this Lease Agreement.

12. **COUNTERPARTS; ELECTRONIC SIGNATURES**.

    This Lease Agreement may be executed in counterparts, each of which taken together shall constitute an original, single, binding agreement between the parties. Any signature of a party required by this Lease Agreement may be transmitted to the other party via facsimile or other electronic transmission and such facsimile or electronically transmitted signature shall be deemed an original signature binding upon the signing party for all purposes.

13. **ATTORNEYS' FEES AND COSTS**.

    In the event that either party must resort to legal action in order to enforce the provisions of this Lease Agreement or to defend such action, the prevailing party will be entitled to receive reimbursement from the non-prevailing party for all reasonable attorneys' fees and all other costs incurred in commencing or defending such action, or in enforcing this Lease Agreement, including but not limited to post judgment costs.

14. **SEVERABILITY**.

    If any term, provision, covenant, or condition of this Lease Agreement is found to be invalid, void, or unenforceable by any court of competent jurisdiction, the remaining provisions hereof will continue in full force and effect and will in no way be affected, impaired, or invalidated.

15. **SURVIVAL**.

    Sections 2 through 14 of this Lease Agreement will survive the expiration, termination, and cancellation of this Lease Agreement.

Lease-506(c)-5yr-24-sg-05-19-2022



**IN WITNESS WHEREOF**, the parties have caused this Lease Agreement to be executed as of the date first written above.

**CryptoTech Holdings, a Texas limited liability Company**

Name: Josh Moore

Title: CEO

Signature: _____

Date: 05/20/2022

**LESSOR**

Mobile-Med Work Health Solutions

Signature: Justin Lo    5/19/2022
By: Justin Lo

Address:
2101 Forest Ave. #220
San Jose, CA 95128
(650) 280-0816
justin@justinlomd.com



Lease-506(c)-5yr-24-sg-05-19-2022

## SCHEDULE A
## LEASED MINING FARM EQUIPMENT

**YOUR LEASE CONSISTS OF THE FOLLOWING EQUIPMENT PACKAGE:**

| **EQUIPMENT** | **SERIAL NUMBER** |
|---|---|
| THIRTY-FOUR (34) Infinite Blockchain Miner(s) | TBA |

**Each Blockchain Miner Incorporates Components Below As Detailed
In The Services And Purchase Agreement Between NFN8 Media And The Lessor**

**Hardware**
- Custom Mining Server Setup
- High-Grade Aluminum Casing
- CPU Rack with Multivariate Outputs – Multiple Nodes
- Sha 256 Microprocessors
- Field-Programmable Gate Array (FPGA)
- 500 Min. Application Specific Integrated Circuit Chips
- Computer Controlled Fans for Cooling and Heat Dissipation
- PCI Slots
- Power Adapters
- Redundant Transfer Devices
- Incoming Power Management Controllers
- Variable Inline Capacitors
- Customized Power Managed Connecting Cables
- Proprietary Managed Dashboard Sync
- Connectors for Monitors

**Software and Firmware**
- Custom Firmware for End User Interface, Wallet Pool Management
- Thermal Load Management Software
- Proprietary Cooling Solution Software
- Metering and Monitoring Chip Efficiency Solution Software
- Proprietary Thermal Load Management Software
- Proprietary Mining Farm Software License
- Proprietary Multi-Software Sync License



Lease-506(c)-5yr-24-sg-05-19-2022

## SCHEDULE B
## LEASE FEE DETAILS

Lease Fees are paid on the following schedule beginning 60 days after the date of this agreement. These fees are paid directly into the Lessor's (supplied) bank account.

### LEASE FEES FOR ONE (1) MINING FARM*

| YEAR | PAID EACH MONTH | Total for Year |
|---|---|---|
| Year 1 | $600.00 | $7,200.00 |
| Year 2 | $600.00 | $7,200.00 |
| Year 3 | $600.00 | $7,200.00 |
| Year 4 | $600.00 | $7,200.00 |
| Year 5 | $600.00 | $7,200.00 |
| **TOTAL LEASE FEES** | | $36,000.00 |

*The above Fees are for each Mining Farm. The Lessor receives Fees for THIRTY-FOUR (34) Mining Farms.

### GENERAL INFORMATION

THE INFORMATION CONTAINED HEREIN (THE "INFORMATION") HAS BEEN PREPARED BY NFN8 MEDIA FOR THE PRIVATE AND CONFIDENTIAL USE OF PROSPECTIVE CLIENTS CONSIDERING THE PURCHASE OF THE COMPUTER EQUIPMENT HEREIN AND IS NOT TO BE REPRODUCED OR DISTRIBUTED BY SUCH PROSPECTIVE CLIENTS, OTHER THAN IN CONNECTION WITH CONFIDENTIALLY SHARING SUCH INFORMATION WITH SUCH PROSPECTIVE CLIENTS' FINANCIAL ADVISORS OR CONSULTANTS.

BY ACCEPTING THIS CONFIDENTIAL AGREEMENT, THE RECIPIENT AGREES: (I) NOT TO DISTRIBUTE OR REPRODUCE THIS AGREEMENT, IN WHOLE OR IN PART, AT ANY TIME, WITHOUT THE PRIOR WRITTEN CONSENT OF NFN8 MEDIA; AND (II) TO KEEP CONFIDENTIAL THE EXISTENCE OF THIS DOCUMENT AND THE INFORMATION CONTAINED HEREIN OR MADE AVAILABLE IN CONNECTION WITH ANY FURTHER INVESTIGATION OF NFN8 MEDIA.

THE INFORMATION CONTAINS CERTAIN "FORWARD-LOOKING" STATEMENTS. YOU CAN IDENTIFY FORWARD-LOOKING STATEMENTS BY TERMINOLOGY SUCH AS "MAY," "WILL," "WOULD," "COULD," "SHOULD," "EXPECTS," "INTENDS," "PLANS," "ANTICIPATES," "BELIEVES," "ESTIMATES," "PREDICTS," "POTENTIAL," "CONTINUES" OR THE NEGATIVE OF THESE TERMS OR OTHER COMPARABLE TERMINOLOGY. FORWARD-LOOKING" STATEMENTS ARE BASED ON VARIOUS ASSUMPTIONS MADE BY NFN8 MEDIA; WHICH ASSUMPTIONS MAY PROVE TO BE INCORRECT. ACCORDINGLY, THERE CAN BE



Lease-506(c)-5yr-24-sg-05-19-2022

NO ASSURANCE THAT SUCH FORWARD-LOOKING STATEMENTS WILL ACCURATELY PREDICT FUTURE EVENTS OR NFN8 MEDIA'S ACTUAL

PERFORMANCE. IN ADDITION, ANY PROJECTIONS AND REPRESENTATIONS, WRITTEN OR ORAL, WHICH DO NOT CONFORM TO THOSE CONTAINED IN THIS AGREEMENT, MUST BE DISREGARDED, AND THEIR USE IS A VIOLATION OF LAW. NO REPRESENTATION OR WARRANTY CAN BE GIVEN THAT THE ESTIMATES, OPINIONS OR ASSUMPTIONS MADE HEREIN WILL PROVE TO BE ACCURATE. WE ASSUME NO OBLIGATION TO UPDATE SUCH FORWARD-LOOKING STATEMENTS OR TO UPDATE THE REASONS ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN SUCH FORWARD-LOOKING STATEMENTS. BECAUSE MANY FACTORS ARE UNFORESEEABLE, THE FOREGOING SHOULD NOT BE CONSIDERED AN EXHAUSTIVE LIST AND READERS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON FORWARD-LOOKING STATEMENTS.

BY READING THE INFORMATION CONTAINED WITHIN THIS DOCUMENT, THE RECIPIENT AGREES WITH NFN8 MEDIA TO MAINTAIN IN CONFIDENCE SUCH INFORMATION, TOGETHER WITH ANY OTHER NON-PUBLIC INFORMATION REGARDING NFN8 MEDIA OBTAINED FROM NFN8 MEDIA OR ITS AGENTS DURING THE COURSE OF THE PROPOSED FINANCING. NFN8 MEDIA HAS CAUSED THESE MATERIALS TO BE DELIVERED TO YOU IN RELIANCE UPON SUCH AGREEMENT AND UPON RULES PROMULGATED UNDER REGULATION FD BY THE SECURITIES AND EXCHANGE COMMISSION.

## ADDITIONAL INFORMATION FOR ALL CLIENTS

As used in this Agreement and unless otherwise expressly stated or the context otherwise indicates, all references to "we", "our", "us", or the "Company" refer to NFN8 Media, LLC, a Texas limited liability company.

WE HAVE THE SOLE AUTHORITY TO NEGOTIATE THE TERMS OF THIS PURCHASE OF COMPUTER EQUIPMENT WITH ANY RECIPIENT OF THIS AGREEMENT, OR ANY OTHER PERSON AT ANY TIME AND TO ENTER INTO A DEFINITIVE AGREEMENT, OR TERMINATE ALL NEGOTIATIONS, WITHOUT PRIOR NOTICE TO ANY PROSPECTIVE CLIENT OR ANY OTHER PERSON. WE RESERVE THE RIGHT, IN OUR SOLE DISCRETION AND FOR ANY REASON WHATSOEVER, TO MODIFY, AMEND AND/OR WITHDRAW ALL OR A PORTION OF THE PURCHASE AND/OR TO ACCEPT OR REJECT IN WHOLE OR IN PART ANY PROSPECTIVE PURCHASE OF THE COMPUTER EQUIPMENT OR TO ALLOT TO YOU LESS THAN THE QUANTITY OF EQUIPMENT THAT YOU MAY WISH TO PURCHASE.



Lease-506(c)-5yr-24-sg-05-19-2022

BEFORE PURCHASING THE COMPUTER EQUIPMENT, NFN8 MEDIA: (1) WILL GRANT EACH PROSPECTIVE CLIENT THE OPPORTUNITY TO REVIEW ADDITIONAL DOCUMENTS AND TO ASK QUESTIONS OF, AND TO RECEIVE ANSWERS FROM, THE OFFICERS OF NFN8 MEDIA CONCERNING NFN8 MEDIA AND THE TERMS AND THE CONDITIONS OF THIS PURCHASE OR ANY OTHER MATTER SET FORTH HEREIN; AND (2) SUPPLY ANY ADDITIONAL INFORMATION,

TO THE EXTENT NFN8 MEDIA POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE, NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN.

### WHERE YOU CAN FIND MORE INFORMATION

We are not subject to the informational and reporting requirements under the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

For additional information you may also contact us at: **737-900-2539**

### (THE SALE OF COMPUTER EQUIPMENT (MINING FARM COMPUTERS)

NFN8 Media is offering to sell up to a total of Indefinite number of computer equipment systems called Mining Farm Computers to be used in cryptocurrency mining operations (the "Computer Equipment**"). The Services and Purchase Agreement is for a purchase of THIRTY-FOUR (34) Mining Farm Computer(s) for a Total Fee of $1,020,000.00.** Since the purchase of the Mining Farm Computers offered in each **Services and Purchase Agreement** along with an opportunity to immediately lease back the Mining Farm Computers to an NFN8 Media affiliated company could potentially be construed as a sale of a "security" by Federal and State regulators, we are only allowing "accredited investors", as defined below, to participate in this purchase and lease-back transaction (The **Services and Purchase Agreement and the Lease Agreement**). NFN8 Media reserves the right to increase the amount of the sale of computer equipment in its sole discretion. The initial closing of each **Services and Purchase Agreement** (the "Initial Closing") will occur as soon as practicable after NFN8 Media has accepted the initial **Services and Purchase Agreement**. It is currently contemplated that the proceeds each **Services and Purchase Agreement** will be delivered to NFN8 Media at one or more closings. Following the Initial Closing, NFN8 Media may conduct one or more subsequent closings (consummation of each individual **Services and Purchase Agreement**) until the earlier of (i) December 31, 2021, subject to the right of NFN8 Media to extend the sale of computer equipment or (ii) the date on which the maximum sale of computer equipment equals Indefinite. If the sale of all computer equipment is successful, NFN8 Media may sell additional MINING FARM Computer Equipment, for an additional aggregate price of up to Indefinite. NFN8 Media may employ registered commissioned selling agents in

Lease-506(c)-5yr-24-sg-05-19-2022

connection with the offer to sell Mining Farm computers to Clients, who will purchase them and lease them back.

Although NFN8 Media is attempting to sell up to Indefinite of Computer Equipment pursuant to the terms of each individual **Services and Purchase Agreement** (the aggregated total of all **Services and Purchase Agreements** which equals the total computer equipment sales described in (ii) above), it is not obligated to sell or lease-back the maximum amount of computer equipment described in (ii) above, and it cannot make any assurances that such amount will be sold or leased or both. All proceeds from each **Services and Purchase Agreement** for Mining Farm Computers will be deposited into the regular business account of NFN8 Media, and no escrow account will be established. NFN8 Media will forthwith prepare and deliver the Mining Farm Computers to the designated data center that NFN8 chooses on behalf of the client.

Upon closing any **Services and Purchase Agreement**, NFN8 Media will immediately begin to utilize the proceeds received therefrom, notwithstanding the fact that NFN8 Media has not received purchases for all or even substantially all of the Mining Farm Computer Equipment. NFN8 Media is not obligated to sell all of the Computer Equipment pursuant to this Agreement.

## USE OF PROCEEDS

| | |
|---|---|
| **Total amount to be Purchased:** | $ Indefinite |
| PLEASE SEE SCHEDULE A FOR DETAILED INFORMATION CONCERNING THE USE OF PROCEEDS | |
| Hardware, Software, Services | Proposed use |

## ADDITIONAL INFORMATION

**The address of the principal executive offices of NFN8 Media is:**
13809 Research Blvd.
Suite 785
Austin, TX 78750

For additional information concerning this Purchase, contact Josh Moore, President, at 737-900-2539 or josh@nfn8.com.



Lease-506(c)-5yr-24-sg-05-19-2022

**PURCHASE ONLY FOR ACCREDITED INVESTORS**

This Purchase is being extended to "Accredited Investors" only pursuant to Rule 506(c) of Regulation D of the Securities Act of 1933. Under the Act, and for purposes of this Agreement, an "Accredited Investor" is defined as follows:

(1) Any bank as defined in Section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in Section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000, or, if a self-directed plan, with investment decisions made solely by persons that are Accredited Investors;

(2) Any private business development company as defined in Section 202(a) (22) of the Investment Advisers Act of 1940;

(3) Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, or similar business trust, or partnership, not formed for the specific purpose or acquiring the securities offered, with total assets in excess of $5,000,000;

(4) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer or general partner of a general partner of that issuer;

(5) Any natural person whose individual net worth or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;



Lease-506(c)-5yr-24-sg-05-19-2022

(7) Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii); and

(8) Any entity in which all of the equity owners are Accredited Investors.

## SECURITIES ACT AND EXCHANGE ACT COMPLIANCE

Enacted in 2012, Section 201(a) of the Jumpstart or Business Startups Act (JOBS Act) eliminated the prohibition on using general solicitation under Rule 506 where all purchasers of the securities are accredited investors and the issuer takes reasonable steps to verify that the purchasers are accredited investors.  An "accredited investor" includes a natural person who earned income that exceeded $200,000 (or $300,000 together with a spouse) in each of the prior two years, and reasonably expects the same for the current year, or a natural person who has a net worth of over $1 million, either alone or together with a spouse (excluding the value of a person's primary residence). An "accredited investor" may also be a non-human entity such as a bank, partnership, corporation, nonprofit or trust, when certain criteria are satisfied.  A more detailed definition of "accredited investor" in included in the Definitions section supra and is available in full within Section 501 of the SEC's Regulation D.

The JOBS Act requires that issuers wishing to engage in Rule 506(c) general solicitation must take "reasonable steps" to verify the accredited investor status of purchaser.  One of the most common ways for an issuer to meet this standard is to obtain written confirmation from a licensed attorney stating that such person or entity has taken reasonable steps to verify that the purchaser is an accredited investor. In this particular offering, legal counsel, a broker dealer, accountant or third-party verification service (collectively hereinafter referred to as the "Service"), on behalf of NFN8 Media will make an objective determination as to whether the steps taken are "reasonable" in the context of the particular facts and circumstances of each lessor and transaction.  The Service will consider all relevant factors illustrated by Rule 506(c), which may include but are not limited to the following considerations:

- The nature of the lessor and the type of accredited investor that the lessor claims to be.

- The amount and type of information that CryptoTech Holdings has about the lessor.

- The nature of the offering, such as the manner in which the lessor was solicited to participate in the offering, and the terms of the offering, such as minimum investment amount.

Lease-506(c)-5yr-24-sg-05-19-2022

Furthermore, the Service will require documentation to verify that a lessor is qualified as an accredited investor. The following is a non-exclusive list of verification methods that the Service may use when seeking greater certainty that a lessor satisfies the verification requirement with respect to natural person lessors:

- Verification based on income, by reviewing copies of any Internal Revenue Service form that reports income, such as a Form W-2, Form 1099, Schedule K-1 of Form 1065, and a filed Form 1040.

- Verification on net worth, by reviewing specific types of documentation dated within the prior three months, such as bank statements, brokerage statements, certificates of deposit, tax assessments and a credit report from at least one of the nationwide consumer reporting agencies, and obtaining a written representation from the investor.

- A written confirmation from a registered broker-dealer, an SEC-registered investment adviser, a licensed attorney or a certified public accountant stating that such person or entity has taken reasonable steps to verify that the lessor is an accredited investor within the last three months and has determined that such lessor is an accredited investor.