# EXHIBIT 20



# PURCHASE AND SERVICES AGREEMENT

This Purchase and Services Agreement ("**Agreement**") is dated May 20th, 2024 (the "**Effective Date**"), by and between NFN8 Capital, LLC, a Nevada limited liability company, ("**Capital**"), and the other person or entity who has executed this Agreement ("**Clien**t").

## RECITALS

Client desires to purchase the computer equipment described in Schedule A attached hereto and the service obligation of Capital with respect to such equipment (the "**Equipment**") from Capital**.**

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained in this Agreement, and for good and valuable consideration the receipt and sufficiency of which are hereby acknowledged by the parties, Capital and Client agree as follows:

Capital will provide the following under this Agreement:

1) **PURCHASING AND INSTALLATION; SERVICES**

    The Client is purchasing the equipment, and acquiring the services described in Schedule A below.

2) **EQUIPMENT**

    It is understood that the Client is purchasing the Equipment for the purpose of leasing it to NFN8 Holdings, LLC, an affiliate of Capital ("**HOLDINGS**"). The Equipment is 100% owned by the Client. It is agreed that at the sole discretion of Capital, any of the hardware set forth on Schedule A annexed hereto can be upgraded or exchanged for other hardware of the same or better kind and quality of the previous hardware and shall be deemed owned by the Client and subject to this Agreement.

3) **OPERATION**

    Capital is responsible for making sure that the Client's Equipment is installed and operating efficiently and effectively in a manner that comports with usual and customary practices in the Blockchain and cryptocurrency mining industry.

4) **BILL OF SALE.**

    Capital shall provide the Client with a Bill of Sale for the Equipment, which will specify the product description of the Equipment.

5) **FEES.**

    The purchase price for each Mining Farm is $20,000.00, payable on the date hereof. The Client is purchasing the Equipment for a total fee of $1,000,000.00 (the "**Total Fee**"). Upon receipt of the Total Fee by certified check or wire transfer or other immediately available funds ("**good funds**"), Capital will perform all items in Sections 1, 3 and 4 of this Agreement. No purchasing, installation, or services of any kind will be performed by Capital until it receives (i) a copy of this Agreement executed by the Client, (ii) good funds and (iii) confirmation that the Client is an accredited investor as such term is defined in Rule 506(c) of Regulation D of the Securities Act of 1933, as amended (the "**Act**").

**NFN8 CAPITAL**

6) **TERM AND TERMINATION**.

   The term of this Agreement shall commence on the Effective Date, Capital's service obligations hereunder shall continue as long as a certain lease dated the same date as this Agreement between Client and HOLDINGS (the "**Lease Agreement**") remains in full force and effect.

7) **FORCE MAJEURE**.

   Capital shall not be liable to the Client for the failure to perform its obligations under this Agreement if prevented from doing so because of an Act of God, strike, fire, terrorism, pestilence, flood, war, civil disturbance, interference by government, civil, or military authority, pandemic or other causes beyond the reasonable control of the party. Upon the occurrence of such an event the party seeking to rely on this provision shall promptly give written notice to the other party of the nature and consequences of the event.

8) **NOTICES**.

   All notices and other communications under this Agreement must be in writing and must be given by facsimile, email or first-class mail, certified with return receipt requested, and will be deemed to have been duly given 24 hours after transmission of a facsimile or email with proof of receipt, or three days after mailing, to the respective persons and entities named following this paragraph. Either party may change its address, telephone number, facsimile number, email address, or contact name by providing notice thereof to the other party in the manner specified above.

   *If to NFN8 Capital, LLC*:
   13809 Research Blvd.
   Suite 785
   Austin, TX 78750
   Fax: (512) 857-8176
   office@nfn8.com

   *If to Client:*
   At the address and telephone number set forth below Client's signature.

9) **LIMITATION OF LIABILITY**.

   THE PARTIES AGREE THAT IT IS IMPOSSIBLE TO DETERMINE WITH ANY REASONABLE ACCURACY THE AMOUNT OF DAMAGES TO CLIENT UPON THE BREACH BY CAPITAL OF ITS OBLIGATIONS HEREUNDER. THEREFORE, THE PARTIES AGREE THAT CLIENT'S SOLE REMEDY FOR MATERIAL BREACH BY CAPITAL OF ITS OBLIGATIONS HEREUNDER AND THE LEASE AGREEMENT WILL BE LIQUIDATED DAMAGES, AT THE SOLE ELECTION OF CAPITAL, (a) IN THE AMOUNT OF $30,000 PER MINING FARM PURCHASED LESS ANY AMOUNTS PAID UNDER THIS AGREEMENT OR THE LEASE AGREEMENT OR (b) THE RETURN OF THE EQUIPMENT TO CLIENT. THE OBLIGATIONS SET FORTH HEREIN UNDER THIS AGREEMENT AND THE LEASE AGREEMENT SHALL BE IN THE AGGREGATE AND NOT CUMULATIVE AND ONLY BE COLLECTED ONCE AND NOT SEPARATELY UNDER BOTH AGREEMENTS. CLIENT HEREBY WAIVES ALL OTHER CLAIMS FOR DAMAGES OF ANY KIND AGAINST CAPITAL, ITS MEMBERS, MANAGERS, SHAREHOLDERS, DIRECTORS, OFFICERS, EMPLOYEES, CONTRACTORS, AGENTS, REPRESENTATIVES OR AFFILIATES, INCLUDING, WITHOUT

20240126

LIMITATION, ANY CLAIMS FOR ANY LOSS OF USE, INTERRUPTION OF BUSINESS OR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING, WITHOUT LIMITATION LOST PROFITS), REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT, STRICT PRODUCT LIABILITY OR OTHERWISE (EXCEPT AS OTHERWISE SPECIFIED IN THIS SECTION OF THE AGREEMENT). CLIENT AND CAPITAL AGREE THAT THE LIQUIDATED DAMAGES SET FORTH ABOVE ARE REASONABLE AND NOT A PENALTY BASED ON THE FACTS AND CIRCUMSTANCES OF THE PARTIES AT THE TIME OF ENTERING INTO THIS AGREEMENT WITH DUE REGARD TO FUTURE EXPECTATIONS. THESE LIQUIDATED DAMAGES AND THOSE UNDER THE LEASE AGREEMENT ARE NOT ADDITIVE; THEY SHALL ONLY BE PAID UNDER THIS AGREEMENT OR THE LEASE AGREEMENT, NOT UNDER BOTH AGREEMENTS.

10) **GOVERNING LAW**.

   This Agreement and any dispute arising from or in connection with this Agreement shall be interpreted under and governed by Texas law, without regard to conflict of laws principles.

11) **BINDING ARBITRATION**.

   Capital and the Client agree any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Dallas, Texas before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. Judgment on any award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

12) **WAIVER**.

   The failure of either party to insist upon the performance of any obligation or term of this Agreement or to exercise any right hereunder shall not constitute a waiver of that obligation or term. No waiver of any right or obligation under this Agreement shall be effective unless in writing and signed by both parties.

13) **ACKNOWLEDGMENT**

   (A) In accordance with the rules and regulations promulgated by the U.S. Securities and Exchange Commission (the "**SEC**"), the interest acquired through the execution of this Agreement and the Lease Agreement as described in an Executive Summary relating to this transaction which has previously been delivered to Client (the "**Executive Summary**") is deemed to be a "security" as such term is defined in the Act. As a result, such interest is subject to the SEC's rules and regulations governing securities. These securities are being privately offered to accredited purchasers only and in each case whom Capital believes satisfies suitability standards pursuant to Rule of Regulation D of the 1993 Act and are subject to restrictions on transferability and resale. Purchasers should be aware that they may be required to bear the financial risks of this purchase until fully repaid.

   (B) By executing this Agreement, the Client is not purchasing cryptocurrency. The Client is purchasing 100% of the Equipment. The Client is acquiring no interests in the products generated by the Equipment by HOLDINGS, the lessee of the Equipment.

3

20240126

(C) This Agreement creates no relationship of employment, joint venture, partnership, limited partnership, fiduciary or agency between the parties and the parties hereby acknowledge that no other facts or relations exist that would create any such relationship between them. The parties are engaging in this Agreement as independent parties with respect to each other.

(D) Client acknowledges and agrees that all service obligations of Capital under this Agreement will be assigned to HOLDINGS and upon such assignment Capital will have no further obligations to Client pursuant to this Agreement.

14) **SUCCESSORS AND ASSIGNS**.

This Agreement shall inure to the benefit of and will be binding upon and enforceable by the parties and their respective heirs, representatives, successors and permitted assigns; provided that Client cannot assign its rights under this Agreement without the prior written consent of Capital, which consent may be withheld for any reason.

15) **ENTIRE UNDERSTANDING; AMENDMENT**

This Agreement and the schedules attached hereto, the Lease Agreement and the Executive Summary constitute the entire understanding and agreement between the parties with respect to the subject matter set forth in this Agreement and supersedes any and all prior agreements, understandings, promises, conduct and representations made concerning the subject matter of this Agreement. This Agreement may only be amended in writing, signed by each party to this Agreement.

16) **COUNTERPARTS; ELECTRONIC SIGNATURES**.

This Agreement may be executed in counterparts, each of which taken together shall constitute an original, single, binding agreement between the parties. Any signature of a party required by this Agreement may be transmitted to the other party via facsimile or other electronic transmission and such facsimile or electronically transmitted signature shall be deemed an original signature binding upon the signing party for all purposes.

17) **ATTORNEYS' FEES AND COSTS**.

If either party resorts to legal action in order to enforce the provisions of this Agreement or to defend such action pursuant to the arbitration provisions set forth in paragraph 12 above, the prevailing party will be entitled to receive reimbursement from the non-prevailing party for all reasonable attorneys' fees and all other costs incurred in commencing or defending such action, or in enforcing this Agreement, including but not limited to post-judgment costs.

18) **SEVERABILITY**.

If any term, provision, covenant, or condition of this Agreement is found to be invalid, void, or unenforceable by any court of competent jurisdiction or arbitrator, the remaining provisions hereof will continue in full force and effect and will in no way be affected, impaired, or invalidated.

19) **SURVIVAL**.

Sections 7, 9, 10, 11, 13, 14, 15, 17, 18 and 19 of this Agreement will survive the expiration, termination, or cancellation of this Agreement.

# NFN8 CAPITAL

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed on the date first written above.

**NFN8 Capital, LLC, a Nevada limited liability company**

Name: _Josh Moore_

Title: _CEO_

Signature: _[signature]_

Date: _05/24/2024_

**CLIENT**

**M-M WHS LLC**

DocuSigned by:
_Justin Lo_        5/21/2024
F2E0630B7FC1400...

Signature: Justin Lo

Address: 2101 Forest Ave #220., San Jose, CA 95128

Phone Number: (650) 280-0816

Email: justin@justinlomd.com

Social Security # / Tax ID: _85-3510237_

20240126

5



## SCHEDULE A
*DESIGNATED BY NFN8 CAPITAL, LLC*

**YOUR PURCHASE CONSISTS OF THE FOLLOWING EQUIPMENT PACKAGE**

**FIFTY (50) EQUIPMENT**
Infinite Miner(s)

**SERIAL NUMBER**
Issued under corresponding Customer Number

**EACH MINER INCORPORATES THE FOLLOWING**

*HARDWARE*
CUSTOM MINING SERVER SETUP
HIGH-GRADE ALUMINUM CASING
CPU RACK WITH MULTIVARIATE OUTPUTS – MULTIPLE NODES
SHA 256 MICROPROCESSORS
APPLICATION SPECIFIC INTEGRATED CIRCUIT CHIPS
COMPUTER CONTROLLED FANS FOR COOLING AND HEAT DISSIPATION
PCI SLOTS
POWER ADAPTERS
INCOMING POWER MANAGEMENT CONTROLLERS
CUSTOMIZED POWER MANAGED CONNECTING CABLES
PROPRIETARY MANAGED DASHBOARD
CONNECTORS FOR MONITORS

*SOFTWARE AND FIRMWARE*
CUSTOM FIRMWARE FOR END USER INTERFACE, WALLET POOL MANAGEMENT
THERMAL LOAD MANAGEMENT SOFTWARE
PROPRIETARY COOLING SOLUTION SOFTWARE
METERING AND MONITORING CHIP EFFICIENCY SOLUTION SOFTWARE
PROPRIETARY THERMAL LOAD MANAGEMENT SOFTWARE
PROPRIETARY MINING FARM SOFTWARE
PROPRIETARY MULTI-SOFTWARE

*SERVICES*
(1) The purchased assets are procured, assembled, and tested by Capital. (2) Mining Software is installed, tested, managed and updated. (3) The purchased assets are transported, installed, and warehoused at a designated data center where power, cooling, and venting are carefully controlled. (4) The data center is protected, alarmed, and insured. (5) The equipment may be modified, updated or both or exchanged for like, kind, or more advanced equipment at any time at the discretion of Capital. (6) The software referenced above is part of the services provided in this agreement. It is not owned by the client. The client does not obtain any rights to the software. The equipment purchaser pays no additional fees for (1) through (6). The exact location and address of the data center is not disclosed herein for security and safety reasons.

20240126